**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Uber Technologies, Inc.; Portier, LLC; Amazon Logistics, Inc.; Amazon.com, Inc.; Maplebear Inc. d/b/a Instacart,<br><br>Plaintiffs,<br><br>v.<br><br>City of New York,<br><br>Defendant. | Case No. 26-cv-9455<br><br>**COMPLAINT** |

Plaintiffs Uber Technologies, Inc. and Portier, LLC (collectively, "Uber"), Amazon Logistics, Inc. and Amazon.com, Inc. (collectively, "Amazon"), and Maplebear Inc. d/b/a Instacart ("Instacart") bring this action against the City of New York (the "City") to preliminarily and permanently enjoin the City from enforcing an ordinance—Local Law 34 of 2026 ("Delivery Deactivation Law" or "Law")—and to obtain a judicial declaration that the Law violates both the United States Constitution and the New York Constitution. Plaintiffs allege as follows:

## INTRODUCTION

1. In the modern economy, many prepared meals, goods, and groceries are delivered locally by individual couriers who prefer the convenience and flexibility of freelance work to the confines of traditional employment. Plaintiffs offer access to technology that facilitates such deliveries by connecting couriers with consumers seeking the delivery of such items and with merchants seeking to provide them. New York law protects the rights of individuals and businesses to enter into contractual arrangements to facilitate these ways of earning.

2. This ecosystem depends on trust. Customers' personal information, including their home addresses, is shared with couriers they have never met. Couriers then pick up the deliveries from merchants and transport the deliveries to consumers' homes, workplaces, and other locations,

all of which often require interacting with consumers and their family, friends, or co-workers, restaurant and retail employees, and members of the public. Earning and maintaining the trust of everyone who uses Plaintiffs' technology requires enforceable contractual discretion to remove individuals Plaintiffs believe pose a risk to the safety, privacy, quality, or reliability of those interactions.

3. Plaintiffs structure their agreements with couriers in a way designed to help prevent, respond to, and protect against misconduct, including unsafe or fraudulent behavior, and otherwise maintain a high quality of service. Deactivation, i.e., rescinding permission to access Plaintiffs' applications, is a critical and mutually agreed-upon tool for businesses to maintain standards and protect consumers, merchants, the public, and themselves from individuals who jeopardize the safety or property of others. The New York City Department of Consumer and Worker Protection ("DCWP") previously has encouraged businesses to rely on deactivation provisions as a "tool[ ] to deter misconduct," and it has adopted payment policies that would "make the threat of deactivation more effective."[1]

4. Plaintiffs do not take deactivating a courier lightly. Deactivations are relatively rare and largely relate to safety or fraud. Plaintiffs' deactivation decisions are rooted in a careful balance of competing priorities: fulfilling consumer needs; enabling courier access to their programs and earning opportunities; helping merchants increase sales and reach new customers; maintaining merchant, consumer, and courier safety; and protecting Plaintiffs' goodwill and economic interests.

[1] DCWP, *Notice of Adoption of Final Rule* 14 (2023), https://rules.cityofnewyork.us/wp-content/uploads/2023/06/DCWP-NOA-Minimum-Pay-for-Food-Delivery-Workers.pdf.

5. Having the contractual right to deactivate couriers is critical. That discretion is particularly critical in situations with imperfect and disputed information, such as when a courier faces reports of fraud, theft, harassment, sexual assault, or substance abuse. Plaintiffs structure their contracts with couriers so that they retain the discretion needed to put safety first.

6. In some cases, it is essential for Plaintiffs to be able to take prompt action and remove access without first providing progressive discipline. They also may rely on events that occurred over a period of time exceeding one year. Permitting couriers who Plaintiffs determined have materially violated their respective agreements to continue to enter merchants' businesses or come to consumers' doors poses an avoidable risk and public safety concern that Plaintiffs' contracts are designed to minimize.

7. For similar reasons, Plaintiffs generally do not disclose to couriers the details of specific, individualized comments or complaints that a consumer or a merchant has lodged about the courier. Providing that information could subject a consumer or merchant to retaliation because a courier likely could identify the consumer or merchant even without personally identifiable content and may already know the complainant's home or business address.

8. The "Delivery Deactivation Law"—titled "A Local Law to amend the administrative code of the city of New York, in relation to the wrongful deactivation of app-based contracted delivery workers"—unconstitutionally interferes with Plaintiffs' contractual agreements by seeking to fundamentally rewrite the bargains between Plaintiffs and the couriers with whom they contract. Put simply: the Delivery Deactivation Law eliminates Plaintiffs' contracted-for ability to exercise their own respective business judgments about who is allowed access to their applications.

9. A court in this jurisdiction already has enjoined the Delivery Deactivation Law's twin: Local Law 52 of 2026, which similarly restricted Uber's constitutional and contractual rights to decide whether and why to deactivate ride-share drivers. *Uber Techs., Inc. v. City of New York*, 839 F. Supp. 3d 218, 228–29 (S.D.N.Y. 2026). In that instance, the court found Uber had a likelihood of proving Local Law 52 severely impaired contractual deactivation rights central to Uber's agreements while protecting "a narrow class of drivers" rather than advancing "the broader social or economic interest which the Constitution requires." *Id.* at 229.

10. Uber provides a set of smartphone applications that connect people who want goods or services with people who want to provide them. Uber Eats, for example, connects consumers who order meals, groceries, household goods, and alcohol (where available) with local merchants who sell those items and with independent couriers who deliver them.

11. Amazon operates a mobile application, known as Flex, where individuals ("Delivery Partners") may sign up to use their personal vehicles to make local deliveries of groceries and other items to Amazon's customers in New York City and elsewhere.

12. Instacart operates a multi-sided digital marketplace where consumers, independent contractor shoppers, and retailers can connect for on-demand delivery of groceries and other goods. Instacart's contracted couriers ("shoppers") use the Instacart Shopper App to provide shopping and delivery services for Instacart's customers.

13. Plaintiffs' contracts are subject to the Delivery Deactivation Law's provisions because each Plaintiff is covered as a "delivery service" as defined by the Law. The Delivery Deactivation Law would force Plaintiffs to maintain and restore couriers' access to their programs even if Plaintiffs have determined that the couriers violated Plaintiffs' standards, agreements, and

policies. It also would require Plaintiffs to communicate specific information to couriers that Plaintiffs do not and would not otherwise provide.

14. The key provisions of the Delivery Deactivation Law are as follows:

- The Deactivation Prohibitions (Section 20-1532(a)–(c)) would replace Plaintiffs' contractual rights to deactivate couriers based on Plaintiffs' determinations of violations with the City's three limited and vaguely defined reasons and would subject Plaintiffs to review by "factfinders" that can consider and weigh any "factor[ ]" they want.

- The Progressive Discipline Mandate (Sections 20-1531, 20-1532(b)–(c) and 20-1539) would prohibit Plaintiffs from deactivating a courier for any misconduct that is not "egregious" unless Plaintiffs first had imposed—within the last year—"a graduated range of disciplinary measures, including but not limited to warnings and further training requirements" with the specific measures "varying based on the frequency and degree" of misconduct.

- The Retroactive Provision (Sections 20-1533(a), (b), and (d)) would apply the Deactivation Prohibitions back to 2021, meaning that Plaintiffs would have to prove that any deactivation decisions in the past six years would have met a standard that did not exist; if Plaintiffs decline to reverse their potentially years-old decisions, the Law exposes Plaintiffs to punitive damages for failure to have met that previously non-existent standard.

- The Notice and Compelled Reports Provisions (Sections 20-1532(e), 20-1533(c), and 20-1536(a)) would alter the content of Plaintiffs' speech by requiring them to deliver specific messages and information, including "all the precise and detailed reasons" for a courier's deactivation, "information and data," and "all customer comments, ratings, and complaints" about the courier. Plaintiffs do not wish to convey that information particularly because the disclosure could endanger customers and the public at large, chill the speech of consumers and merchants that Plaintiffs depend on, conflict with Plaintiffs' privacy commitments to consumers, merchants, and couriers, and educate fraudsters.

- The Burden of Proof Provision (Section 20-1535) would construct unfair and biased proceedings before a factfinder either in front of DCWP, a "dedicated voice" for "workers in NYC,"[2] in an OATH proceeding, or in a private action in court. The Burden of Proof Provision creates a presumption that all deactivations are unlawful, shifts the burden of proof to Plaintiffs in any proceeding involving a deactivated courier, and restricts

[2] DCWP, *To protect and enhance the daily economic lives of New Yorkers to create thriving communities*, https://www.nyc.gov/site/dca/about/overview.page (last visited Oct. 28, 2026).

Plaintiffs' ability to defend themselves by excluding important evidence or punishing them for not considering evidence they did not have.

- The Enforcement Provisions (Sections 20-1508 and 20-1511) entitle a deactivated courier to enforce the Delivery Deactivation Law and seek compensatory damages, attorney's fees and costs, punitive damages, and even restored access to Plaintiffs' programs. The Enforcement Provisions thus allow couriers—whom Plaintiffs determined to have violated their policies by misconduct—to seek a mandated return to Plaintiffs' programs.

- The Informal Dispute Resolution Provision (Section 20-1537) would require Plaintiffs to maintain a channel through which any deactivated courier may challenge his deactivation and attempt to conclude "informal resolution" processes over email and other electronic communications within 15 days, overriding the informal dispute-resolution process to which Plaintiffs have agreed with couriers.

15. As a consequence, the Delivery Deactivation Law would send couriers to consumers' homes and places of work and into merchant locations even if Plaintiffs have determined in good faith that those couriers pose a risk to consumer or public safety or have otherwise engaged in conduct harmful to Plaintiffs' businesses, including by engaging in fraudulent activity. Couriers will be able to seek retroactive relief for years-old deactivations. And the Delivery Deactivation Law will compel Plaintiffs to disclose confidential and sensitive information about consumers and other couriers.

16. The New York City Council ("Council") passed the Delivery Deactivation Law after an extensive lobbying campaign by organized labor, including the Workers Justice Project ("WJP"), demanding the Council address purported "unfair deactivations" without regard for consumers, merchants, Plaintiffs' business interests, their existing contracts, their free-speech rights, or overall public safety. WJP boasted about working in "partnership" with the Council to pass laws targeting delivery applications. One of its co-executive directors accused one of the Plaintiffs here, Uber, of deactivating couriers without due process "because they just don't care

about that human being, [and] because it's also about protecting their pockets" by making "millions and billions on the backs of workers."[3]

17. Justin Brannan, the Council's primary sponsor of the Delivery Deactivation Law, publicly confirmed in a Council press release that he had been working with WJP "for over a decade" and that addressing "arbitrary and opaque worker deactivations, which strip workers of their livelihoods and dignity and incentivize the unsafe operation of delivery vehicles, is a fitting capstone to our years of work together."[4]

18. The Council made plain that it enacted the Delivery Deactivation Law for the sole purpose of protecting a small group of couriers who allegedly had "wrongful deactivations." But the Council had no basis for doing so. During its deliberations, the Council accepted without scrutiny the claim that there is a proliferation of "wrongful" deactivations. The Council did not define "wrongful." It did not collect or seek any data showing that the problem of "wrongful deactivation" actually existed. Instead, the Council primarily relied on anecdotes from advocacy organizations and alleged deactivated couriers. The data it did have undermines its rationale. DCWP told the Council that it had received roughly 180 deactivation complaints over "the past couple of years"—less than 0.3 percent of the 61,000 couriers DCWP estimated worked for app-based delivery services as of 2022 (in a report on which the Council relied). DCWP did not report, and the Council did not ask, how many of those deactivations were actually "wrongful" or whether DCWP corroborated the complaints. And none of the public hearings reflected a meaningful discussion by the Council about safety—other than merely parroting WJP's talking points—or why it was in the public's interest to prioritize the perceived problem of "unfair" deactivations for

---

[3] Sarah O'Connell, *"Deliveristas" Rally for Job Protection*, Brooklyn News Serv. (Sept. 21, 2025), https://journalism.blog.brooklyn.edu/2025/09/deliveristas-rally-for-job-protection/.

[4] *Legislation to Advance Affordability and Housing Solutions for All New Yorkers*, N.Y. City Council, https://council.nyc.gov/press/2025/12/18/3034/.

a small number of New Yorkers above safety for merchants and consumers, fraud prevention, or anything else.

19. The Council likewise had no basis for the Delivery Deactivation Law's Notice and Compelled Reports Provisions. The Council did not scrutinize whether the purported procedural concerns with how Plaintiffs notify couriers of potential standard or policy violations and deactivations constitute a real, or widespread, problem. Reality does not reflect any credible problems with the process, including notice in advance of what behavior could lead and/or has led to deactivation.

20. The various provisions of the Delivery Deactivation Law independently—and taken together—will have serious effects on Plaintiffs' contractual relationships with their couriers and otherwise violate Plaintiffs' constitutional rights under the U.S. and New York Constitutions.

21. *First*, the Deactivation Prohibitions would override Plaintiffs' contractual right to deactivate couriers for conduct that they determine in their discretion materially violates couriers' respective agreements with Plaintiffs. In place of that existing contractual agreement, the Council articulates only three valid reasons for deactivation: "just cause," "a bona fide economic reason," and a legal requirement.

22. *Second*, the Progressive Discipline Mandate would prohibit Plaintiffs from removing a courier they have determined violated existing contractual obligations until they have first provided warnings and further training—unless the conduct was "egregious" as the Council has defined the term ("so outrageous, dangerous, or illegal that a delivery service cannot reasonably expect to correct it through progressive discipline") and interpreted by any individual "factfinder." § 20-1531.

23. *Third*, the Retroactive Provision is arbitrary and irrational. It would require Plaintiffs to prove that any challenged deactivation from the past six years meets the Deactivation Prohibitions, even though they did not exist at the time of the deactivations and Plaintiffs were (and are) not otherwise contractually obligated to meet them. Likewise, the "just cause" standard would impose mandatory consideration of seven "factors" that did not apply in the past and would require a "factfinder" to consider any other factor they think is relevant, even though Plaintiffs had no—and even now lack—notice of what those factors may be. Plaintiffs may thus be compelled to restore access to individuals removed for fraud, theft, or unsafe conduct because evidence needed to satisfy the new standards is no longer available. If Plaintiffs decline to restore access, they face potential damages, including punitive damages, if a factfinder rejects their justification under those standards. The City has no legitimate basis for imposing these new consequences on completed contractual decisions.

24. *Fourth*, the Notice and Compelled Reports Provisions would compel Plaintiffs to disclose "all the precise and detailed reasons" for a deactivation, reveal the "information and data" related to the deactivation, and collect and provide deactivated couriers with "all customer comments, ratings, and complaints" about them, along with a report about all *other* courier deactivations from the preceding year. Plaintiffs currently do not and are not required to provide such extensive information and data; doing so would be detrimental to merchant and consumer safety and to consumer, merchant, and courier privacy. Forced disclosure also would give fraudsters an upper hand in evading detection. Leaving aside the significant operational burden on Plaintiffs, requiring the disclosure of such information will sweep in information that has no relevance to the underlying deactivation, thus jeopardizing safety and privacy for no valid reason.

25. *Fifth*, the Burden of Proof Provision would prevent Plaintiffs from offering any reasons they did not provide the courier at the time of deactivation, thereby entirely shifting the inquiry away from the expressed goal of the Delivery Deactivation Law (i.e., whether Plaintiffs had "just cause" to deactivate a courier) to the procedural concerns (i.e., whether Plaintiffs provided sufficient "precise" and "detailed" notice to the courier of the reason for deactivation). Further creating a one-sided process, the Burden of Proof Provision would permit couriers to submit any evidence they desire, even if never provided to Plaintiffs. When Plaintiffs cannot meet their burden in this lopsided proceeding, they must reactivate the courier irrespective of the strength of the substantive reasons for the deactivation, including if the deactivation was based on complaints of violence, theft, harassment, threats, or fraud. The Burden of Proof Provision would prioritize form over function to benefit a small percentage of couriers at the expense of everyone else.

26. *Sixth*, the Enforcement Provisions, combined with the Retroactive Provision and other provisions, would lead to punitive damages (among other relief) and forced reactivation for any courier Plaintiffs have deactivated since 2021 if they have not maintained documentation substantiating the reason for the deactivation or sufficiently communicated the reason and underlying evidence to couriers, or did it a day late, or a factfinder decides some new "factor" is determinative. This means Plaintiffs would be required to reactivate couriers even if Plaintiffs had just cause for their deactivation—such as, for example, due to serious complaints of assault—because of a technicality, stale evidence, faded memories, or inconsistent document retention.

27. The Contracts Clause of the United States Constitution forbids States and municipalities from substantially impairing contractual rights simply to benefit a small group of individuals. As the legislative record makes plain, the Law has little, if any, public benefit. The

City has not attempted to, and cannot, show the Delivery Deactivation Law is an appropriate and reasonable means to achieve *any* legitimate public purpose. The legislative history demonstrates that the Council relied on uncorroborated anecdotal evidence, arbitrary assumptions, unreliable data, and speculation. The outcome is, at best, a law purporting to solve a problem that does not exist and one that will all but certainly create new problems. Put simply, the Delivery Deactivation Law cannot survive constitutional scrutiny.

28. The Law also impermissibly violates Plaintiffs' First Amendment rights by forcing Plaintiffs to disclose confidential information—including information about Plaintiffs' customers and other couriers—and competitively sensitive information about couriers and internal anti-fraud processes that Plaintiffs would otherwise not disclose. The Law similarly forces Plaintiffs to associate with contracted couriers on terms no party has chosen or agreed to be bound by, even after Plaintiffs have determined (or may determine in the future) that couriers have violated Plaintiffs' standards and acted inconsistently with their values regarding safety or professional integrity.

29. The Law's vagueness is an unconstitutional due-process violation all its own. The Law leaves Plaintiffs to guess what is required, denying them fair notice while giving factfinders broad latitude to enforce its requirements arbitrarily. The Law's "just cause" is an effectively undefined standard comprised of seven factors that are themselves ambiguous and any number of unknown factors at each factfinder's own preference. The Law's notice and disclosure mandates compound the uncertainty as the Law provides no objective standard for when a notice is sufficiently "precise and detailed" or when a courier needs additional information to "meaningfully contest" a deactivation. By defining uncertain obligations through still more uncertain terms, the Law provides "no reliable way" to determine what compliance requires and "produces more

unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson v. United States*, 576 U.S. 591, 598 (2015).

30. The Delivery Deactivation Law will cause immediate and irreparable harm to Plaintiffs. Even a day of infringed constitutional rights is an immediate and irreparable injury. If the Delivery Deactivation Law takes effect, it will permanently impair Plaintiffs' contracts, compel the communication and disclosure of sensitive and protected information that Plaintiffs would not otherwise provide, force Plaintiffs to retain or reinstate couriers whom Plaintiffs would otherwise not permit, subject Plaintiffs to an unfair and lopsided adjudicative process, and lead to reputational harm and a loss of business and goodwill.

31. Plaintiffs therefore seek declaratory relief and injunctive relief to prevent the Law from taking effect in January 2027 to protect their constitutional rights and to ensure that they retain ultimate authority over deactivation decisions.

## PARTIES

32. Plaintiff Uber Technologies, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of California.

33. Plaintiff Portier, LLC is a limited liability company and is a wholly owned subsidiary of Uber Technologies, Inc. Portier, LLC is a citizen of Delaware and California. Portier, LLC enters into agreements with couriers who use Uber's delivery platform in New York City.

34. Plaintiff Amazon Logistics, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Washington.

35. Plaintiff Amazon.com, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Washington.

36. Plaintiff Maplebear Inc., doing business as Instacart, is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of California.

37. Defendant City of New York is a municipality organized under the laws of the State of New York.

**JURISDICTION AND VENUE**

38. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a) over the federal claims because those claims arise under the Constitution or laws of the United States, including the Contracts Clause, the First Amendment, the Due Process Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983.

39. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 for the state claims. There is complete diversity among the parties. Plaintiffs are citizens of Delaware, Washington, and California. The City is a citizen of New York. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 97 (1972) ("It is well settled that for the purposes of diversity of citizenship, political subdivisions are citizens of their respective States."), *recognized as superseded by statute on other grounds*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 419 (2011). And the amount in controversy exceeds $75,000. Plaintiffs seek injunctive and declaratory relief, so "the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). Here, that value "is measured by the losses that will follow from the [Law's] enforcement," *id.*—e.g., the costs of complying with the Law. Those costs well exceed $75,000.

40. The Court may also exercise supplemental jurisdiction over the claims based on New York law under 28 U.S.C. § 1367 because those claims are "so related to the federal claims" that they "form part of the same case or controversy."

41. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the City resides in this District; a substantial part of the events or omissions giving rise to the claims occurred in this District; and the City is subject to this Court's personal jurisdiction.

42. Plaintiffs have Article III standing to bring this action because the Law threatens to violate Plaintiffs' constitutionally protected rights. It does so in three ways. First, the Law rewrites Plaintiffs' contracts with couriers in a way that deprives Plaintiffs of the benefit of their bargains. Second, the Law infringes on Plaintiffs' First Amendment speech and association rights. Third, the Law is impermissibly retroactive, depriving Plaintiffs of their due-process rights. Plaintiffs face an "impending" threat of future enforcement that poses a "substantial risk" of harm caused by the Law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). That harm can be redressed by a declaration that the Law is unconstitutional and an injunction preventing its enforcement against Plaintiffs. Accordingly, Plaintiffs have Article III standing to bring these claims. *See id.*

43. This action is related to *Uber Technologies, Inc. v. City of New York*, No. 1:26-cv-4893 (GHW), and *Lyft, Inc. v. City of New York*, No. 1:26-cv-4931 (GHW), given the similarities between the parties and the laws that those cases, and this one, challenge.

## FACTUAL ALLEGATIONS

### I. Background on Uber

#### A. Uber, Courier, and Merchant Earnings Depend on the Safety and the Quality of Services Available on the Platform

44. Uber makes technology that facilitates person-to-person connections. Those interpersonal connections are a core component of its business.

45. Every delivery depends on trust. A courier who uses Uber Eats typically enters a merchant's business to collect an order and, while there, may interact with employees, customers,

and other couriers. The same courier receives the first name and delivery address of the consumer placing the order, and travels there via car, bike, scooter, foot, or other means of transport and delivers the items, including to the door of a private home or business. There may be further face-to-face interactions during the delivery, including with the consumer directly or with other individuals present at the same location, including for example children, spouses, partners, co-workers, personnel, or members of the public. When the delivery is complete, the courier may know where each consumer (or family member or colleague) lives or works.

46. These deliveries occur at all hours of the day to all sorts of consumers of all sorts of goods. They take place, for example, when a mother is home alone with a toddler. When a college student needs a late-night snack. When an elderly man needs his medication delivered. When a professional is working the overnight shift. Any given courier may encounter individuals in their most vulnerable moment. And couriers handle all sorts of goods, most of which include consumable items.

47. Unlike ride-share drivers, who must hold a for-hire license that the Taxi and Limousine Commission can suspend or revoke, the City does not screen, license, or discipline couriers using Uber Eats.

48. Uber itself is deeply committed to the safety and quality of services available on its platform and strives for everyone who uses it to use it with confidence. Uber aims to "provide a safe and enjoyable environment for everyone."[5]

49. As a value-driven company, one of its guiding principles is to "Stand for Safety." Uber describes its commitment to safety on its website,[6] including in the following ways:

---

[5] Uber, *Understanding ratings*, https://help.uber.com/en/driving-and-delivering/article/understandingratings?nodeId=9e240708-a894-43d7-b19d-13061a4fbe5a (last visited June 5, 2026).

[6] Uber, *Standing for Safety with Greg Brown*, https://jobs.uber.com/en/people-stories/inside-the-work/standing-forsafety-with-greg-brown/ (last visited June 5, 2026); Uber, *Our commitment to safety*,

- "At Uber, safety isn't just a department; it's a core cultural value. Teams across the company embrace the value of Stand for Safety in everything we build."
- "At Uber, we stand for safety. Safety is not just a feature—it's a foundation. That's why we invest in innovative technologies, robust policies, and expert partnerships that prioritize women's safety at every step of their journey. We are steadfast in our commitment to building a platform where women feel comfortable, safe, and in control."
- "The Uber platform was built with safety in mind. Through incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."

50. The success of Uber Eats and the opportunities it provides—including for individuals who use it to earn income—depends on consumers, merchants, couriers, and anyone else in the chain of face-to-face contact feeling safe.

51. If consumers, merchants, or couriers are not safe or do not feel safe using Uber Eats, they will not use it, which can set off a negative cycle for all users: slower deliveries, higher costs, fewer deliveries, and fewer earnings for the vast majority of merchants and couriers that help create a safe environment. Uber is vigilant and protective of initially granting access to its platform and remains vigilant and protective about permitting ongoing access. Uber conducts background checks on individuals before they can become couriers, and ongoing checks are built into the Uber platform. Uber reruns criminal background checks annually and goes further with continuous monitoring, a system Uber pioneered in 2018. This technology flags new criminal charges or convictions reported by trusted background check providers, even in between annual checks.

https://www.uber.com/us/en/safety/our-commitment/?uclick_id=bd8a07c5-2192-4d2a-b0cd-ed79da09df17 (last visited June 5, 2026); ); *Ride with confidence*, https://www.uber.com/us/en/ride/safety/ (last visited Oct. 28, 2026).

52. Since 2016, Uber has used Real-Time ID Check, an industry-first technology that periodically requires couriers to upload "selfie" photos of themselves, to verify the person making deliveries matches the person registered.[7]

53. Uber provides consumers with several additional safety measures. For example, consumers: receive the courier's first name and photo; can track the delivery in real time; can require couriers to provide PIN verifications; authorize contactless delivery; and can contact Uber's 24/7 support.

54. Uber's policies require everyone with access to its platform to follow its Community Guidelines, which it posts publicly and incorporates into various agreements, including those with couriers and consumers.[8] As reflected in the Community Guidelines, their purpose is to "provide the basis for behavior we expect from all in the Uber community." They "were developed to help make every experience feel safe, respectful, and positive."

55. To Uber, treating everyone with respect includes ensuring that everyone behaves decently towards other people. The Community Guidelines prohibit aggressive, confrontational, or harassing behavior or using language that could be viewed as disrespectful, discriminatory, threatening, or inappropriate. They also forbid unwanted contact, meaning "when there is no mutual consent," which "can be seen as harassment and includes, for example, texting, calling, social media contact, visiting, or trying to visit someone in person after a trip or delivery has been completed."

---

[7] Uber, *Identity Verification Checks*, https://help.uber.com/en/driving-and-delivering/article/identity-verificationchecks?nodeId=75fb55dc-da08-41bb-b1cb-3229f2839956 (last visited Oct. 28, 2026).

[8] Uber's Community Guidelines state that they apply to "everyone who uses the Uber Marketplace Platform." Uber, *Uber Community Guidelines*, https://www.uber.com/legal/en/document/?country=unitedstates&lang=en&name=general-community-guidelines (last visited Oct. 28, 2026). Uber defines the "Uber Marketplace" as the "rideshare marketplace" that "connects riders looking for transportation with drivers looking for work at the tap of a button" that includes both mobility and food delivery platforms. *See* Uber, *Uber Marketplace*, https://www.uber.com/us/en/marketplace/ (last visited Oct. 28, 2026).

56. The Community Guidelines explain: "Deception can weaken trust and also be dangerous." They prohibit engaging in fraudulent behavior, including by: "falsifying information or assuming someone else's identity;" providing dishonest or inaccurate "information when reporting incidents; creating and accessing your Uber accounts, disputing or claiming charges or fees, and requesting credits"; "deliberately increasing the time or distance of a trip or delivery"; "accepting trip, order, or delivery requests without the intention to complete it, including provoking other users to cancel"; "creating dummy accounts or improper duplicate accounts"; "intentionally requesting or accepting fraudulent or falsified trips or deliveries"; "fraudulently claiming to complete a delivery without delivering all items"; taking "actions intended to disrupt or manipulate the normal functioning of the Uber Marketplace Platform, including manipulating the settings on a phone to prevent the proper functioning of the platform and the GPS system"; "abusing promotions and/or not using them for their intended purpose"; or "disputing charges for fraudulent or illegitimate reasons."

57. Uber is vigilant about identifying courier fraud on its platform, not only for its own economic reasons but also as part of its commitment to safety and quality. For example, deactivating couriers who present fake identity documents protects the platform and its users from couriers who have already been rejected for safety or other reasons.

58. One way for Uber to maintain its standards is by allowing consumers and merchants to rate couriers, and vice versa. Uber "uses ratings to maintain high quality and fairness."

59. Feedback among users is important. All consumers have the option of providing their couriers with ratings using a thumbs up or thumbs down system, and more fulsome feedback via the application itself or customer support. For example, consumers can use Uber's "Help" section to report various types of issues with a delivery, including incidents that made them feel

unsafe such as if the courier engaged in aggressive behavior or did not match the courier identified in the profile. Likewise, merchants can submit a thumbs up or thumbs down rating for a courier and reach out to support to provide more detailed feedback and concerns about a courier. Uber relies on this feedback, and it is a necessary part of its ability to manage safety on its platform.

60. Disputes and negative interactions between consumers and couriers, and merchants and couriers, do occur. Merchants have expressed concern to Uber about their feedback regarding a specific courier causing a courier to take steps to harm their business, such as leaving a false negative review through online channels.

**B. Couriers and Uber Freely Enter into a Contractual Relationship**

61. Couriers and Uber are independent contracting parties. Each party voluntarily chooses to enter the relationship because of the value it brings to them, and each can choose to exit the relationship at any time. At the same time, like any contractual relationship, the contracts impose obligations on each party as well as benefits: Couriers must not violate the policies, standards, and agreements that they have agreed to, and Uber can deactivate a courier only pursuant to the terms of the Platform Access Agreement ("PAA").

1. Couriers Benefit from Their Contracts with Uber

62. Couriers benefit from Uber's commitment to safety and quality, each of which attracts consumers and merchants to the platform, which leads to increased earning opportunities for couriers.

63. Uber offers couriers flexibility. They are free to locate and provide delivery services using platforms other than the ones Uber provides, and to terminate their relationship with Uber at any time, without explanation.

64. The couriers in New York City that can access the Uber Eats and other platforms receive the facial benefit of DCWP's minimum-pay rule for app-based couriers and related protections.

2. Uber Structures Its Contracts to Protect Its Ability to Balance Access, Fairness, Safety, and Its Brand

65. Uber is dedicated to facilitating independent work and earning opportunities. It is, generally speaking, in Uber's economic interest to have more couriers, along with more merchants and more consumers. More couriers can equal more completed deliveries.

66. Uber takes the decision to remove access to courier accounts seriously and considers deactivation to be a last resort.

67. Uber must balance its desire to keep couriers on its platform with its commitments and values related to safety for consumers, merchants, and couriers, and the entire Uber community.

68. Uber creates and enforces standards and policies to balance its commitment to courier access to the platform and earning opportunities, consumer, merchant, and courier safety and experience, and protecting Uber's brand and economic interests. Couriers, consumers, merchants, and Uber all benefit from striking the right balance: consumers will place more orders if they have a safe and high-quality experience when using the platform, which in turn provides more earning opportunities for couriers and merchants and benefits to Uber. Couriers likewise make more deliveries when they are safe, which benefits consumers and Uber.

69. Uber relies on written agreements and standards and policies, including the Community Guidelines, with couriers to confirm one another's rights, limitations, and expectations, including the rights to deactivation.

70. Uber structures its contracts with couriers so that Uber retains the discretion it requires to balance its competing business needs.

71. The contractual discretion to deactivate couriers based on Uber's determination of whether there has been a violation of Uber's policies and standards is critical to Uber's ability to balance priorities, particularly in ambiguous situations. For example, when a courier faces reports of assault, harassing a consumer, or theft from a customer's doorstep, Uber may have to make decisions based on imperfect information. Uber's standards and policies may require determining that being the subject of a serious report makes one ineligible for platform access, which protects consumers, merchants, and the public at large.

3. The PAA Governs Access to Uber Eats

72. Since July 24, 2024, Uber and couriers have entered into the PAA, which establishes the contractual right to access the platform. In addition to its explicit terms, the PAA states that access is "also governed by the applicable terms on our website, including without limitation, the Community Guidelines" and other Uber standards and policies, all of which it incorporates by reference. (PAA, together with incorporated documents, "Agreement"). Every courier in New York City that is active on the Uber platform has agreed to the Agreement.

73. The terms of the PAA confirm that the couriers have the choice whether to use "other platforms and applications in addition to, or instead of," the one Uber provides. (§ 1.2).

74. The PAA makes clear couriers must "understand" that "the experiences Delivery Recipients and Merchants have with your Deliveries, as determined by Delivery Recipient and Merchant input, may affect your ability to access our Platform or provide Deliveries." (§ 1.2).

75. The PAA specifically spells out each side's respective rights to terminate the agreement. For couriers, the PAA permits a courier to terminate the Agreement "without cause at any time upon seven (7) days' prior written notice to Uber" or "immediately, without notice for

Uber's violation or alleged violation of a material provision of this Agreement." (§ 5.2 ("PAA Termination Provision")).

76. For Uber, the PAA affords a narrower right in the PAA Deactivation Provision, which by its own terms covers both temporary waitlisting and permanent deactivation:

> "**Deactivation.** You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a "*Material Breach or Violation*"). You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred."
>
> (§ 5.3).

77. The PAA Deactivation Provision unequivocally states that Uber may deactivate a courier's account without notice if Uber determines, in its discretion, that the courier "has engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference)."

78. The PAA Deactivation Provision articulates a contractual standard regarding deactivation. Uber does not grant itself free rein to deactivate couriers without a basis, which stands in contrast to the at-will nature of how employers (which Uber is not) often structure their relationships with employees (which couriers are not).

79. The PAA Deactivation and Termination Provisions are central to the Agreement and part of the benefit of the bargain. Couriers deactivated from July 24, 2024 to present in New York City were, and are, subject to the PAA. Couriers deactivated from January 6, 2020 to July 23, 2024 in New York City were subject to earlier versions of the Platform Access Agreement, which contained substantially identical PAA Deactivation and Termination Provisions.

80. The contracted-for ability to deactivate couriers without notice based on Uber's determination of whether a violation has occurred (including by being identified as having committed a serious safety incident or engaging in deceptive conduct) is critical to Uber's ability to maintain the standards that benefit all users of the platform, including couriers, and to live by its values, including to Stand for Safety.

81. Uber's contractual terms are designed to protect against avoidable risks inherent when permitting couriers to remain on the platform and come to merchants' businesses and consumers' doors when there was a violation of Uber's standards and policies.

4. The PAA and Incorporated Policies and Standards Identify Bases for Deactivation

82. The PAA identifies some types of conduct that would violate the Agreement, including, for example: sharing accounts (§ 2.4); failing background checks (§ 2.5(b)); contacting consumers (§ 2.6(c)); falsifying geo-location information (§ 2.10); and spending more than the amount the consumer authorized (§ 2.12).

83. Other policies that the PAA incorporates by reference—such as the Community Guidelines—also identify examples of specific behavior that could serve as the basis for deactivation.

84. The expressed purpose of the Community Guidelines is to articulate "behaviors or circumstances that may cause you to lose access" to the Uber platform. Uber makes clear that failing to comply with any of the requirements of the Community Guidelines "can constitute a material breach or violation of the terms of your agreement with Uber" and thus good cause for deactivation. Uber also makes clear that loss of access may be based on "reported violations," particularly "if the issues raised are serious or a repeat report."

85. The Community Guidelines lay out specific expectations of courier (and customer) behavior and consequences for failing to meet those expectations. For example, the Community Guidelines confirm couriers must not: act disrespectfully or indecently towards other people; "comment on someone's appearance or ask whether they are single"; act in a way that is aggressive, "confrontational, or harassing"; share accounts; and tamper with items during deliveries.

86. Uber devotes multiple pages on its website to providing couriers with information about deactivations.

**C. Deactivations Are Rare**

87. Uber deactivates couriers to protect consumers, merchants, couriers, and itself.

88. The primary reasons for deactivations relate to safety, fraud prevention (including related to identity verification and documentation), legal compliance, and service quality, which often overlap with each other.

89. Together, safety and fraud made up more than two-thirds of deactivations of couriers in the City in 2025.

90. More than half of the courier deactivations in New York in 2025 related to fraud, including identity and account fraud. As the Community Guidelines reflect, the specific types of fraudulent conduct are wide ranging.

91. Fraud-related reasons include sharing one's account and submitting fake or altered identification documents. These reasons may implicate both fraud and safety concerns because they relate to Uber's efforts to verify the courier's identity to make sure that the person who underwent the background check is the person who is actually entering merchant locations and making deliveries to consumers' homes and places of work. When an account is being used by

someone other than the vetted courier, every delivery sends an unvetted stranger into a merchant's location and to a consumer's door.

92. Other fraud-related reasons for deactivation include schemes to steal money from Uber or from merchants or consumers. For example, couriers may use software to manipulate the manner in which their phone or other device transmits GPS location data to the courier's Uber Eats application. This scam is called "GPS spoofing." GPS spoofing can make it look like a courier completed a delivery that he did not make or traveled farther than he really did. Couriers also have falsely marked a consumer's order as delivered while keeping the order.

93. Uber treats a single instance of identity fraud or account sharing as grounds for deactivation.

94. Uber also deactivates couriers who it determines pose safety risks. Specific unsafe conduct leading to deactivations included threats, harassment, theft, unwanted contact with consumers after a delivery, and delivery of alcohol to minors.

95. Uber also deactivates couriers related to compliance and quality reasons. Compliance reasons for deactivation include failed background checks, including for serious criminal convictions; serious pending criminal charges; and serious driving violations for couriers who deliver by car. Quality reasons for deactivation include consistently below-minimum aggregate ratings, which often correlate with unprofessional conduct. Uber also deactivates accounts of couriers who discriminate, such as refusing or canceling deliveries because of a customer's protected characteristics.

96. Consumer and merchant reports play a role in some, but not all, deactivations. Uber may heavily depend on merchant or consumer reports for deactivation decisions on certain grounds, such as those based on interpersonal conflict, harassment, or theft. It is important for

Uber to receive candid feedback about couriers from both consumers and merchants, and thus it is important to Uber that consumers and merchants feel confident submitting feedback without fear of retaliation.

97. Uber assures consumers it will not disclose information they provide to couriers. For example, the Uber Eats application tells consumers that Uber "never shows" the ratings they assign a courier to the courier because "[w]e want you to feel safe and confident when you rate your delivery person because your feedback matters to us" as shown in their screenshot below:




98. Other deactivation decisions, such as those based on identification-verification failures, altered documents, GPS spoofing, or background check failures, do not involve consumer or merchant reports.

99. When Uber does consider reports from merchants or consumers, it may decide to deactivate a courier's account based on a single report of particularly serious conduct, such as a single report of a threat or harassment directed at a merchant or customer, even if Uber is not able to corroborate the customer's or merchant's report. In such situations, and pursuant to its commitment to safety, Uber carefully and appropriately exercises its discretion (as provided in the PAA) to determine if deactivation is warranted.

100. For reports related to less serious conduct, Uber may consider time on the platform relative to the reports and the number of deliveries in decisions related to access. For example, a number of reports of less serious conduct may lead to a different result for a courier who has completed tens of thousands of deliveries over the course of a number of years as compared to a courier who has completed only a few dozen deliveries over the course of a year but received the same number of reports.

101. Before any deactivation based on consumer or merchant reports, Uber considers the reporting consumer's or merchant's history of reporting incidents. For example, Uber identifies consumers whose reports reflect a pattern of lodging similar complaints against a variety of couriers or for the sake of receiving refunds and appeasements. Similarly, Uber removes ratings from a courier's rating calculation where the consumer has a proven pattern of consistently giving low ratings. Uber also will ban a customer account where there is evidence that the consumer submitted a fraudulent report.

### D. Uber Fairly Communicates with Couriers About Deactivation Decisions, How to Submit Evidence, and the Path to Appeal

102. Uber devotes multiple pages of its website to informing couriers about the deactivation process, in addition to the Community Guidelines. One page titled "Deactivations" focuses on "Understanding why drivers and delivery people can lose access to their accounts."

"On this page, you'll find information about the most common reasons why drivers and delivery people may lose access to their accounts or specific earning opportunities, how to avoid it, and what to do if it happens to you."[9]

103. In many instances, Uber informs and warns couriers when they are the subject of reports that could result in deactivation or are otherwise at risk of losing access to their account. Examples are below:




104. For most types of reports outside of the most severe issues, Uber sends the courier a notice within 24 hours after Uber receives a report. The notice informs the courier that they have received a report, the date of the delivery, and the general nature of the report, such as "Post delivery contact." The notice also includes information about how the courier can respond to the

[9] Uber, *Deactivations*, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Oct. 28, 2026).

report, and about the circumstances under which similar reports could lead to losing access to Uber's platform.

105. Uber is careful about how much information to provide. In most situations, Uber believes the balance between safety and fairness favors providing the date and nature of the report to the courier, but not certain details.

106. Uber does not provide to the courier the reporting party's name, the delivery address, the time of the order, any personally identifiable information (PII) of a reporting party, or the verbatim text of the customer's report (unless such information is required during a legal process) because doing so would pose a risk to consumer safety. Even if the identity of the complaining customer is anonymized, providing specific details increases the risk that a courier could identify the complaining customer or merchant. That risk is acute in delivery contexts: a merchant or consumer who reports a courier is someone whose home or business address the courier already knows. For the more serious issues, such as threats or harassment, Uber limits the type of information it provides due to the heightened risk of retaliation.

107. Uber relies on its ability to deactivate courier accounts without providing additional details so it does not jeopardize the safety of the consumers and merchants who use its platform, and on its discretion to differentiate between different situations (for example, between a report of a late delivery and a report of harassment) in determining how much information to provide.

108. Uber also does not disclose details of its decision when it has deactivated a courier based on fraudulent activity because doing so would provide couriers with information they could exploit to evade Uber's fraud-detection mechanisms in the future. Uber is an attractive target for fraudsters due to the scale of its platform, the amount of money exchanging hands over the platform, the ability to receive fraudulent proceeds quickly, and the challenge of distinguishing

legitimate from fraudulent activity in real time. For these reasons, Uber has a robust and sophisticated team in place that is constantly trying to detect, identify, prevent, and reduce these kinds of economic frauds against Uber, consumers, couriers, and the platform. Uber and the entities and individuals that are constantly seeking to cheat Uber's systems and avoid detection are engaged in a "cat-and-mouse" game. The fraudsters develop new schemes, while Uber develops new ways to catch them. It is critical to Uber's efforts that the fraudsters do not get information and intelligence they can use to better commit fraud while avoiding detection.

109. When Uber deactivates an account, couriers also receive an in-app message that includes: the reason for the deactivation; prior contact with Uber's support team when available; a Request Review button and an overview of the review process when available; and the ability to upload video, photos, or other documentation.

110. Uber provides in-app access to the Review Center, which is an internal team of agents that review couriers' appeals of most deactivations and evidence couriers submit to support their case. Couriers have the ability to request a review of almost any decision. The in-app notification provides information about appeals; they are also sent additional communications outside of the app directing them to the Review Center.

111. Uber also sends deactivated couriers an email notifying them of the deactivation and providing a link to request a review by the Review Center.

112. If a courier is eligible and requests a review, a specialized team will review his deactivation and reconsider whether Uber correctly executed its policies, such as, for example, reviewing whether consumer reports that were the basis of the deactivation actually report the conduct at issue and whether the consumer had indications of submitting false reports.

113. The review process includes the right of couriers to submit information to support their case, including audio and video recordings. Uber generally aims to collect and assess relevant information from consumers and couriers, as well as other sources such as GPS location data, when considering if permanent deactivation is appropriate. For instance, Uber will consider the courier's location data to determine whether it supports or refutes the allegations.[10]

114. Every appeal is evaluated by a real person—never by automated systems alone.

115. Couriers are aware of and utilize Uber's review process in meaningful numbers.

116. In addition to the review process, couriers in New York City also have filed various small claims proceedings, civil lawsuits, and arbitration demands against Uber challenging their deactivations. The PAA provides for individual arbitration of any dispute over the termination of the parties' relationship, after an individualized, good-faith informal dispute-resolution process. PAA §§ 13.1, 13.3(d).

## II. Background on Amazon

### A. Amazon Contracts with Delivery Partners Through the Amazon Flex Mobile Application to Make Local Deliveries

117. Affiliates of Amazon.com, Inc. offer various products that customers around the world can purchase, including through Amazon's website, Amazon.com, and mobile applications.

118. When a customer places an order, the customer can either have it delivered to a particular address—often the customer's home or business—or pick it up at a designated location, such as Whole Foods Market.

119. For orders not picked up locally by customers, Amazon contracts with third-party delivery companies and professionals to make local deliveries, including UPS, the U.S. Postal

---

[10] *Deactivations*, *supra* note 9 (explaining "Protection from false allegations" for couriers and opportunity for couriers to provide "information to support their case").

Service, and small-business Delivery Service Partners. In some instances, Amazon—through its subsidiary, Amazon Logistics, Inc.—also contracts with Delivery Partners, who sign up through the Amazon Flex mobile application to make local deliveries of food, groceries, prescriptions, and other goods as independent contractors.

120. Through the Amazon Flex app, Delivery Partners can sign up for pre-scheduled "delivery blocks" or make immediate deliveries through "instant offers." The details of both (including their location, time, and anticipated duration) are posted on the app. An offer for a delivery block or instant offer shows the precise amount of the service fees payable for the block and whether customer tips are available. When tips are available, Amazon may include a range of estimated tips. The anticipated durations of posted delivery blocks vary but commonly range from 2 to 6 hours. Delivery Partners are not required to accept any offer posted to the Amazon Flex app, any specific Amazon Flex offer, or any minimum number of offers.

121. Delivery Partners characteristically pick up batches of pre-packaged items in their selected geographic areas and deliver those items to customers in the same geographic areas using their personal automobiles. In this way, Delivery Partners can help Amazon's customers avoid having to personally pick up orders at a retail store or other location.

122. Individuals seeking to sign up for Amazon Flex must first download the Amazon Flex app on a smartphone, log into the app with an Amazon account (and create one if necessary), and select the local area in which they wish to make deliveries. Individuals must then complete the Amazon Flex onboarding process.

123. In the United States, the Amazon Flex onboarding process progressively confirms a candidate's identity and eligibility to deliver. Amazon utilizes several tools to identify and prevent fraudulent access to the Amazon Flex app, including, at times, manual review designed to

reduce false positives where a legitimate candidate fails identity verification for benign reasons, such as poor image quality. This process is designed to address potential safety, fraud, and theft concerns and ensure individuals that contract with Amazon are legally eligible to provide services and are who they say they are before accessing Amazon's facilities, transporting packages along public routes, and going up to customers' doorsteps.

124. Prospective Delivery Partners must also view a safety video before they can begin delivering with Flex.

125. Additionally, Delivery Partners must affirmatively agree to the Amazon Flex Independent Contractor Terms of Service ("TOS") before they can start making deliveries. There have been multiple versions of the TOS. The current TOS were released January 6, 2025. The TOS and the Program Policies govern the services performed through Amazon Flex and constitute the binding agreement between Amazon and each Delivery Partner.

126. Prior versions of the TOS were released on October 3, 2019, March 31, 2021, and December 29, 2022.

## B. Amazon Flex's Terms of Service Set Service Standards and the Right to Deactivate Account Access

127. In the TOS, Delivery Partners agree to provide services "in a safe and competent manner in accordance with the level of professional care that would be observed by a prudent person rendering similar services and subject to the Service Standards described in the Program Policies."

128. The Service Standards require "the timely and effective delivery of undamaged parcels, bags, totes or other items to the customers' and Amazon's satisfaction" subject to: (1) safety standards, including an obligation to "observ[e] speed limit laws and distracted driving laws" as well as all other applicable "traffic, health, [and] safety" laws; (2) reliability standards,

including an agreement to "be ready to timely provide Services" once the Delivery Partner has chosen a delivery block or "timely" forfeit that delivery block; (3) delivery standards, including that the Delivery Partner will attempt to complete the deliveries and do so in a manner that will allow the customer to actually receive their deliveries and "be able to find [them]," and that "undeliverable" goods will be "returned to Amazon"; (4) customer service standards, including refraining from "disrespectful, rude, inappropriate, unprofessional, dangerous or threatening conduct"; and (5) Amazon's Workplace Harassment Policy, which establishes that Amazon "will not tolerate inappropriate conduct, including discrimination or harassment based on sex."

129. The TOS address termination rights separately for Amazon and Delivery Partners. Delivery Partners may terminate "at any time and for any reason" by notifying Amazon.

130. For Amazon, the TOS provide:

> Amazon may terminate this Agreement for the following reasons ("for cause") by giving you a notice of termination in accordance with Section 14 below: (i) for failure to meet any of the Service Standards, (ii) for failing or refusing a background check or identity verification check, or for providing false or incomplete information any time before or after the Effective Date, (iii) for material violation of the Program Policies or any other policy provided to you by Amazon, (iv) for material breach of this Agreement, (v) if your Amazon.com account is deactivated; (vi) for misuse of the Amazon Flex app, including incidents of fraud or theft or (vii) for other commercially reasonable cause.

131. Amazon's deactivation and termination rights have been materially identical since March 31, 2021. Those rights are also functionally identical to the rights established in the 2019 version of the TOS, though later versions of the TOS clarified certain grounds that would warrant deactivation.

132. Amazon's contractual right to deactivate Delivery Partners is essential to the agreement and the Flex program. That right permits Amazon to limit continued access to the Flex app to only those Delivery Partners who act consistently with the standards and policies governing

Flex. It also provides a critical tool for Amazon to prevent and respond to issues relating to customer safety, fraud, theft, and other misconduct that threaten the values Amazon upholds, create potential risk of liability, and jeopardize the high quality of service that Amazon aims to provide for its partners and customers.

**C. Only a Small Fraction of New York City Delivery Partners Are Deactivated**

133. Deactivation is relatively uncommon in Amazon Flex.

134. In 2025, 63,100 Delivery Partners operated with New York City as their chosen service area. Amazon deactivated only 3% of "non-probationary" Delivery Partners, i.e., those with active accounts for at least thirty days after their first delivery.

135. As of October 2026, the pool of Delivery Partners enrolled in New York City grew to 73,400, and the deactivation rate remained roughly flat at 2.9% for Delivery Partners, who had active accounts for at least thirty days after their first delivery.

136. Amazon currently has several enforcement categories that may lead to deactivation. Egregious or high-severity categories, like theft, harassment, or safety violations, permit immediate deactivation. For non-egregious enforcement categories, Amazon provides alerts and warnings before deciding to deactivate Delivery Partners' accounts. In the "Standings" portion of the Flex app, Amazon shows Delivery Partners where they stand in terms of quality of rendered services—for example, if their service has been "Fantastic" or "Unacceptable." When a Delivery Partner changes to a different tier or receives an alert, Standings lets them know why and offers learning materials, such as tips on how to avoid receiving similar alerts in the future. Deactivation decisions for less severe categories reference prior informal warnings and alerts.

137. Many of the deactivations in the Amazon Flex program occur during the onboarding process as a result of the checks that Amazon has in place. For example, if the onboarding process identifies multiple accounts associated with one individual, or a single account

being accessed from multiple devices simultaneously or in patterns inconsistent with use by a single legitimate individual, the account is flagged for suspected fraud and offboarded after appropriate verification. This is an important tool in helping to prevent bad actors and unsafe drivers from obtaining access to the Amazon Flex app and interacting with the public under Amazon's imprimatur.

138. Deactivations also occur as a result of theft, such as when Delivery Partners fail to deliver customers' goods and fail to return undelivered goods to Amazon. Theft is a violation of Amazon's Service Standards and grounds for deactivation.

139. For example, in September 2026, Amazon deactivated a Delivery Partner after that Partner stole the floor jack from a customer. Following a report by the customer, Amazon began investigating, including by reaching out to the customer to gather evidence. Video evidence showed the Delivery Partner kicking the floor jack, picking it up, walking with it, and leaving in their car. Further evidence confirmed the Delivery Partner assigned to deliver the package in question was the same Delivery Partner in the video.

140. In another September 2026 theft-related deactivation, a customer complained that a Delivery Partner stole property from the customer's porch valued at approximately $325. Video evidence showed the Delivery Partner taking an item from a box located under the customer's porch and walking away with it. Since the Delivery Partner removed a non-Amazon item that was not in their possession upon arrival from the customer's porch, the Delivery Partner's account was deactivated.

141. The TOS also require Delivery Partners to "behave respectfully and professionally when interacting with [Amazon's] customers, station operators, merchants and other delivery

partners." Even "a single violation, depending on the seriousness of the infraction, can make [a Delivery Partner] ineligible to participate in" Flex.

142. Amazon has used this policy to deactivate the accounts of Delivery Partners who violate it. In one instance, multiple Delivery Partners were involved in a physical altercation at an Amazon facility. They then left the facility, where another Delivery Partner joined the fight. These types of behaviors place Amazon associates, other Delivery Partners, and customers in harm's way, and Amazon does not tolerate such conduct. Amazon thus deactivated all those Delivery Partners' accounts to protect other Delivery Partners and Amazon customers from potential similar conduct in the future.

### D. After Deactivation, Amazon Flex's Terms of Service Currently Provide Notice and a Right to Appeal

143. When a Delivery Partner's account is deactivated, the Delivery Partner receives an email identifying the violation type and informing them of their right to appeal. Amazon currently provides Delivery Partners in New York City 30 days to appeal a for-cause deactivation. Examples of such emails are below:

amazon flex

Hi $_customerName,

We are contacting you because we investigated your account and determined that on $date you took a customer's package while delivering with Amazon Flex.

Taking a customer's package is a violation of the Terms of Service. This violation means you are no longer eligible to deliver with Amazon Flex and will not be able to sign in to the Amazon Flex app.

If you would like to appeal this outcome, please email amazonflex-support@amazon.com providing additional information and any evidence to support your appeal within 30 days of receiving this notice.

The Amazon Flex Team

1-0027-001

SITE TERMS| PRIVACY POLICY , Amazon.com, Inc. or its affiliates

amazon flex

Hi $_customerName,

We reviewed your Amazon Flex account and found that on multiple occasions, you accepted payment for delivery blocks but did not physically attempt delivery of any of the assigned packages. In these instances, you either did not update the status of the assigned packages in the Amazon Flex app or you inaccurately marked packages as undeliverable without physically being at the delivery location. This is a violation of the Terms of Service.

As a result, your account is permanently deactivated. You are no longer eligible to deliver with Amazon Flex and will no longer be able to sign in to the app.

If you would like to appeal, please email amazonflex-support@amazon.com with additional information within 30 days of receiving this notice.

The Amazon Flex Team

SITE TERMS| PRIVACY POLICY , Amazon.com, Inc. or its affiliates

144. Amazon's current practice does not involve giving deactivated Delivery Partners all of the information required by the Law. Amazon has reasons for limiting those disclosures, including the possibility that greater detail could expose confidential or proprietary information,

assist individuals attempting to defeat Amazon's operational safeguards, or provide deactivated Delivery Partners with information they could use to identify and harass customers who complained about their performance.

145. Currently, Amazon does not disclose all the "precise and detailed" reasons for a Delivery Partner's deactivation. Nor does it necessarily provide all the "information and data relevant to such contracted delivery worker's deactivation" upon deactivation. Instead, Amazon provides its Delivery Partners with real-time contractual service ratings, and when a Delivery Partner is deactivated, he or she receives an email that identifies the contractual violation type and the right to appeal.

146. Amazon's existing notice practice gives a deactivated Delivery Partner enough information to decide whether and how to challenge the decision. Amazon limits additional disclosures based on the circumstances of the particular matter.

147. Amazon determines what information to disclose by considering several competing interests. Amazon's existing Program Policies treat customer names, addresses, and other customer-related information learned during deliveries as personal information, and the TOS state that Amazon will not provide personal information or customer testimony in disputes or claims between Delivery Partners and customers. Providing additional detail—such as "[a]ll customer comments, ratings, and complaints received regarding the contracted delivery worker," § 20-1536(a)—creates the possibility that Delivery Partners may be able to identify, for example, customers or other Delivery Partners who lodged complaints or reports against them. Indeed, in the two theft-related examples discussed above, both deactivations stemmed from customer complaints. Such identification could create a risk of retaliation and could also discourage

customers or other Delivery Partners from reporting legitimate concerns in the future, undermining Amazon's goals of protecting Delivery Partners, customers, and their property.

148. Fraud methods change over time as individuals attempting to defraud Amazon adapt their techniques. Amazon likewise modifies its methods for identifying fraudulent activity. For that reason, Amazon carefully controls and limits dissemination of information concerning its anti-fraud tools and practices where disclosure could help individuals design ways around those protections.

149. Once an appeal of a deactivation decision is received, it is routed to a team that follows standard operating procedures to have employees, rather than automated systems, ensure that all processes have worked as intended. That team reviews the Delivery Partner's contract, the original enforcement decision, the evidence on file, and any new information provided by the Delivery Partner, and then decides whether to restore access to the Delivery Partner or keep the deactivation in place.

150. As noted, Amazon does not rely on automated processes to decide appeals of deactivation decisions; real people review each such appeal, and two employee auditors must approve such decisions. Amazon communicates the result to the Delivery Partner after that review.

151. Currently, about 23% of Delivery Partner deactivations are appealed, and about 3% of deactivated accounts are eventually reactivated. These statistics show that Amazon's appeal process is fair, the review is meaningful, and Delivery Partners have a real opportunity to seek restored access. Amazon regularly audits its processes to help ensure that only those accounts that do not meet standards are deactivated.

152. Amazon also, as a courtesy to its Delivery Partners, grants appeals that are not required by the TOS. For example, Amazon will routinely give grace to Delivery Partners who

are unable to meet their contractual obligations due to unforeseen circumstances, such as when a Delivery Partner's car has broken down or they got sick, causing their out-of-policy delivery block cancellation. In such and similar circumstances, Amazon will reactivate a Delivery Partner's account.

### E. Amazon Prioritizes Safety and Reliability

153. Amazon prioritizes safety above all else and strives to contract with Delivery Partners who will deliver to customers in a safe and reliable manner. Amazon thus refuses to contract with those who do not share Amazon's values, and it reinforces these values in its communications to both Delivery Partners and the public at large.

154. On the Amazon Flex website, Amazon provides Delivery Partners and the public important information about safety and Amazon Flex because Amazon's "deep commitment to safety guides [its] approach to everything at Amazon Flex."[11] Amazon tells Delivery Partners that, "[i]f you arrive at a delivery location and do not feel safe, you can contact Driver Support through the Amazon Flex app. We don't expect you to ever make a delivery if you feel unsafe." Amazon encourages Delivery Partners to report incidents, too. "Reporting incidents to Driver Support helps us research and follow up on them, to help keep you safe, and hold customers and community members accountable." Safety also includes Amazon's anti-harassment policy: "We do not tolerate inappropriate conduct, including discrimination or harassment, from anyone."

155. In a May 1, 2025, Amazon News publication about the Flex program, Amazon explained that "[s]afety is our top priority, which is why we continue to innovate and invest in comprehensive safety measures that help keep delivery partners and the communities they serve

---

[11] Amazon Flex, *Amazon Flex Delivery Partner Safety*, https://flex.amazon.com/safety (last visited Oct. 28, 2026).

safe."[12] "Reflective safety vests, vehicle magnets that stick onto the side of a vehicle identifying delivery partners, and headlamps are available to ensure they remain visible while delivering." In addition, Amazon described "new safety features like Driver Profiles, which allows customers to view the name and photo of participating delivery partners before their package arrives." This helps ensure customer safety by allowing customers to know beforehand who their Delivery Partner will be so that they do not mistakenly open the door to those pretending to be making a delivery.

156. In an August 17, 2026, post on the Amazon Flex Blog, Amazon described safety features on the Flex app, safety tips, and a new ad campaign regarding road safety.[13] The safety features include an in-app navigation system, which "displays speed limits so you can continue to drive safely to and from delivery stations and stops," "a map alert when you enter a school zone, and real-time icons when you are approaching an upcoming intersection or nearby bike lanes." Amazon offered reminders on "important safety precautions you can take to help keep yourself and community members safe while on the road," such as "[w]hen approaching intersections, come to a complete stop before the painted line, count to three, and ensure crosswalks are clear before proceeding." And Amazon highlighted that its "road safety campaign" would include "ads on Amazon video streaming, Amazon music, and more."

157. In a September 26, 2022, post on the Amazon Flex Blog, Amazon offered advice on "[h]ow to succeed as a delivery partner."[14] Amazon said that "[y]our safety and the safety of

[12] Amazon Staff, *Everything You Need to Know About the Amazon Flex Program*, Amazon News (May 1, 2025), https://www.aboutamazon.com/news/operations/amazon-flex-delivery-service.

[13] Amazon Flex, *Staying Safe on the Road with Pedestrians and Cyclists* (Aug. 17, 2026), https://flex.amazon.com/blog/staying-safe-on-the-road-with-pedestrians-and-cyclists.

[14] Amazon Flex, *How to Succeed as a Delivery Partner* (Sept. 26, 2022), https://flex.amazon.com/blog/how-to-succeed-as-a-delivery-partner.

customers and community members is important when delivering with Amazon Flex. Take care of yourself, drive safely, follow the law, and treat other people with respect and kindness. We also expect others to be respectful of you, and we hold community members, employees, and delivery partners accountable to the Amazon Flex Workplace Harassment Policy."

158. Amazon also communicates its commitment to reliability in numerous forums. For example, in a March 3, 2020, Amazon News publication, Amazon emphasized the important role that Amazon Flex Delivery Partners play in making local deliveries.[15] Amazon wrote, "We're proud of the fact that our Same-Day services are driven in partnership with local communities where we operate, and made possible by the people who live there . . . this expansion enables more opportunities for Amazon Flex delivery partners to choose work that fits their schedule and earn great pay while delivering Same-Day packages on behalf of Amazon."

159. Amazon thus expects that Delivery Partners will timely report for any scheduled delivery blocks and attempt to deliver any packages within that block; Amazon *does not* expect or ask Delivery Partners to deliver as fast as possible. As such, in the September 26, 2022, post on "[h]ow to succeed as a delivery partner," Amazon explained its expectation that Delivery Partners "arrive and check in at the pickup location within 5 minutes of the start time."[16] And it said that "[d]elivery quality is about getting packages to the right place at the right time. We expect you to contact customers if you need help accessing a delivery location, to do your best to follow reasonable customer instructions in the Amazon Flex app, and to place packages in a safe location."

---

[15] Jon Alexander, *Same-Day Delivery Just Got Faster*, Amazon News (Mar. 3, 2020), https://www.aboutamazon.com/news/operations/same-day-delivery-just-got-faster.

[16] Amazon Flex, *supra* note 14.

## III. Background on Instacart

160. Instacart is a technology company that operates a multi-sided digital marketplace where consumers, independent contractor shoppers, and retailers connect for on-demand delivery of groceries and other goods. Instacart prides itself on being an industry leader in operating a safe and efficient online delivery marketplace. Trust is "a key ingredient in [its] recipe for success as a community," and as such Instacart prioritizes safety over all else. To preserve this trust, Instacart maintains appropriate safeguards, including procedures for deactivating unsafe or inefficient shoppers, as well as procedures for deactivating customers who engage in unsafe or otherwise problematic behavior.

161. The Instacart marketplace platform operates by connecting three sets of strangers: (1) independent contractor shoppers, who contract with Instacart to provide shopping and delivery services; (2) consumers, the customers who place orders for groceries and other goods; and (3) retailers, like grocery stores, that want to offer online shopping and delivery or pickup of their goods. To facilitate transactions, the strangers must interact both digitally and physically. For example, a customer digitally discloses his or her preferred physical location address for delivery of goods to the independent-contractor shoppers. The independent-contractor shoppers then physically shop orders in retailer storefronts, encountering partner employees and customers. Finally, shoppers transport the goods to a physical interaction and, based on the order, interact physically with a customer when required to verify age for products such as alcohol or certain medicines. If trust is breached during this chain, any number of individuals are at risk both physically and otherwise.

162. The platform allows consumers and retailers to arrange for, among other things, same-day personal shopping and delivery services. Consumers access the platform through a web

page or a smartphone app. From there, they can browse and order goods from a broad selection of retailers. Instacart partners with more than 300 retail brands at approximately 1,800 store locations serving customers in New York City alone, ranging from national to local institutions and representing nearly 100,000 retail stores across the United States and Canada. In turn, retailers depend on Instacart's platform for access to a broad consumer base and for easy and flexible fulfillment of consumer orders.

163. Independent contractors, "shoppers," may access Instacart's platform through a mobile application called the Instacart Shopper App. When a shopper goes "online"—that is, indicates availability to provide shopping and delivery services—the shopper can select one or more consumer orders called "batches." As independent contractors, shoppers decide whether and when to go online, if at all, where to shop and deliver, and which batches to accept (if any). Instacart does not require shifts or minimum hours and does not penalize shoppers for declining or ignoring batches.

**A. Instacart's Contracts with Shoppers**

164. To begin shopping as an independent contractor through Instacart, a person must register for a shopper account, satisfy certain minimum eligibility requirements, including completing a background check, and agree to Instacart's contractual terms. These contractual terms are set out in three main documents.

165. Instacart's Independent Contractor Agreement ("ICA") establishes the parties' respective rights and obligations, including the conditions governing shoppers' access to the platform and Instacart's contractual discretion to suspend or revoke that access. Specifically, Sections 5.2 and 5.3 of the ICA provide in relevant part:

> 5.2 Instacart may immediately terminate this Agreement upon written (including email) notice to you in the event you engage in a material breach of the terms of

> this Agreement, including, but not limited to, any act that violates Instacart's Full Service Shopper Account Access Guidelines (https://shoppers.instacart.com/guidelines), such as when you:
>
> a. Cause a safety issue;
> b. Violate applicable local, state, or federal laws or applicable guidance;
> c. Fail to meet acceptable standards of service with respect to the end result of the Services as specified by the Customer;
> d. Repeatedly fail to complete deliveries within the Customer's delivery window or repeatedly fail to deliver complete orders after accepting a Delivery Opportunity;
> e. Fail your background checks at any time after signing this Agreement;
> f. Violate the Customer's privacy rights;
> g. Engage in or encourage fraudulent conduct;
> h. Misuse or otherwise improperly disclose Confidential Information, or reproduce or prepare derivative works based on Instacart's platform, in violation of Section 8 of this Agreement;
> i. Invalidate this Agreement through an improper signature or identification verification;
> j. Direct, cause, or permit any of your Personnel to commit any of the violations listed in (a) through (i) of this paragraph.
>
> 5.3 Notwithstanding anything to the contrary, Instacart may stop providing access to the Instacart Platform, services, or features to you or to other users of the Instacart Platform, temporarily or indefinitely, when Instacart determines, in its reasonable and good faith business judgment, it is necessary to do so to ensure the safe and/or reliable operation of the Instacart Platform.

166. The ICA specifies that Instacart agrees to give the shopper access to its platform. In return, the shopper agrees to comply with Instacart's conditions of access. The shopper agrees to perform all services on the platform safely, respectfully, and according to acceptable industry standards. The shopper also agrees that access is not guaranteed. The shopper may lose access if he or she materially violates the ICA or other incorporated policies. The shopper further agrees that Instacart may terminate the ICA immediately, upon written notice, for a material breach, and that Instacart may stop providing access, temporarily or indefinitely, when it determines "in its reasonable and good faith business judgment" that doing so is necessary to ensure the safe and/or

reliable operation of the platform. The shopper accepts Instacart's discretion over these matters as a condition of access to the platform.

167. The ICA incorporates Instacart's Full Service Shopper Account Access Guidelines ("Access Guidelines"), which specify standards a shopper must meet to obtain and maintain access to the platform. Among other things, the Access Guidelines explain that a shopper may lose access for unsafe behavior or unacceptable service. Unsafe behavior can include profanity, violence, unsafe driving that violates applicable law, aggression, fraud, poor food safety, or "co-shopping" (i.e., bringing an unauthorized person on a batch). And unacceptable service can also include handling food unsafely, repeatedly failing to deliver within a customer's delivery window, or prompting multiple complaints from consumers or retailers.

168. The Access Guidelines also emphasize consumer privacy, which is a concern inherent in Instacart's delivery model. To complete a delivery, Instacart must provide a shopper with customer-specific information, including the customer's address and delivery instructions, and authorize the shopper to travel to the customer's residence. That information is disclosed for the limited purpose of completing a particular order. Once disclosed, however, it cannot be retrieved, and its misuse may expose a customer not merely online, but at the customer's home. For this reason, such privacy-related violations may result in immediate deactivation. Privacy violations may take a variety of forms, such as sharing a screenshot of a smartphone while the screen is showing a consumer's personal information. Likewise, they may include contacting a consumer about something unrelated to the consumer's order. The Access Guidelines address the points at which the platform's digital and physical risks intersect. These are not technical rules. They prevent non-Instacart shoppers from obtaining customer information or appearing at a

customer's home, and they reduce the risk that information disclosed for one delivery will be retained or misused afterward.

169. Instacart's Community Guidelines, which spell out the standards that all users of the platform, including shoppers, must respect, reinforce the contractual terms of the ICA and Access Guidelines. They serve as a public proclamation that safety is Instacart's "first priority" and that Instacart does not "permit any activity that could create unsafe conditions or cause harm to others."

170. Violating any of these interconnected rules can lead to removal from the platform. Instacart "reserves the right to investigate and take action" on any violation of the Guidelines in its sole discretion. It also reserves the right to suspend a user's account while it investigates a potential violation.

**B. Instacart's Commitment to Safety and Efficiency**

171. Together, these policies not only spell out Instacart's contractual relationship with shoppers; they also define Instacart to the public at large. Instacart's policies repeatedly emphasize safety, privacy, and efficiency because those values are central to Instacart's identity—and its continued viability. Instacart operates a multi-sided digital platform that connects people who otherwise have no relationship with one another. Customers entrust shoppers with access to their homes, personal information, shopping habits, and delivery preferences, while shoppers rely on that information to shop for and deliver products for payment. Customers believe the platform will offer efficient service, protect their information, and keep them safe. They believe these things in large part because of Instacart's policies and contracts, which give access only to people who agree to follow Instacart's standards.

172. Instacart's standards are meaningful only when they are enforced. And they are enforced largely through Instacart's discretion over who may access the platform. That right is a central feature of the ICA—a primary reason that Instacart agrees to enter it. The right allows Instacart to balance safety, efficiency, and privacy while also maximizing access to the platform.

**C. Instacart's Deactivation Process and Guardrails**

173. Instacart's deactivation process balances shoppers' access to earning opportunities with the safety, privacy, and trust of customers, retailers, and other platform users. It provides warnings where appropriate, permits prompt action when serious concerns arise, and gives shoppers an opportunity to submit evidence and seek review. These safeguards protect shoppers from unwarranted deactivation while preserving Instacart's ability to address misconduct and protect the marketplace.

174. Not all misconduct results in immediate deactivation. In many cases, when Instacart learns that a shopper has violated its standards, it sends the shopper a notice warning that the shopper's conduct is unacceptable. Only after repeated violations does Instacart deactivate the shopper's account. And only when a potential violation is serious does Instacart immediately deactivate the account. Serious violations include, among other things, safety violations, illegal behavior, and fraud.

175. Even when Instacart immediately deactivates the account, it may continue its investigation. Some alleged misconduct is too risky or dangerous to allow the shopper to continue to access the platform while the investigation proceeds. For example, if a shopper is credibly accused of harassment or criminal activity, such as stalking, Instacart will suspend the account before the investigation is complete. If the investigation clears the shopper of wrongdoing,

Instacart restores the account. If Instacart does not restore the account, the shopper has the same appeal and dispute-resolution avenues as all other shoppers.

176. Those appeal rights are fair and transparent. When Instacart deactivates a shopper's account, it notifies the shopper by email and in the Shopper App that the account has been deactivated and provides the category of the violation, e.g., a safety, privacy, or fraud violation. Where appropriate, Instacart also warns shoppers before deactivation. A deactivated shopper may appeal to the Trust & Safety Team and submit evidence, and a real person reviews each appeal. After the appeal, a shopper who is not satisfied can invoke the dispute-resolution process spelled out in the Independent Contractor Agreement.

**D. The Importance of Confidentiality**

177. Many deactivations rely on consumer complaints or reports. Instacart personnel are not present in the store, in the shopper's vehicle, or at the consumer's door, and in many cases the consumer is the only person other than the shopper who knows what happened. Instacart typically learns of a safety or privacy problem only after it receives a report.

178. In part for that reason, when Instacart does decide to deactivate an account, it is careful about the information it provides. It does not give the shopper the reporting consumer's name, address, or other personally identifying information, the contents of the consumer's order, or the consumer's verbatim report. Nor does Instacart give shoppers its investigative files. These files and information would alert the shopper to which consumer filed the report and heighten the risk of reprisal.

179. Even limited detail can allow a shopper to identify the consumer who filed the report. A shopper typically completes only around four or five deliveries in a day. If the shopper is told the date and nature of the report, such as an allegation about an unauthorized charge or a

theft from a particular order, the shopper may readily work out which consumer made the report. A report about an unusual or memorable interaction, such as an altercation at the consumer's door, can point to one consumer directly.

180. Disclosure also chills reporting. A consumer who has been harassed, threatened, or had personal information misused may not report the problem if the consumer believes that the shopper will see the report, learn who made it, or receive a copy of what they wrote. Every report that goes unmade is a risk that Instacart will not learn of misconduct and cannot protect the next consumer.

**E. Instacart's Anti-Fraud Measures**

181. Instacart must also guard against the risk of fraud. Fraudulent behavior takes many forms. For example, in the past, shoppers have charged consumers for items they did not order. They have also manipulated the time and mileage they incur while delivering a batch to inflate compensation. Time and mileage inflation is often facilitated by technology. Bad actors have used GPS "spoofing" software to make it appear that they traveled dozens or in some cases hundreds of miles farther than they did. This kind of fraud can cause significant overpayments. Instacart has therefore invested significant amounts of time and money to develop anti-fraud detection techniques.

182. These techniques are proprietary and confidential. Instacart developed them to combat the specific and evolving fraud threats on its own platform. It has also taken pains to keep its detection tools safe. Fraud-detection tools are useless if the fraudster knows how they work. Bad actors can immediately circumvent them and render Instacart's investments useless.

183. As a result, Instacart does not share details about these tools with deactivated shoppers. It does not tell a shopper who used software to commit fraud how it detected the fraud.

If it did, the detection tools would be self-defeating. Instacart must account for that risk when it determines how much information to give a deactivated shopper.

### F. The Small Percentage of Affected Shoppers

184. Deactivation is rare. For example, over the course of the year, only 5% of New York shopper accounts were deactivated. That number is consistent with prior time periods. Among the affected shoppers, more than half were deactivated for fraud. The other most common reasons were quality and safety.

185. Many deactivations are not permanent. A large portion of deactivations relate to causes that the shopper can cure. For example, when a shopper does not use an account within 45 days of opening it, Instacart may deactivate the account. Likewise, if a shopper does not use an account for 75 consecutive days, Instacart may deactivate it. Instacart deactivates these accounts to make room for shoppers who want to use the platform. But the deactivated shoppers are not permanently barred from the platform. They may apply to reactivate their accounts in the future.

## IV. Legislative Hearings on the Delivery Deactivation Law

186. In July 2025, New York City Councilmembers Justin L. Brannan, Sandy Nurse, and Shaun Abreu introduced Introduction 1332 of 2025, which the Council would eventually pass as the Delivery Deactivation Law.

187. The Law was introduced—and enacted—after a sustained campaign of lobbying by organized labor. Organized labor groups like the WJP and its affiliated organization Los Deliveristas Unidos ("LDU") have consistently advocated for new laws "guaranteeing stronger worker protections against" purportedly "unfair deactivations."[17] Well before the Law was

[17] Ligia Guallpa, Maria Figueroa & Gustavo Ajche, *Delivering Justice: A Worker Justice Centered Vision for Street Safety* 2, 8 (2024), https://www.nyc.gov/assets/manhattancb3/downloads/calendar/2024/Delivering-Justice-Report-2024.pdf.

introduced, WJP leaders spoke about the supposed need to "creat[e] more protections against deactivation," prevent "wealthy, greedy app companies" from "deactivating unfairly" the accounts of couriers, and hold those "companies[ ] accountable."[18] WJP boasted about working in "partnership" with the Council to pass laws targeting delivery applications. One of its co-executive directors accused Uber of deactivating couriers "because they just don't care about that human being, [and] because it's also about protecting their pockets" by making "millions and billions on the backs of workers."[19] In a publication dedicated to enhancing "street safety," they also pushed for the passage of laws that would stop purportedly wrongful deactivations—such as "retaliatory deactivations"—and to provide "due process" for deactivation decisions.[20] Members of LDU rallied outside City Hall on the same day Councilmember Brannan introduced the Law,[21] and LDU saw itself as a central figure in the "fight[ ]" for the Law's passage.[22]

188. At the September 12, 2025, hearing of the Committee on Consumer and Worker Protection ("Committee"), LDU Executive Director Ligia Guallpa claimed that couriers were being deactivated by companies with "no just cause, no reason for deactivation," and "no real due process."

---

[18] Office of the Mayor, *Transcript: Mayor Adams Announces First Annual Increase in Minimum Pay Rate for App-Based Restaurant Delivery Workers*, NYC (Apr. 1, 2024), https://www.nyc.gov/mayors-office/news/2024/04/transcript-mayor-adams-first-annual-increase-minimum-pay-rate-app-based.

[19] O'Connell, *supra* note 3.

[20] Ligia Guallpa, Maria Figueroa & Gustavo Ajche, *Delivering Justice: A Worker Justice Centered Vision for Street Safety*, https://static1.squarespace.com/static/651571ae4b60961776b44c4b/t/6602d47b09d2ae59c7c445a5/1711461506930/Delivering-Justice-Report-2024.pdf.

[21] Eva Moschitto, *Adams Continues Chaos for Deliveristas*, The Indypendent (Sept. 4, 2025), https://indypendent.org/2025/09/adams-continues-chaos-for-deliveristas/.

[22] Andrew R. Chow, *Gustavo Ajche Is Fighting for the Dignity of Delivery Workers*, Time (Sept. 16, 2025), https://time.com/collections/latino-leaders-2025/7310770/gustavo-achje/; *see also* Elsie Carson-Holt, *Deliveristas Rally for Deactivation Protections at City Hall*, The Indypendent (Sept. 15, 2025), https://indypendent.org/2025/09/deliveristas-rally-for-deactivation-protections-at-city-hall/; Sophia Lebowitz, *Delivery Workers Continue Push for Deactivation Protections*, StreetsBlog NYC (Oct. 14, 2025), https://nyc.streetsblog.org/2025/10/14/delivery-workers-continue-push-for-deactivation-protections.

189. DCWP testified that in the "couple of years" preceding the Law's introduction, it had received around 180 complaints regarding deactivations, and the volume of those complaints had not changed following passage of a law passed about minimum-pay requirements.

190. New York Taxi Workers Alliance Executive Director Bhairavi Desai described the bill as "necessary" to prevent companies from using deactivation as "a sword that hangs on the neck of workers."

191. National Employment Law Project lawyer Daniel Ocamp argued that the Law would help couriers, who purportedly "are still routinely deactivated without reason," by creating a presumption of innocence for couriers and placing the "burden of proving that [deactivation] was for cause" on the companies.

192. The Law's supporters parroted many of the same terms and concepts, including at the September 12, 2025 hearing.

193. Councilmember Shekar Krishnan stated that the point of the Law was to prevent companies from "compromis[ing]" a courier's livelihood through deactivations where couriers were purportedly given "no prior notice" and "no process prior to" the deactivation. He claimed that companies "are the prosecutor, judge, and jury" while the "burden" to "challenge a decision that was already made" falls on couriers.[23]

194. Councilmember Krishnan further stated that companies were violating a "basic, fundamental principle"—due process—by "tak[ing] away . . . workers' rights and their livelihoods" without "any proper *process* procedures" or "chance to make their case."

[23] *Transcript of the Minutes of the Committee on Consumer and Worker Protection* 64–66 (Sept. 12, 2025), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=7480055&GUID=265D0ED3-FB2F-48B9-AF70-79973B11E094 (attachment 10).

195. Councilmember Shaun Abreu asked DCWP what resources it would need to "hold the apps accountable."

196. During the hearing, the Committee did not offer a definition for what counted as an "unfair" or "wrongful" deactivation, nor did it obtain any data purporting to identify "unfair" or "wrongful" deactivations (as opposed to deactivations generally). Instead, the Committee relied on uncorroborated anecdotes from a handful of individuals and survey responses prepared by WJP.

197. WJP submitted written testimony from 45 couriers in support of the Law, 38 of whom testified that they had accounts deactivated by companies covered by the Law.[24] The majority of the 38 deactivated couriers admitted that the company had informed them of the reason why their accounts were deactivated. While all denied any wrongdoing on their part, at least 15 of the testifying deactivated couriers admitted to the conduct that led to their deactivation, such as refusing long-distance trips, taking an inordinate amount of time to complete deliveries, and using multiple phones contrary to company policies.

198. A few couriers simply relayed their general discontent with their deactivations without substantively engaging with their actual deactivation circumstances.

199. For example, the written testimony included the following statements:

- Instacart deactivated my account, because there is a big problem with the app system. They suspended my account with fake reasons. I did nothing wrong, I have worked on Instacart for 4 years, I don't understand why they deactivated my account. I also sent them the evidence. But they didn't respond.[25]

- Uber, Grubhub, DoorDash, and Instacart should not be allowed to fire us or lock us out for taking the necessary time to deliver safely, for delays caused by restaurants, or for accidents and other challenges we face while delivering meals and groceries.

[24] *Testimony, Hearing on Introduction 1332-2025 Before the Comm. on Consumer & Worker Prot.* (N.Y.C. Sept. 12, 2025), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=7480055&GUID=265D0ED3-FB2F-48B9-AF70-79973B11E094 (attachment 9).

[25] *Testimony of Deputy Comm'r Carlos A. Ortiz* 5 (Sept. 12, 2025), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=7480055&GUID=265D0ED3-FB2F-48B9-AF70-79973B11E094 (attachment 9).

> We need clear protections to ensure that our schedules are not unfairly limited or that we are not punished simply for being unable to deliver faster. Most importantly, **appeals must be reviewed by human beings, not algorithms**.[26]

200. Other couriers described appeal processes. Some couriers described submitting proof to support their claims of unfair deactivations. And at least one courier noted that he had been deactivated *four* times. Council members did not ask for any details probing such testimony, including for example the circumstances related to the courier regaining access on multiple occasions. The Council also did not attempt to reconcile claims that appeals were not available with testimony describing an appeals process.

201. The legislative record does not reflect any effort by the City to corroborate any of the anecdotal accounts, such as to determine why any particular individual was deactivated, what sort of notice the company provided, or whether there was an appeals process. Nor does the record reflect an effort to assess whether any deactivation practices caused broader harm.

202. The written testimony included comments about how the legislation "raise[d] serious legal concerns, including interference with the platforms' rights under the First and Fourteenth Amendments and Contracts Clause of the United States Constitution."[27] The record does not reflect any questions that the Council posed about such concerns.

203. Following the September hearing, the Council amended the proposed legislation, and on December 18, 2025, the Committee issued a report discussing the Law ("Report").

204. The Report did not substantively engage with many of the companies' concerns. Instead, the Report relied on uncorroborated and unverified anecdotal evidence like that presented

---

[26] *Letter from Gustavo Ajche to Comm. on Consumer & Worker Prot.* (Sept. 12, 2025), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=7480055&GUID=265D0ED3-FB2F-48B9-AF70-79973B11E094 (attachment 9).

[27] *Relay Testimony on Int. 1332-2025* (Sept. 12, 2025), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=7480055&GUID=265D0ED3-FB2F-48B9-AF70-79973B11E094 (attachment 9).

in the September hearing. Based on the few unsubstantiated accounts, the Report asserted that "contracted delivery workers have felt exploited by" companies, that they "report[ed] that they lose access to the apps without being given a clear reason why," and that many "believed they were deactivated for delays that were not within their control."[28]

205. The Report did not identify reliable data of wrongful deactivations. Instead, for the proposition that "many contracted delivery workers report that they lose the ability to secure work through the apps—also known as 'deactivation'—without warning, explanation or recourse," the Report cited only three sources.

206. The first two sources—news articles from *Business Insider*[29] and *The New York Times*[30]—compiled additional uncorroborated, anecdotal evidence from couriers and ride-share drivers around the country speaking to their purported experiences with deactivation. Neither article discussed a single instance of deactivation, much less wrongful deactivation, in New York City. The *New York Times* article noted that there is "little existing research on deactivations," but it pointed to a "2023 survey of app drivers conducted *by a coalition of labor groups* [that] found that 40 percent had been deactivated at some point" and another survey, also created by labor groups, purportedly showing that "of more than 800 California drivers, two-thirds said they had faced deactivation."[31] The article did not report surveys identifying unjustified, wrongful, or arbitrary deactivations. It is unclear how the article authors defined "deactivations" or if they

[28] *Committee Report of the Governmental Affairs Division* 20–23 (Dec. 18, 2025), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=7480055&GUID=265D0ED3-FB2F-48B9-AF70-79973B11E094 (attachment 12).

[29] Alex Bitter & Nancy Luna, *Delivery drivers who make their living on apps like Instacart, DoorDash, and Grubhub say they're being booted with little warning or recourse,* Bus. Insider (Oct. 1, 2023), https://www.businessinsider.com/how-gig-workers-are-fighting-against-sudden-account-deactivations-2023-9.

[30] Nick Keppler, *They Were Deactivated From Delivering. Their Finances Were Devastated*, N.Y. Times (Mar. 29, 2025), https://www.nytimes.com/2025/03/29/business/uber-lyft-doordash-deactivation.html.

[31] *Id.* (emphasis added).

defined the term more broadly than the Law, and included, for example, situations where an earner had sole control over their account access, such as needing to upload a document.

207. The Report's final source was a 2021 survey of 500 couriers conducted in partnership with WJP and largely authored by WJP and LDU leaders ("WJP Survey"). The 2021 survey found that 68 percent of couriers had "reported facing discipline or punishment" by the companies with whom they provided services.[32] But the WJP Survey did not state that such "issues" were limited to deactivation, and where it mentioned deactivations, it did not explain whether those deactivations were unjustified, wrongful, or arbitrary. Its reference to "discipline" also calls into question the New York Times article to the extent it stated that couriers were deactivated without any warning. The Council did not consider whether or how the passage of time since 2021 would impact the Report's findings and conclusions.

208. The Report similarly did not discuss what external impacts the Law would have on consumers, merchants, other couriers, or the public at large. It did not address, for example, whether the increased risk of fraud, theft, or safety issues would decrease the overall quality or increase the ultimate price of delivery services provided in the City.

209. Likewise, the Report did not address concerns stemming from the mandate to *reactivate* couriers merely because a business committed a procedural violation in communicating its deactivation decision to the courier. Nor did the Report address concerns that businesses would be chilled from deactivating couriers in the first place because of the uncertainty surrounding the legislation's vague standards and punitive enforcement mechanisms. And the Report failed to

[32] Maria Figueroa et al., *Essential but Unprotected: App-Based Food Couriers in New York City* 31 (2023), https://hdl.handle.net/1813/113534.

address how the costs imposed on the public and the City would impact the City's already-strained budget.

210. Despite these deficiencies, the Report concluded that "[a]rbitrary and unfair deactivations of contracted delivery workers are harmful to workers and their families" and that the Law was necessary "to ensure that the delivery services are fairly implementing deactivation protocols and giving workers an opportunity to challenge deactivation."

211. On the same day it issued its Report, the Committee voted on the Law as amended. The Committee did not discuss safety, fraud, theft, misconduct, or any other effect that the Law would have on the public. Instead, Chairperson Menin explained, the Law was designed to benefit "contracted delivery workers."

212. Following the Committee's vote, the full Council passed the Law at the Stated Meeting on the same day by a vote of 40 to 8 with no discussion of the Law's merits.

213. WJP and its allies celebrated the Law's passage. Public reports thus described the Law's passage as a significant "victory" for WJP and LDU,[33] and one Councilmember thanked "the Workers' Justice Project Council" by name when voting to pass the Law, noting it was a "leader" in "get[ting the] legislation across."[34]

214. Similarly, Councilmember Brannan stated:

> Securing protection from arbitrary and opaque worker deactivations, which strip workers of their livelihoods and dignity and incentivize the unsafe operation of delivery vehicles, is a fitting capstone to our years of work together. I started my career as a legislator fighting for the little guy and I'll go out the same way. The

---

[33] Chow, *supra* note 22; Carson-Holt, *supra* note 22; Lebowitz, *supra* note 22.

[34] *Transcript of the Minutes of the Committee on Consumer and Worker Protection* 13 (Dec. 18, 2025) (statement of Councilmember Gale A. Brewer), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=7480055&GUID=265D0ED3-FB2F-48B9-AF70-79973B11E094 (attachment 13).

human beings behind these billion-dollar apps deserve to be treated with dignity and respect and nothing less.[35]

215. The Law was returned unsigned by the Mayor on January 20, 2026, and is slated to take effect on January 17, 2027.[36]

**V. The Burdens Imposed by the Delivery Deactivation Law**

216. The Delivery Deactivation Law regulates the deactivation of the accounts of individuals who contract with a "delivery service." "Deactivation" is defined as "any indefinite or permanent discharge, termination or layoff of a contracted delivery worker or any indefinite or permanent revocation [or restriction] of a contracted delivery worker's access to the delivery platform or authorization to accept deliveries on the delivery platform." § 20-1501 (alteration in original) (emphasis omitted). And "delivery service" is defined as "a person that facilitates, offers, or arranges for the delivery of goods to or from a location in the city, including, but not limited to, a *third-party* food delivery service[ and], a *third-party* courier service, and *third-party* grocery delivery service, provided that the term 'delivery service' does not include any such person that facilitates, offers or arranges fewer than 50 trips each week, or any person that facilitates, offers or arranges for the delivery of goods solely by vehicles required by federal or state law, rule or regulation to be registered with the federal motor carrier safety administration." *Id.* (alteration in original) (emphases added).

217. The Law has eight main components: (1) deactivation prohibitions, restricting when delivery services may deactivate couriers; (2) a retroactive provision, giving deactivated

[35] N.Y.C. Council, *Building on Legacy of Confronting the Housing Crisis, NYC Council Approves Legislation to Advance Affordability and Housing Solutions for All New Yorkers* (Dec. 18, 2025), https://council.nyc.gov/press/2025/12/18/3034/.

[36] The Law has seven sections. The first six contain substantive components and would amend or add various provisions to chapter 15 of title 20 of the New York City Administrative Code. Unless otherwise specified, the citations herein refer to the section number of the Administrative Code as amended or added by the Law (e.g., § 20-1532).

workers the right to petition for restoration of access if they were deactivated within the last six years and based on the deactivation prohibition's standards; (3) notice provisions, requiring that delivery services provide certain information and notices to workers; (4) a burden of proof provision, placing the burden on delivery services to justify deactivating workers; (5) an informal dispute resolution provision, mandating that delivery services create methods for internally addressing deactivation disputes; (6) reporting and recordkeeping requirements, forcing delivery services to keep and provide information to DCWP; (7) progressive discipline provisions, requiring delivery services to create and implement policies regarding progressive discipline of workers; and (8) enforcement mechanisms and remedies.

218. The Law takes effect "1 year after" its enactment, i.e., on January 17, 2027.

**A. Deactivation Prohibitions**

219. The Law's keystone provision is § 20-1532, which provides that "[a] delivery service shall not deactivate a contracted delivery worker" who has contracted with the delivery service for at least 30 days except in three specific circumstances. § 20-1532(a).

220. *First*, a delivery service may deactivate a worker where the service has found "just cause." To establish "just cause," a delivery service must show a delivery worker committed "misconduct or fail[ed] to satisfactorily perform their job duties for a delivery service." § 20-1531. Despite that seemingly simple definition, a finding of just cause also requires a factfinder to balance seven non-exclusive factors. § 20-1532(b).

221. Those seven factors are:

- "Such contracted delivery worker knew or should have known of such delivery service's policy, rule, or practice that forms a basis for progressive discipline or such deactivation and knew or should have known of the potential consequences for violation of such policy, rule, or practice;"

- "Such delivery service's policy, rule, or practice that forms a basis for progressive discipline or such deactivation is reasonably related to safe and efficient delivery service operations;"
- "Such delivery service provided relevant and adequate training to such contracted delivery worker;"
- "Such delivery service's policy, rule, or practice that forms a basis for such deactivation, including the utilization of progressive discipline, was reasonable and applied consistently;"
- "Such delivery service undertook a fair and objective investigation into such contracted delivery worker's misconduct or failure to satisfactorily perform job duties;"
- "Such deactivation is a reasonable response to such contracted delivery worker's misconduct or failure to satisfactorily perform job duties and accounts for any mitigating circumstances, including but not limited to such contracted delivery worker's past work history; and"
- "Such contracted delivery worker violated the policy, rule, or practice or engaged in any misconduct or failure to satisfactorily perform job duties that forms a basis for progressive discipline or such deactivation."

222. The Law gives no guidance or limitation on how to balance or weigh these factors, nor what other factors should or may be considered.

223. The Law establishes that delivery services generally cannot deactivate workers as a first resort. The Law establishes that a deactivation will not constitute "just cause" unless there is "egregious misconduct" or if the service first uses a progressive discipline policy, discussed below, *infra* 245, that imposes a "graduated range of disciplinary measures" less serious than deactivation. §§ 20-1531, 20-1532(c). The Law requires the "progressive discipline" to have occurred no "more than 1 year before such deactivation." § 20-1532(c).

224. The Law defines "egregious misconduct" as "misconduct that is so outrageous, dangerous, or illegal that a delivery service cannot reasonably expect to correct it through progressive discipline," which "*may* include, but is not limited to, depending on the circumstances:

(i) violence or threats of violence; (ii) theft; (iii) sexual harassment; (iv) discrimination in violation of federal, state, or local law; or (v) willful destruction of property." § 20-1531 (emphasis added).

225. *Second*, a delivery service may deactivate a worker where the service has given a "bona fide economic reason" that is supported by the service's own business records. §§ 20-1532(a), 20-1534(a).

226. The Law recognizes only two such reasons: "(i) a proportionate reduction in volume of sales or profit within the fiscal quarter that ended prior to the issuance of a notice of layoff . . . or (ii) a delivery service discontinuing its driving services in the city." § 20-1534(a). Such economic deactivations must be made in order of seniority under rules to be promulgated by DCWP, and for three years afterward, the service must make reasonable efforts to offer restoration of access to those workers before onboarding anyone new. § 20-1534(b)(1)–(2). Further, a deactivation will not be considered for a bona fide economic reason unless the delivery service gives the delivery worker 120 days' advance notice of the layoff. § 20-1532(d).

227. *Third*, a delivery service may deactivate a worker "where federal, state, or local law or rule requires such delivery service to deactivate such contracted delivery worker." § 20-1532(a).

**B. Retroactive Provision**

228. In addition to prohibiting when delivery services may deactivate couriers in the future, the Law also provides previously deactivated workers a way to seek restoration of access for purportedly wrongful past deactivations. § 20-1533(a).

229. Under § 20-1533, all workers who were deactivated since January 2021—even those deactivated for serious infractions of Plaintiffs' safety and anti-fraud policies years ago—have one year to petition delivery services "for reinstatement or restoration of access" to those services. The Law entitles couriers to restoration of access within 30 days "unless such prior

deactivation occurred during the probation period"—defined as "a period of 30 calendar days beginning on the first date that a contracted delivery worker performs delivery services for a delivery service"—"or was for just cause, for a bona fide economic reason, as described in section 20-1534, or required by federal, state, or local law or rule." §§ 20-1533(a), 20-1531.

230. As with § 20-1532, the retroactive provision requires a balancing of non-exclusive factors to determine whether the delivery service has shown just cause. Those factors largely mirror those for prospective deactivations, with some slight alterations, including that the factfinder need not consider what training the delivery service provided but must consider whether the service considered exculpatory evidence before deactivating the worker. § 20-1533(b).

231. Regardless of the purported merits of the prior deactivation, however, delivery services need not restore access for couriers who "do[ ] not meet a minimum requirement that applies to all current contracted delivery workers for such delivery service or if such delivery service is not providing access to such delivery platform to any new contracted delivery worker, and has not provided such access during the 3 months prior to the effective date of the local law that added this section." § 20-1533(d). Those workers, however, must be placed on a waitlist and will be given priority over "new contracted delivery worker[s]." *Id.*

**C. Notice and Compelled Reports Provisions**

232. The Law imposes several notice requirements on delivery services. Any time a service deactivates a worker, for example, it must provide, "[w]ithin 72 hours . . . a notice of deactivation" containing "all the precise and detailed reasons for such deactivation and the effective date of such deactivation." § 20-1532(e). The notice must also inform couriers of their rights to challenge deactivation decisions, whether through informal resolution (which the service must create), an administrative proceeding before DCWP, or a private cause of action. § 20-

1532(e)(i)–(iv); § 20-1537 (informal resolution process); § 20-1507(b) (DCWP proceeding); § 20-1511(a)(6)–(10) (private cause of action).

233. The same information must be included in the notice given 120 days before a delivery worker is deactivated for economic reasons, § 20-1532(d), and in a notice given to a previously deactivated worker upon a delivery service's determination that the worker should not be given restored access, § 20-1533(c).

234. Upon deactivation, delivery services must also "provide a deactivated contracted delivery worker with information and data relevant to such contracted delivery worker's deactivation." § 20-1536(a). That data includes:

- "Performance data specific to such contracted delivery worker;"
- "All customer comments, ratings, and complaints received regarding the contracted delivery worker; and"
- 12 months of reports regarding "other contracted delivery workers who engaged in the same or similar misconduct or failure to satisfactorily perform job duties forming a basis for the deactivation of the contracted delivery worker subject to such notice."

235. The Law nominally requires the removal of personally identifiable information from the information that delivery services must provide to deactivated workers, but it provides that "a factfinder may require disclosure of certain personally identifiable information if a contracted delivery worker could not otherwise meaningfully contest the basis for a deactivation." § 20-1536(b).

236. The services must continue to provide "all information and data concerning such contracted delivery workers that such contracted delivery workers had access to prior to deactivation" for "at least 6 years after deactivati[on]." § 20-1536(d).

**D. Burden of Proof Provision**

237. In addition to restricting when delivery services may deactivate couriers, the Law also tips the scale against delivery services by placing the burden of proof on services to justify their deactivations while simultaneously limiting what those services can use to support their decisions.

238. The Law effectively creates a presumption that all deactivations are wrongful, requiring services to show "by a preponderance of the evidence" that *delivery services* complied with §§ 20-1532 and 20-1533. § 20-1535(a).

239. It then restricts the reasons that delivery services may provide to defend their presumptively wrongful decisions by providing that factfinders "may not consider any reasons proffered by the delivery service not included in the notice of deactivation" or notice that the service would not restore access for a previously deactivated worker. § 20-1535(b). There is no similar prohibition on couriers; they "may submit evidence in any proceeding alleging a violation of [the Law] that was not provided to a delivery service," and the factfinder *must* "consider such evidence, notwithstanding any failure by such contracted delivery worker to submit such evidence to such delivery service prior to such proceeding." § 20-1535(c).

**E. Informal Dispute Resolution Provision**

240. The Law requires delivery services to give deactivated couriers an opportunity to challenge their deactivations in-house.

241. Thus, delivery services must create "an email address, website or other form of electronic communication through which a contracted delivery worker or their representative may challenge such contracted delivery worker's deactivation, prior deactivation, or impending deactivation" and "submit evidence to substantiate any such challenge." § 20-1537(a).

242. The Law also requires that delivery services permit deactivated workers to "seek informal resolution" of their challenge "within 1 year of such deactivation." § 20-1537(b). The service and worker then have "15 days . . . to reach a resolution, unless such contracted delivery worker and such delivery service mutually agree to a longer timeframe." *Id.* If they reach a resolution, Plaintiffs must memorialize it on a form created by DCWP.

**F. Reporting and Recordkeeping**

243. The Law next requires delivery services to maintain records and disclose anonymized, aggregated data to DCWP about deactivations and disputes regarding those deactivations.

244. The Law thus authorizes DCWP to promulgate rules compelling delivery services to produce such data regarding the number of deactivated workers, the number of workers who sought and reached informal resolution of their deactivation grievances, the number of workers "who commenced arbitrations or private actions" under the Law, and "any other information [DCWP] deems relevant." § 20-1538(a). And it gives DCWP authority to promulgate rules compelling delivery services to retain such data, as well as to issue subpoenas for its production. § 20-1538(b).

**G. Progressive Discipline Mandate**

245. The Law requires delivery services to develop and "maintain a written progressive discipline policy," creating "a disciplinary system that provides for a graduated range of disciplinary measures, including but not limited to warnings and further training requirements, in response to a contracted delivery worker's misconduct or failure to satisfactorily perform job duties for a delivery service, with the type of disciplinary measure varying based on the frequency and degree of such misconduct or failure." §§ 20-1531, 20-1539(a).

246. Those policies must explain what types of misconduct will warrant discipline, the delivery service's performance standards, what disciplinary measures a service will apply to misconduct, the service's procedures for notifying workers of disciplinary actions, and the "[p]rocedures for applying discipline against a contracted delivery worker." § 20-1539(b).

247. The policy must be sufficiently clear "that a reasonable person can understand the acts and omissions that may result in deactivation or other disciplinary measures," and delivery services must provide that policy to their couriers. § 20-1539(c)–(d).

248. The Law also gives DCWP the authority to "promulgate rules establishing minimum requirements for the progressive discipline policy." § 20-1539(f).

**H. Enforcement Provisions**

249. The Law creates several methods of enforcing its provisions.

250. DCWP is required to "enforce the provisions" of the Law. § 20-1507(a). The Law thus gives couriers the right to file complaints with DCWP within two years of an alleged violation. § 20-1507(b)(1). DCWP is authorized to "investigate" those complaints. § 20-1507(b)(2). DCWP may also "open an investigation on its own initiative" and initiate administrative enforcement actions. § 20-1507(b)(3)–(4).

251. The City's Corporation Counsel has authority to initiate civil enforcement actions "for correction of any violation of" the Law, including actions for injunctive and other "appropriate" relief. § 20-1510.

252. The Law also authorizes a private right of action for workers who allege a violation of the deactivation prohibitions, the retroactive provision, the notice requirements, or the progressive discipline policy requirements. § 20-1511(a) (creating a private cause of action for violations of §§ 20-1532, 20-1533, 20-1534, 20-1536, and 20-1539). Such actions generally must

be brought "within 2 years of the date the person knew or should have known of the alleged violation." § 20-1511(c).

253. Contracted couriers are "entitled" to several remedies for violations of their rights under the Law. § 20-1508(a). Those remedies include:

- "compensatory damages" and other make-whole relief, § 20-1508(a)(1);
- "an order directing compliance with the" Law, § 20-1508(a)(2);
- for violations of §§ 20-1532 and 20-1533, "reinstatement or restoration of access to the delivery platform of a delivery service, unless waived by a contracted delivery worker," § 20-1508(a)(3)(g); and
- for violations of §§ 20-1536 and 20-1539, $500, § 20-1508(a)(3)(j)–(k).

254. For violations of § 20-1532, DCWP "may, in addition, grant the following relief: $500, rescission of any discipline issued, payment of any lost earnings resulting from the wrongful deactivation, and any other equitable relief as may be appropriate." § 20-1508(a)(3)(h).

255. The Law also imposes escalating civil penalties starting at $500 for violations, except for violations of § 20-1533. § 20-1509(a).

256. Should couriers bring a civil action under the new private cause of action, available remedies include compensatory damages, injunctive and declaratory relief, attorney's fees and costs, and, for violations of §§ 20-1532 and 20-1533, restoration of access and punitive damages. § 20-1511(b).

## VI. The Law's Impact on Plaintiffs

257. Section 20-1532(b) identifies seven subjective factors that a "fact-finder shall consider" when determining whether there was "just cause" to deactivate a courier. In addition to those factors, a factfinder must also consider "any other relevant factors." § 20-1532(b). The Law does not specify what the "other relevant factors" might be, nor does it provide any guidance on how to balance or weigh those factors. That creates enormous compliance uncertainty for

Plaintiffs. Where there is less-than-conclusive proof of "egregious misconduct," that uncertainty may lead Plaintiffs to refrain from deactivating couriers whose breaches of their agreements with Plaintiffs would otherwise permit deactivation and pose a risk to the safety and property of others. Plaintiffs will never ignore the safety of their customers. The Law, however, would punish Plaintiffs for this commitment by pairing a vague standard with the significant threat of enforcement actions, liability for damages and attorney's fees, and even punitive damages. In other words, the Law demands Plaintiffs pay a heavy price when, instead of maintaining access for couriers, Plaintiffs prioritize merchant and customer safety or protecting themselves against fraud.

258. The Law's deactivation prohibitions substitute the City's judgment for Plaintiffs' business judgment about how to administer their delivery contracts. Plaintiffs and the couriers with whom they contract have mutually agreed to abide by specified contractual terms regarding deactivation, including terms to prevent fraud or other misconduct, maintain the safety of customers, and ensure the efficient oversight of Plaintiffs' delivery contracts. Currently, Plaintiffs have discretion over when to contract with couriers and over the number of couriers included in any given program. The Law prevents Plaintiffs from exercising those contractual rights and instead grants certain couriers access to Plaintiffs' programs even if the couriers violated their bargained-for contractual agreements.

259. The Law would require Plaintiffs to adopt, follow, and publish to couriers a "progressive discipline" system they are not otherwise obligated to maintain, and keep couriers on their platforms even after determining they have violated their contractual commitments in order to first provide progressive discipline.

260. The Law's retroactive provision effectively rewrites key provisions of Plaintiffs' contracts with couriers going back six years. It replaces bargained-for deactivation provisions in those contracts with its own deactivation standard, long after deactivation decisions were made in reliance on the then-operative contracts. The retroactive provision allows couriers who have been deactivated in the past six years to "petition" for restoration of access any time within a one-year period following the Law's effective date. § 20-1533(a). Plaintiffs have only 30 days to restore access for couriers unless the prior deactivation was within the courier's 30-day probation period or was for "just cause," a "bona fide economic reason," or was required by federal or state law. If Plaintiffs do not restore access for the courier, he or she may seek restored access through an informal resolution process that will be adjudicated according to several subjective statutory factors. § 20-1533(b)(1)–(6), (c). The Law even authorizes deactivated couriers to file a civil action and seek punitive damages for these years-old deactivations. § 20-1511(b).

261. In other words, if the Law takes effect on January 17, 2027, every New York City contracted courier deactivated since January 17, 2021, may petition for restored access within the year. This requirement allows deactivated individuals—many of whom may have been deactivated for serious misconduct jeopardizing the safety and property of others—to have their accounts reactivated, unless Plaintiffs can identify evidence that may be stale or no longer in their possession to prove each individual deactivation was for "just cause," and deliver the requisite notices and data within 30 days.

262. While Plaintiffs retain information regarding deactivations, their retention decisions vary depending on the enforcement or deactivation type. Those decisions were also not taken with the Law in mind, meaning even the evidence Plaintiffs did retain may not be sufficient under the Law's new standards.

263. Plaintiffs had no reason to foresee that a law might one day retroactively supersede their bargained-for contractual deactivation rights—much less that it would do so with a lookback period of six years and the prospect of punitive damages. To the contrary, New York law mandates that independent-contractor relationships be governed by the terms of a written contract, recognizing both the validity of those relationships and protecting them under contract law. *See* N.Y. Gen. Bus. Law § 1412. New York has also recognized the importance of deactivation. *See, e.g.*, N.Y. Veh. & Traf. Law § 1696(1)(d)(iii) (requiring transportation network companies to "revoke access" when independent contractors violate specific safety provisions). And DCWP has encouraged businesses to rely on deactivation as a means of enforcing the standards of those with whom they contract for services.[37]

264. The Law compels delivery services to share "precise and detailed reasons for" deactivation, disclose all potentially relevant evidence regarding that deactivation (or else be unable to rely on it to defend deactivations), and make information available to deactivated couriers for six years. Although Plaintiffs provide couriers with notice of the reason for deactivation and, in some cases, real-time information about service ratings, Plaintiffs do not currently provide all of the information required under the Law and would not choose to do so. The data compelled under the Law contains information that is confidential, sensitive, or both, and Plaintiffs would otherwise not disclose such information or allow deactivated couriers access to such information. This compelled reporting requirement requires Plaintiffs to speak in ways that could reveal their own proprietary information, including confidential processes that could provide couriers with a roadmap to circumvent those processes.

[37] DCWP, *supra* note 1, at 14.

265. The compelled reporting requirement is burdensome. Plaintiffs must devote significant resources to compiling the reports and must adhere to rigid timelines to provide them to deactivated couriers in New York City. That is unreasonable on its own, but even more so for deactivations that occurred years ago, which would require Plaintiffs to search for and collect years-old data to comply with requirements and standards that did not yet exist at the time of deactivation. Complying with these requirements will require multiple full-time employees to collect, review, sort, and assemble data.

266. These burdens will irreparably harm Plaintiffs. In addition to the irreparable harm caused by the deprivation of their constitutional rights, Plaintiffs face irreparable harm by the loss of customer trust and the resulting damage to their reputation and goodwill. Customers understand that Plaintiffs' choices about whom to contract with are a component of Plaintiffs' expression regarding their values. If Plaintiffs cannot deactivate or are forced to restore access to the accounts of couriers who violate Plaintiffs' policies and those couriers continue to violate those policies—even just one additional time—that indirectly damages Plaintiffs' reputation and customer goodwill.

267. Additionally, the Law requires Plaintiffs to provide each deactivated courier with a written explanation of all "precise and detailed reasons" for deactivation. These reasons must include all customer comments, ratings, and complaints about the courier, undefined "[p]erformance data" specific to the courier, and an "[a]nonymized and aggregated report" regarding discipline or deactivation of any couriers who engaged in similar misconduct or failure to perform satisfactorily, which Plaintiffs must formulate an opinion on and speak it. § 20-1536(a). These disclosures will inevitably chill customer reports, as customers will hesitate to report misbehavior when they understand that the courier may learn about the report.

268. The required disclosures also expose merchants and customers who report misconduct to a risk of retaliation. Details of a complaint may enable a courier to identify the merchant or customer, return to the merchant's or customer's home or business, and retaliate. That risk threatens the customer and merchant trust Plaintiffs have worked hard to build and may deter merchants and customers from reporting misconduct.

269. Removing personally identifiable information does not cure the problem. The Law permits a factfinder to require disclosure of that information if a courier could not otherwise "meaningfully contest" the deactivation. § 20-1536(b). Even without that disclosure, a courier may readily recognize which customer or merchant complained. A courier who stole goods or property, for example, will know where the theft occurred.

270. The harm to Plaintiffs' businesses will be real and irreparable: they will suffer incalculable damage to their reputation and goodwill, particularly when the Law compels Plaintiffs to continue to associate with couriers whose behavior will cause customers and merchants to form a negative impression of Plaintiffs.

## VII. This Court Preliminarily Enjoined Local Law 52, the Delivery Deactivation Law's Twin

271. On December 18, 2025—the same day it passed the Delivery Deactivation Law—the City Council passed Introduction 276 of 2024, which became Local Law 52 of 2026 after the Council overrode the Mayor's veto. *Uber*, 839 F. Supp. 3d at 235–36.

272. Local Law 52 imposes on ride-share platforms many of the same obligations the Delivery Deactivation Law imposes on delivery services and is in most respects substantially identical: Local Law 52 prohibits deactivation after a 30-day probation period absent just cause, a bona fide economic reason, or a legal requirement. Just cause is judged under the same seven non-exclusive factors. As with the Delivery Deactivation Law, Local Law 52 requires a notice of

"all the precise and detailed reasons" for deactivation, and the platform bears the burden of proof to justify deactivation. Failure to do so results in mandatory restoration of access for any violation. And like the Delivery Deactivation Law, Local Law 52 has a retroactive provision requiring restoration of access for couriers deactivated years earlier unless the platform can justify those completed deactivations under the newly promulgated standards. Local Law 52 also requires a progressive-discipline policy and an "informal resolution" process. *Compare id.* at 236–39, *with* §§ 20-1508(a)(3)(g), 20-1511(b), 20-1532, 20-1533, 20-1535.

273. Uber and Lyft challenged Local Law 52 under the Contracts Clause, among other provisions. On July 21, 2026, Judge Woods preliminarily enjoined the law in its entirety, holding that the platforms were likely to succeed in showing that it "protects a narrow class of drivers and does not advance the broader social or economic interest which the Constitution requires to permit the severe impairment of their contracts." *Uber*, 839 F. Supp. 3d at 229, 259–60.

274. First, the court held that Local Law 52 likely substantially impairs the platforms' agreements. Deactivation provisions are "central" to those agreements, defining "whether, when, and under what circumstances a driver may use the platform," and the law's provisions "transfer the ultimate authority to determine whether a driver may remain on the platform from [the platforms] to an outside factfinder applying standards that the parties' agreement does not contain." *Uber*, 839 F. Supp. 3d at 243–44. It made no difference that the platforms already used many of the law's procedures because the law "converts a voluntary practice into a mandatory obligation." *Id.* at 244.

275. The court also held that Local Law 52 likely upsets the platforms' reasonable expectations because no prior regulations or pending legislation made the law foreseeable. *Uber*,

839 F. Supp. 3d at 244–45. And the court concluded that the law afforded Uber and Lyft no way to preserve their contractual rights. *Id.* at 246.

276. Second, the court held that the platforms were likely to show that Local Law 52 does not serve "a significant and legitimate public purpose." *Uber*, 839 F. Supp. 3d at 247. A law is not directed towards a public end when it "merely . . . confers a meaningful benefit on an affected group." *Id.* But that is all Local Law 52 did. The court found that the City sought only to provide a benefit to allegedly wrongfully deactivated drivers. *Id.* Indeed, the legislative record reflected and "document[ed]" that interest alone. *Id.* at 228, 248–49 & n.5.

277. Third, the court concluded that, even if the City had identified a legitimate public purpose, the platforms were likely to show that Local Law 52 is not a reasonable and necessary means of addressing it. *Uber*, 839 F. Supp. 3d at 251–54. The court explained that the law permanently impairs Uber's and Lyft's rights without compensation, and the law's central features determine entitlement to reinstatement "on grounds materially broader than whether a deactivation was erroneous, arbitrary, or unsupported." *Id.* at 252.

278. The court also held that the platforms would suffer irreparable harm to their reputations and customer goodwill absent a preliminary injunction and that the public interest favored preserving the status quo. *Uber*, 839 F. Supp. 3d at 255–60. Accordingly, the court preliminarily enjoined Local Law 52 in full. *Id.* The court declined to limit the injunction to pre-enactment agreements because the law "creates one deactivation regime" that "does not distinguish between agreements made before and after enactment," and narrowing it "would require the Court to add a temporal qualification the Council did not enact." *Id.* at 259.

## FIRST CLAIM FOR RELIEF

**(Declaratory Relief and Injunctive Relief for Violation of the Contracts Clause of the United States Constitution (art. I, § 10, cl. 1; 42 U.S.C. § 1983))**

279. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

280. The Delivery Deactivation Law violates the Contracts Clause of the U.S. Constitution by effectively rewriting central provisions in Plaintiffs' contracts with couriers to impose new substantive and procedural requirements. *See* U.S. Const. art. I, § 10, cl. 1. The City cannot show this burden is reasonable or necessary to advance a legitimate public purpose.

281. The Contracts Clause of the U.S. Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. This prohibition applies to local ordinances. *See, e.g.*, *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 62 (2d Cir. 2020).

282. The Contracts Clause "limits . . . the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978). This is because "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id.* at 245.

283. Laws trigger scrutiny under the Contracts Clause if they "operat[e] as a substantial impairment of a contractual relationship." *Allied Structural*, 438 U.S. at 244. "In answering that question," courts "consider[ ] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [its] rights." *Sveen v. Melin*, 584 U.S. 811, 819 (2018).

284. Laws that substantially impair contractual relationships are invalid unless they are "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 584 U.S. at 819 (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983)). "T[his] standard is more demanding than the rational basis review that applies when legislation is challenged under the Due Process Clause." *Melendez v. City of New York*, 16 F.4th 992, 1032 (2d Cir. 2021). Indeed, "[t]he requirement of a legitimate public purpose guarantees that the [government] is exercising its police power, rather than providing a benefit to special interests." *Energy Rsrvs. Grp.*, 459 U.S. at 412. The government "bears the burden of proof in showing a significant and legitimate public purpose underlying the [law]." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002); *see Energy Rsrvs. Grp.*, 459 U.S. at 411–12.

285. Uber's existing and historical contracts with its couriers provide that Uber may deactivate a courier's account if Uber determines, in its discretion, that the courier engaged in conduct that is deceptive, fraudulent, unsafe, illegal, harmful to Uber's brand, business or reputation, or that otherwise violates Uber's standards and policies.

286. Amazon's existing contracts with Delivery Partners include a deactivation provision that affords Amazon the contractual right to deactivate Delivery Partners for a variety of reasons, including failing to meet Amazon's service standards, failing or refusing a background check, violating Amazon policies, misusing the Amazon Flex app, and committing fraud or theft. Amazon currently provides Delivery Partners in New York City 30 days to appeal a for-cause deactivation.

287. Instacart's existing contracts give it the discretionary right to determine whether and when a shopper has breached the agreement, and, if so, to deactivate the shopper immediately.

Under those contracts, Instacart may "immediately terminate" the agreement upon written notice that the contractor "engage[d] in a material breach." Instacart may also suspend a shopper's account while it investigates potential serious breaches—again, in its "reasonable and good faith business judgment." ICA ¶¶ 5.2–5.3.

288. Addressing a substantially similar law enacted by the City at the same time as the Delivery Deactivation Law, the court in *Uber Technologies, Inc. v. City of New York* found that law likely violated the Contracts Clause. 839 F. Supp. 3d at 240. The law at issue in *Uber*, Local Law 52 of 2026, enacted similar provisions regarding deactivations of drivers for ride-share apps like Uber and Lyft. The court explained that the City's effort to "superimpos[e]" new obligations governing deactivations burdened provisions that were "central" to Uber's and Lyft's agreements regarding "whether, when, and under what circumstances a driver may use the platform." *Id.* at 242–43. The City could not justify that burden because Local Law 52 did not serve a legitimate public purpose but rather was designed to "benefit" a group that was "quite small": wrongfully deactivated drivers. *Id.* at 248–49. While the City had evidence of deactivations generally, it lacked any reliable data showing "*wrongful or arbitrary*" deactivations were a widespread problem. *Id.* (emphasis added). This lack of evidence also demonstrated that Local Law 52 was not a reasonable and necessary means of advancing the City's goals. Without data as to the reasons for existing deactivations, the City could not "justify authorizing a factfinder to reassess [Uber's and Lyft's] training, operating policies, and disciplinary judgments, mandating reinstatement for procedural violations notwithstanding just cause, or reopening [several] years of completed decisions under standards that did not govern when those decisions were made." *Id.* at 252. The decision in *Uber* demonstrates that the Delivery Deactivation Law is likewise unconstitutional.

289. The Law substantially impairs the existing contracts between delivery services and the independent contractors they contract with by "nullif[ying] [the] express terms" of those contracts. *Allied Structural*, 438 U.S. at 247. The Law "superimpos[es]" obligations that are "conspicuously beyond" those that Plaintiffs "had voluntarily agreed to undertake" and modifies the "basic term[s] of" their contracts. *Id.* at 240, 246. The Law's requirements superimpose a new and independent "just cause" standard that turns on a non-exhaustive list of statutory factors that appear nowhere in Plaintiffs' contracts. *See* § 20-1532(b). This standard does so without establishing any concomitant burdens on Plaintiffs' counterparties. In addition, the Law mandates another process to notify individuals of deactivation. And the Law forces Plaintiffs to restore access to a courier when a statutorily required 72-hour deactivation notice was either late or insufficiently "precise and detailed." §§ 20-1508(a)(3)(g), 20-1511(b), 20-1532(e). The result is that DCWP could order restored access even when a courier indisputably violated his or her contract.

290. The burdens extend still further. The Law allows couriers to petition for restored access for up to six years after their deactivation with the prospect of a civil action and punitive damages if Plaintiffs determine they will not restore access. §§ 20-1511(b), 20-1533. It places the burden to prove deactivation was appropriate on Plaintiffs based on the City's new standards and based on a record that is artificially limited to only the reasons that Plaintiffs disclose within 72 hours of deactivation. And it mandates that in many cases, before deactivation, Plaintiffs must engage in what the Law refers to as "progressive discipline," and with the scope of such cases being unclear. At bottom, Plaintiffs' contractual rights to deactivate are no longer their own—they are instead governed by the City's superimposed criteria, restrictions, and ultimately subject to decision making by an outside factfinder who can consider literally any factor.

291. The Delivery Deactivation Law also wholly prevents Plaintiffs from safeguarding or reinstating their rights by eliminating their discretion permanently. The Law has no mechanism for seeking an exception. It requires so-called progressive discipline and just cause indefinitely. It permanently eliminates Plaintiffs' discretion over deactivations and thus permanently impairs Plaintiffs' contractual rights.

292. The City cannot carry its burden of showing a significant and legitimate public purpose underlying the Law. *Uber*, 839 F. Supp. 3d at 247. The legislative record and other evidence demonstrate that the Law is designed to "provid[e] a benefit to special interests," *Energy Rsrvs. Grp.*, 459 U.S. at 412—namely, wrongfully deactivated couriers. Those deactivated couriers make up a tiny fraction of the New York City population. The Law was therefore passed, not for any legitimate public purpose, but to pursue "the interests of a narrow class." *Uber*, 839 F. Supp. 3d at 251.

293. The Delivery Deactivation Law is also not a reasonable or appropriate means of advancing any legitimate public purpose. The Second Circuit has explained that in determining whether a law challenged under the Contracts Clause is a reasonable means to achieve a legitimate public purpose, a court should consider five factors: (1) whether the law impairs contractual rights on a temporary or limited basis, or whether it permanently and entirely extinguishes them; (2) whether there is some record basis to link the legislature's purpose and its chosen means; (3) whether, if the burden of contractual impairment comes at the expense of a discrete group of private persons, it is tailored to the party causing the public harm that the state sought to mitigate; (4) whether the relief provided by the law is conditioned on need and, if not, whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is better positioned financially to bear the burden than the relieved party is; and (5) whether the law

provides compensation for damages or losses sustained as a result of the impairment. *See Melendez v. City of New York*, 16 F.4th 992, 1023 (2d Cir. 2021).

294. Under the *Melendez* factors, the Delivery Deactivation Law is not a reasonable means necessary to achieve any legitimate public purpose: (1) the Law impairs Plaintiffs' contractual rights on a permanent basis; (2) there is no record basis linking any public purpose to the Law's requirements, and it contains no findings about the problem it was trying to solve or the source of that problem; (3) the Law is not tailored to the party causing the public harm that the state sought to mitigate; (4) the Law does not condition relief on need; and (5) the Law offers Plaintiffs no compensation for the loss of their rights or the risks they face caused by mandatory reinstatement and limits on their deactivation rights. The Law is thus not a reasonable means to achieve any public purpose.

295. The legislative record further confirms that there is little connection between its new mandates and any conceivable legitimate public purpose. The record establishes that total deactivations are few and far between—which still says nothing about how many of those deactivations were wrongful or arbitrary. The legislative record also does not include evidence of how the Law benefits the public at large. So the Law, if allowed to go into effect, will fundamentally rewrite Plaintiffs' contracts, remove basic contractual protections, force Plaintiffs to defend years-old deactivations under a new standard with evidence they may no longer have, and arrogate deactivation authority to an outside factfinder, all to advantage a small group without any legislative-record evidence of a widespread problem or public benefits.

296. Accordingly, the Law violates the Contracts Clause of the U.S. Constitution, both facially and as applied, which entitles Plaintiffs to injunctive, declaratory, and other appropriate relief.

## SECOND CLAIM FOR RELIEF

**(Declaratory Relief and Injunctive Relief for Violation of the First Amendment to the United States Constitution (42 U.S.C. § 1983) (Compelled Speech))**

297. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

298. The First Amendment to the U.S. Constitution, made applicable to States and municipalities by the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I.

299. Under this guarantee, the government cannot "compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). Yet the Law does precisely this by compelling Plaintiffs to share "precise and detailed reasons" for deactivations, disclose all potentially relevant evidence regarding that deactivation (or else be unable to rely on it to defend deactivations), and make information available to deactivated couriers for six years. The Law also requires delivery services to "maintain a written progressive discipline policy," and the City mandates what speech goes into this "single writing." § 20-1539. It further forces Plaintiffs to form an opinion about what kinds of misconduct are similar to the misconduct of any given courier and then speak that opinion and provide associated data.

300. Because the Law compels Plaintiffs to disclose information they would "rather avoid" and articulate certain policies that they would not otherwise adopt, it is content-based "regardless of the character of the speech it compels." *DoorDash, Inc. v. City of New York*, 185 F.4th 1, 8 (2d Cir. 2026). Strict scrutiny thus applies, and the Law is presumptively unconstitutional. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

301. Strict scrutiny also applies because the Law seeks to compel speech that is noncommercial. Compelled statements regarding deactivation decisions and discipline policies

are not made to "propose a commercial transaction." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 374 (2d Cir. 2025) (citation omitted). They have nothing to do with "an advertisement," do not "make[ ] reference to a specific product," and lack a meaningful connection to an economic motive given the far stronger fraud and safety concerns the speech poses. *Id.* (citation omitted). The "nature of the speech taken as a whole" is thus noncommercial, and the City must carry its burden of showing a compelling state interest, and that the challenged provisions are the least restrictive means to advance that interest. *Id.* (citation omitted).

302. The City cannot establish that the Law furthers a compelling government interest. The Law is not "reasonably related to" any "interest in preventing deception of consumers." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). It is instead aimed at a hypothetical concern about unidentified deficiencies in delivery services' deactivation processes. That is not a legitimate state interest, let alone a compelling one.

303. None of the provisions is narrowly tailored to serve any legitimate interest in all events because there are less restrictive alternatives to serve the City's supposed interests.

304. Even if the speech were considered commercial subject to intermediate scrutiny, the Law would not pass muster for similar reasons.

305. The City cannot identify any "substantial" government interest in benefiting a narrow group based on a legislative record showing only hypothetical harms. *DoorDash, Inc.*, 185 F.4th at 8–9.

306. Nor does the Law "directly advance" any substantial interest if there were one. *DoorDash, Inc.*, 185 F.4th at 8–9.

307. Even taking the City's stated interest of curbing wrongful deactivations at face value, the legislative record confirms that the City has not "'carefully calculated' the costs and

benefits associated with the [Law's] burden on speech" or evaluated the "numerous and obvious less-burdensome alternatives" to achieving the City's goals. *DoorDash, Inc.*, 185 F.4th at 9 (quoting *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 & n.13 (1993)).

308. Whether reviewed under strict or intermediate scrutiny, the Law, which compels Plaintiffs to provide information about their customers and internal processes that they would not otherwise provide, cannot survive a challenge under the First Amendment. *See DoorDash*, 185 F.4th at 8–9. The Law compels Plaintiffs to deliver a message they would not otherwise choose to deliver, serves no legitimate public purpose, is not a reasonable and necessary means to achieve any such purpose, and is not tailored to serve any such interest. Accordingly, the Law violates the First Amendment to the U.S. Constitution, both facially and as applied, which entitles Plaintiffs to injunctive, declaratory, and other appropriate relief.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief and Injunctive Relief for Violation of Article I, Section 8 of the New York Constitution)

309. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

310. The guarantees of free speech in Article I, Section 8 of the New York Constitution are "often broader" than the protections afforded by the First Amendment. *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1278 (N.Y. 1991) (citation omitted); *accord Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018) (noting that the New York Constitution's free-speech protections are "at least as protective" as the First Amendment).

311. The Second Circuit has repeatedly recognized that compelled disclosures implicate core free-speech concerns because they alter the content of a private party's communications. *See Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246–50 (2d Cir. 2014) (sustaining

injunction against local law whose provisions likely violated the First Amendment because they "impermissibly compel speech").

312. The same defect is present here. The Law compels Plaintiffs to disseminate the government's selected message through their own communications channels in violation of Article I, Section 8 of the New York Constitution.

313. Accordingly, the Law violates Article I, Section 8 of the New York Constitution, both facially and as applied, which entitles Plaintiffs to injunctive, declaratory, and other appropriate relief.

**FOURTH CLAIM FOR RELIEF**

**(Declaratory Relief and Injunctive Relief for Violation of the First Amendment to the United States Constitution (42 U.S.C. § 1983) (Expressive Association))**

314. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

315. The First Amendment to the U.S. Constitution, made applicable to States and municipalities by the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I.

316. Under this guarantee, the government may not infringe the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," as well as the corresponding "freedom *not* to associate." *Slattery v. Hochul*, 61 F.4th 278, 286 (2d Cir. 2023) (emphasis added) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984)).

317. The Law infringes Plaintiffs' freedom of expressive association by forcing Plaintiffs to associate with individuals—even those that are dangerous and engaged in fraudulent conduct—in their respective delivery contracting. State action compels association in violation of the First Amendment when "the group making the claim engaged in expressive association," "the

state action at issue significantly affected the group's ability to advocate its viewpoints," and the "state's interest" does not justify "the burden imposed on the associational expression." *Slattery*, 61 F.4th at 287 (citation omitted).

318. Plaintiffs engage in protected expressive association through their public statements, company values and policies, and by contracting with individuals who embody Plaintiffs' commitment to safety and professional integrity (such as by combating fraud and theft). First Amendment protections apply to this association, even where Plaintiffs do not associate for the sole purpose of disseminating a certain message. *See Slattery*, 61 F.4th at 287. Here, the Delivery Deactivation Law forces Plaintiffs to associate with individuals that they have already determined or may determine in the future undermine Plaintiffs' public statements and their values with respect to the services they provide.

319. The Delivery Deactivation Law alters Plaintiffs' ability to advocate their viewpoints by forcing them to restore access for or retain couriers with whom Plaintiffs have already chosen or may choose to disassociate based on their determinations that those couriers have engaged in conduct contrary to Plaintiffs' messages or that present risks incompatible with Plaintiffs' values. Compelling Plaintiffs to restore access for or retain couriers who act or have acted against the very missions of Plaintiffs' organizations is a severe alteration. *See Slattery*, 61 F.4th at 288 ("The statute forces Evergreen to employ individuals who act or have acted against the very mission of its organization.").

320. The City's interest in the Delivery Deactivation Law does not outweigh or justify the burden imposed on Plaintiffs' associational expression. The Law aims to address an unsubstantiated problem to benefit a narrow class of "wrongfully deactivated" couriers at the expense of Plaintiffs, their customers, and the general public. This is not a legitimate state interest,

let alone a compelling one. And, even if it were, the Law is not narrowly tailored to serve even that interest.

321. Accordingly, the Law violates the First Amendment to the U.S. Constitution, both facially and as applied, which entitles Plaintiffs to injunctive, declaratory, and other appropriate relief.

**FIFTH CLAIM FOR RELIEF**

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (Retroactive) (42 U.S.C. § 1983))**

322. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

323. The Due Process Clause of the Fourteenth Amendment limits the power of state and local governments to impose retroactive legislation that arbitrarily upsets settled expectations and vested rights in violation of due process. *See* U.S. Const. amend. XIV.

324. Although economic legislation is generally reviewed under a deferential rational-basis standard, retroactive legislation must itself be justified by a legitimate legislative purpose furthered through rational means. In other words, the state not only must have a rational basis for the law in general; it must have a rational basis specifically for making the law retroactive. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) ("a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application").

325. Courts have recognized that retroactive legislation is subject to due-process scrutiny because retroactivity raises special concerns regarding fairness, reliance interests, and the disruption of settled legal expectations. *See Restrepo v. McElroy*, 369 F.3d 627, 631 (2d Cir. 2004). Indeed, the "presumption against retroactive legislation is deeply rooted in [the U.S. Supreme Court's] jurisprudence, and embodies a legal doctrine centuries older than our Republic."

*Landgraf*, 511 U.S. at 265. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.*

326. Courts evaluating retroactive legislation consider, among other things, the nature and extent of the reliance interests impaired, the degree of retroactivity, and whether the governmental justification is sufficient to warrant upsetting preexisting rights. *See*, *e.g.*, *E. Enters. v. Apfel*, 524 U.S. 498, 533–34 (1998) (plurality op.); *see also id.* at 549 (Kennedy, J., concurring in part and dissenting in part).

327. The Delivery Deactivation Law operates retroactively by attaching new legal consequences to actions and contracts that Plaintiffs entered long before the Law's enactment. In doing so, the Law deprives Plaintiffs of their "legitimate expectations" and "upset[s] settled transactions." *Apfel*, 524 U.S. at 533.

328. When Plaintiffs entered into contracts with couriers, Plaintiffs possessed vested rights and legitimate expectations under the laws then in force and structured their affairs in reliance upon that law. The Law substantially impairs those settled expectations by imposing obligations, liabilities, restrictions, and penalties that did not exist when Plaintiffs entered into their agreements.

329. The Law's retroactive operation is arbitrary and fundamentally unfair because it does not merely regulate future conduct; instead, it reaches backward and alters the legal consequences of completed transactions and previously accrued rights. The retroactive application of the Law is thus "substantial and particularly far reaching." *Apfel*, 524 U.S. at 534.

330. Nor is the retroactive reach of the Law necessary to achieve any legitimate governmental objective, as any legitimate governmental interests identified by the City (of which there are none) could be fully accomplished through prospective regulation.

331. Even if the City could identify a legitimate public purpose for applying the Law to deactivations after its effective date, it can identify no such purpose for applying the Law's restrictions to deactivations completed in the past.

332. Accordingly, the Law violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, both facially and as applied, which entitles Plaintiffs to injunctive, declaratory, and other appropriate relief.

**SIXTH CLAIM FOR RELIEF**

**(Declaratory Relief and Injunctive Relief for Violation of Article I, Section 6 of the New York Constitution)**

333. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

334. Article I, Section 6 of the New York Constitution likewise guarantees due process of law. Like the Due Process Clause of the Fourteenth Amendment, it has been interpreted to forbid arbitrarily retroactive legislation. *Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal*, 154 N.E.3d 972, 995 (N.Y. 2020).

335. Indeed, the New York Court of Appeals has held that the state's constitutional Due Process Clause provides broader protection than its federal counterpart. *See, e.g.*, *Sharrock v. Dell Buick-Cadillac, Inc.*, 379 N.E.2d 1169, 1173–78 (N.Y. 1978) (finding violation of New York Constitution Article I, Section 6 Due Process but not in violation of U.S. Constitution); *People v. LaValle*, 817 N.E.2d 341, 364 (N.Y. 2004) ("This Court has repeatedly construed the State Constitution's Due Process Clause to provide greater protection than its federal counterpart.").

"Retroactivity concerns are further heightened" where, as here, the challenged law affects "contractual or property rights." *Regina*, 154 N.E.3d at 1000.

336. In considering whether a retroactive law violates the New York Constitution Due Process Clause, the "important factors . . . are (1) 'the [plaintiff]'s forewarning of a change in the legislation and the reasonableness of . . . reliance on the old law,' (2) 'the length of the retroactive period,' and (3) 'the public purpose for retroactive application.'" *James Square Assocs. LP v. Mullen*, 993 N.E.2d 374, 380 (N.Y. 2013) (citation omitted).

337. The Law fails all three prongs of the *Replan* test. *See Replan Dev., Inc. v. Dep't of Hous. Pres. & Dev. of N.Y.C.*, 517 N.E.2d 200, 202–03 (N.Y. 1987). First, Plaintiffs have reasonably relied on the existing legal framework governing the contracts they entered into over the last six years and had no reason to expect the City of New York would attempt to bootstrap a new "just cause" requirement on their deactivations retroactively. Second, the Law imposes an arbitrary and unduly lengthy lookback period of six years, yet nothing in the Law or its legislative history provides any reason as to why it should be retroactive at all, and certainly nothing as to why it reaches back for an arbitrary and extended period of six years. Third, the Delivery Deactivation Law serves no legitimate government purpose.

338. Accordingly, the Law violates the Due Process Clause of the New York Constitution, both facially and as applied, which entitles Plaintiffs to injunctive, declaratory, and other appropriate relief.

**SEVENTH CLAIM FOR RELIEF**

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (Void for Vagueness) (42 U.S.C. § 1983))**

339. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

340. The Due Process Clause requires that governments provide fair notice of what conduct is prohibited. "As one of the most fundamental protections of the Due Process Clause," the "void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (internal quotation marks and citations omitted). The vagueness doctrine serves to ensure that regulated parties "know what is required of them so they may act accordingly" and "that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

341. The Delivery Deactivation Law fails to adequately provide Plaintiffs notice of "what is required of them." *Fox Television*, 567 U.S. at 253. The Delivery Deactivation Law provides no reference or clarifying definition of "just cause" that enables Plaintiffs to understand what is required either going forward or for demonstrating years-old deactivations satisfy "just cause." §§ 20-1532(b), 20-1533(b). In fact, the Delivery Deactivation Law piles ambiguous terms on ambiguous terms, compounding the uncertainty. Among the seven non-exclusive factors that make up "just cause," the City includes a courier's "failure to satisfactorily perform job duties" without explaining what might be satisfactory, a courier's harm to Plaintiffs' "legitimate business interests" without offering what the City views as legitimate, whether the deactivation is a "reasonable response" or "reasonably related to safe and efficient" operation without any guidance on what is reasonable, and whether "relevant and adequate training" was provided without detail on what makes training adequate. A factfinder may thus consider any other factor they wish, along with any mitigating circumstances, including taking into account any personal issue the courier faces. By defining an inherently vague phrase only with further ambiguity, the Delivery

Deactivation Law "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson v. United States*, 576 U.S. 591, 598 (2015).

342. The Law assigns responsibility to weigh these factors to a third-party factfinder. And because the factors are subjective, the factfinder exercises effectively unlimited discretion. The factfinder can reach any conclusion on nearly any set of circumstances—just the kind of open-ended discretion that offends due process. *See Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 621 (2d Cir. 2011) ("Statutes must 'provide explicit standards for those who apply' them to avoid 'resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972))).

343. The notice and compelled disclosure obligations fare no better. Under the Delivery Deactivation Law, Plaintiffs must provide "all the precise and detailed reasons" for a deactivation. § 20-1532(e). But the City does not define what qualifies as "precise" or "detailed" enough. Plaintiffs thus face a serious risk that different factfinders will interpret "precise and detailed" in different ways, leading to arbitrary and unpredictable results. The consequences will be significant as even a procedural error, such as an insufficiently "precise" notice, may allow a properly deactivated courier to have access restored and be able to commit additional misconduct at the expense of Plaintiffs and their customers. The same is true for the Law's requirement that Plaintiffs disclose "personally identifiable information" if a courier "could not otherwise meaningfully contest" his deactivation. § 20-1536(b). What is "meaningful" to one factfinder may be different for another factfinder. Here, too, the consequences are severe as Plaintiffs' mistakes may lead to either restored access or more disclosure than necessary of their customers'

information, potentially jeopardizing their safety. Simply put, the Law provides "no reliable way" to determine what is and what is not required. *Johnson*, 576 U.S. at 598.

344. Accordingly, the Law violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, both facially and as applied, which entitles Plaintiffs to injunctive, declaratory, and other appropriate relief.

**PRAYER FOR RELIEF**

345. For these reasons, Plaintiffs respectfully request entry of an order and judgment:

a. Declaring that the Law violates the Contracts Clause of the U.S. Constitution, the First Amendment to the U.S. Constitution, the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, and Article I, Sections 6 and 8 of the New York Constitution, both facially and as applied;

b. A preliminary injunction barring the City from enforcing the Law;

c. A permanent injunction barring the City from enforcing the Law;

d. An award of fees, costs, and disbursements, including any attorney's fees to which Plaintiffs are entitled under 42 U.S.C. § 1988 and other applicable law; and

e. Such other relief as the Court deems just and proper.

Dated: October 28, 2026
New York, New York

Respectfully submitted,

By: */s/ Eli Z. Freedberg* (with permission)
Eamon P. Joyce (N.Y. Bar No. 4104865)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
212.839.5300
ejoyce@sidley.com

Tobias S. Loss-Eaton (N.Y. Bar. No. 4938403)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202.736.8000
tlosseaton@sidley.com

Eli Z. Freedberg (N.Y. Bar No. 4175816)
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
631.247.4713
efreedberg@littler.com

Alexander T. MacDonald (*PHV forthcoming*)
James A. Paretti, Jr. (*PHV forthcoming*)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., NW
Washington, DC 20006
202.842.3400
amacdonald@littler.com
jparetti@littler.com

*Attorneys for Maplebear Inc. d/b/a Instacart*

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Mylan L. Denerstein*
Mylan L. Denerstein
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-4000
mdenerstein@gibsondunn.com

Lucas C. Townsend (*PHV forthcoming*)
John W. Tienken (*PHV forthcoming*)
Riley K. Segars (*PHV forthcoming*)
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: (202) 955-8500
ltownsend@gibsondunn.com
jtienken@gibsondunn.com
rsegars@gibsondunn.com

Brian Richman
Jaime R. Barrios (*PHV forthcoming*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: (214) 698-3100
brichman@gibsondunn.com
jbarrios@gibsondunn.com

*Attorneys for Plaintiffs Amazon Logistics, Inc. and Amazon.com, Inc.*

By: */s/ Karen L. Dunn* (with permission)
Karen L. Dunn (N.Y. Bar No. 4498028)
Meryl C. Governski (*PHV forthcoming*)
Kyle N. Smith (N.Y. Bar No. 5075940)
Linda E. Halfacre (*PHV forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 240-2900
kdunn@dirllp.com
mgovernski@dirllp.com
ksmith@dirllp.com
ehalfacre@dirllp.com

*Attorneys for Plaintiffs Uber Technologies, Inc., and Portier, LLC*

# Addendum

# LOCAL LAWS
# OF
# THE CITY OF NEW YORK
# FOR THE YEAR 2026

---

## No. 34

---

Introduced by Council Members Brannan, Nurse, Abreu, Restler, Cabán, Banks, Marte, Brewer, Hanif, Krishnan, Gutiérrez, Joseph, Feliz, Ayala, Hudson, Ossé, Avilés, Sanchez, Salaam, De La Rosa, Farías, Williams, Stevens, Brooks-Powers, Powers, Lee, Louis, Epstein and the Public Advocate (Mr. Williams).

## A LOCAL LAW

**To amend the administrative code of the city of New York, in relation to the wrongful deactivation of app-based contracted delivery workers**

*Be it enacted by the Council as follows:*

Section 1. The definitions of "delivery service" and "deactivation" in section 20-1501 of the administrative code of the city of New York, the definition of "delivery service" as added by local law number 123 for the year 2025 and the definition of "deactivation" as added by local law number 95 for the year 2025, are amended to read as follows:

Delivery service. The term "delivery service" means a person that facilitates, offers, or arranges for the delivery of goods to or from a location in the city, including, but not limited to, a third-party food delivery service[ and], a third-party courier service, *and third-party grocery delivery service*, provided that the term "delivery service" does not include any such person that facilitates, offers or arranges fewer than 50 trips each week, or any person that facilitates, offers or arranges for the delivery of goods solely by vehicles required by federal or state law, rule or regulation to be registered with the federal motor carrier safety administration.

Deactivation. The term “deactivation” means any indefinite or permanent discharge, termination or layoff of a contracted delivery worker or any *indefinite or permanent* revocation [or restriction] of a contracted delivery worker’s access to the delivery platform or authorization to accept deliveries on the delivery platform.

§ 2. Subdivision b of section 20-1507, as amended by local law number 123 for 2025, is amended to read as follows:

b. 1. Any person alleging a violation of this chapter may file a complaint with the department within 2 years of the date the person knew or should have known of the alleged violation*, except that a complaint alleging a violation of section 20-1533 may be filed within one year after the effective date of the local law that added subchapter 3 of this chapter*.

2. Upon receiving such a complaint, the department shall investigate it*, except that upon receiving a complaint alleging a violation of subchapter 3, the department may investigate the complaint*.

3. The department may open an investigation on its own initiative.

4. A person or entity under investigation shall, in accordance with applicable law, provide the department with information or evidence that the department requests pursuant to the investigation. The department may attempt to resolve an investigation concerning a violation of this chapter through any action authorized by chapter 64 of the charter. Adjudicatory powers pursuant to this subchapter may be exercised by the commissioner or by the office of administrative trials and hearings pursuant to chapter 64 of the charter, in accordance with any delegation of such adjudicatory powers by the department to such office pursuant to paragraph (1) of subdivision (h) of section 2203 of the charter.

5. The department shall keep the identity of any complainant confidential unless disclosure is necessary to resolve the investigation or is otherwise required by law. The department shall, to the extent practicable, notify such complainant that the department will be disclosing the complainant's identity before such disclosure.

§ 3. Subdivision a of section 20-1508, as amended by local law number 123 for 2025, is amended to read as follows:

a. For violations of their rights under this chapter, a contracted delivery worker shall be entitled to the following relief:

1. all compensatory damages and other relief required to make the worker or former worker whole;

2. an order directing compliance with the requirements set forth in this chapter; and

3. for each violation of:

(a) section 20-1504,

(1) $500 for each violation not involving denial of future work opportunities *or deactivation*;

(2) $2,500 for each violation involving denial of future work opportunities *or deactivation*; and

(3) any equitable relief appropriate under the circumstances, including but not limited to, *rescission of any discipline issued, reinstatement of any deactivated contracted delivery worker, or* payment of any lost earnings resulting from such retaliation.

(b) section 20-1521, $200;

(c) section 20-1522, including any minimum payment established by rule pursuant to section 20-1522, 3 times the amount of any payment that should have been made and was not timely made;

(d) section 20-1523, $200;

(e) section 20-1524, $200; [and]

(f) section 20-1527, $200[.];

*(g) section 20-1532 or section 20-1533, reinstatement or restoration of access to the delivery platform of a delivery service, unless waived by a contracted delivery worker;*

*(h) section 20-1532, the department may, in addition, grant the following relief: $500, rescission of any discipline issued, payment of any lost earnings resulting from the wrongful deactivation, and any other equitable relief as may be appropriate;*

*(i) subdivision c of section 20-1534, $500;*

*(j) section 20-1536, $500; and*

*(k) section 20-1539, $500.*

§ 4. Subdivision a of section 20-1509, as amended by local law number 123 for 2025, is amended to read as follows:

a. For each violation of this chapter, *except for any violation of section 20-1533,* any person is liable for a penalty of $500 for the first violation and, for subsequent violations that occur within 2 years of any previous violation of this chapter, up to $750 for the second violation and up to $1,000 for each succeeding violation.

§ 5. Subdivisions a, b, and c of section 20-1511, as amended by local law number 123 for 2025, are amended to read as follows:

a. Any person alleging a violation of the following provisions of this chapter may bring a civil action, in accordance with applicable law, in any court of competent jurisdiction:

1. section 20-1504;

2. section 20-1521;

3. section 20-1522, including any minimum payment established by rule pursuant to section 20-1522;

4. section 20-1523; [and]

5. section 20-1524[.]*;*

*6. section 20-1532;*

*7. section 20-1533*;

*8. section 20-1534;*

*9. section 20-1536; and*

*10. section 20-1539.*

b. Such court may order compensatory, injunctive and declaratory relief, including the remedies set forth in section 20-1508, and reasonable attorney's fees and costs*, provided that, for each violation of section 20-1532 or 20-1533, the court may order reinstatement or restoration of access to the delivery platform of the contracted delivery worker, unless waived by the contracted delivery worker, and may order the delivery service to pay the reasonable attorney's fees and costs of the contracted delivery worker, and in addition, for each violation of section 20-1532 or 20-1533, the court may order punitive damages*.

c. A civil action under this section shall be commenced within 2 years of the date the person knew or should have known of the alleged violation*, except that for a violation of section 20-1533, a civil action shall be commenced within one year after the effective date of the local law that added subchapter 3 of this chapter*.

§ 6. Chapter 15 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 3 to read as follows:

*SUBCHAPTER 3*

*WRONGFUL DEACTIVATION OF APP-BASED CONTRACTED DELIVERY WORKERS*

*§ 20-1531 Definitions. As used in this subchapter, the following terms have the following meanings:*

*Delivery platform. The term "delivery platform" means a website, mobile application, or other internet service through which a delivery service offers or assigns a trip to a contracted delivery worker retained by such delivery service.*

*Egregious misconduct. The term "egregious misconduct" means misconduct that is so outrageous, dangerous, or illegal that a delivery service cannot reasonably expect to correct it through progressive discipline. "Egregious misconduct" may include, but is not limited to, depending on the circumstances: (i) violence or threats of violence; (ii) theft; (iii) sexual harassment; (iv) discrimination in violation of federal, state, or local law; or (v) willful destruction of property.*

*Just cause. The term "just cause" means a contracted delivery worker's misconduct or failure to satisfactorily perform their job duties for a delivery service.*

*Misconduct. The term "misconduct" means conduct that is demonstrably and materially harmful to a delivery service's legitimate business interests.*

*Prior deactivation. The term "prior deactivation" means a deactivation that occurred during the 6 years prior to the effective date of the local law that added this subchapter.*

*Probation period. The term "probation period" means a period of 30 calendar days beginning on the first date that a contracted delivery worker performs delivery services for a delivery service.*

*Progressive discipline. The term "progressive discipline" means a disciplinary system that provides for a graduated range of disciplinary measures, including but not limited to warnings and further training requirements, in response to a contracted delivery worker's misconduct or*

*failure to satisfactorily perform job duties for a delivery service, with the type of disciplinary measure varying based on the frequency and degree of such misconduct or failure.*

*§ 20-1532 Prohibition on wrongful deactivation. a. A delivery service shall not deactivate a contracted delivery worker after such contracted delivery worker's probation period with such service except for just cause, for a bona fide economic reason, as described in section 20-1534, or where federal, state, or local law or rule requires such delivery service to deactivate such contracted delivery worker.*

*b. In determining whether a delivery service has deactivated a contracted delivery worker for just cause, a fact-finder shall consider, in addition to any other relevant factors, whether:*

*1. Such contracted delivery worker knew or should have known of such delivery service's policy, rule, or practice that forms a basis for progressive discipline or such deactivation and knew or should have known of the potential consequences for violation of such policy, rule, or practice;*

*2. Such delivery service's policy, rule, or practice that forms a basis for progressive discipline or such deactivation is reasonably related to safe and efficient delivery service operations;*

*3. Such delivery service provided relevant and adequate training to such contracted delivery worker;*

*4. Such delivery service's policy, rule, or practice that forms a basis for such deactivation, including the utilization of progressive discipline, was reasonable and applied consistently;*

*5. Such delivery service undertook a fair and objective investigation into such contracted delivery worker's misconduct or failure to satisfactorily perform job duties;*

*6. Such deactivation is a reasonable response to such contracted delivery worker's misconduct or failure to satisfactorily perform job duties and accounts for any mitigating circumstances, including but not limited to such contracted delivery worker's past work history; and*

*7. Such contracted delivery worker violated the policy, rule, or practice or engaged in any misconduct or failure to satisfactorily perform job duties that forms a basis for progressive discipline or such deactivation.*

*c. Except where deactivation is for egregious misconduct, a deactivation of a contract delivery worker shall not be considered based on just cause unless a delivery service demonstrates that:*

*1. Such delivery service has utilized progressive discipline; provided, however, that such delivery service may not rely on progressive discipline issued more than 1 year before such deactivation; and*

*2. Such delivery service had a written policy on progressive discipline that was in effect and was provided to such contracted delivery worker.*

*d. Where a deactivation of a contracted delivery worker is for a bona fide economic reason, as described in section 20-1534, a delivery service must provide, in a form and manner designated by the department, an advance notice of layoff to such contracted delivery worker at least 120 days prior to such deactivation. Such advance notice shall state all the precise and detailed reasons for, and the effective date of, such deactivation. Such advance notice shall include information about: (i) such contracted delivery worker's right to challenge such deactivation as unlawful pursuant to this subchapter; (ii) how such contracted delivery worker may initiate an informal resolution process with such delivery service pursuant to section 20-1537; (iii) the opportunity for such contracted delivery worker to submit evidence to substantiate a challenge to such deactivation; and (iv) such contracted delivery worker's right to file a complaint with the department, or initiate a private action.*

*e. Within 72 hours after deactivating a contracted delivery worker, a delivery service shall provide, in a form and manner designated by the department, a notice of deactivation to such*

*contracted delivery worker which contains a written explanation of all the precise and detailed reasons for such deactivation and the effective date of such deactivation. Such notice shall include information about: (i) such contracted delivery worker's right to challenge such deactivation as unlawful pursuant to this subchapter; (ii) how such contracted delivery worker may initiate an informal resolution process with such delivery service pursuant to section 20-1537; (iii) the opportunity for such contracted delivery worker to submit evidence to substantiate a challenge to such deactivation; and (iv) such contracted delivery worker's right to file a complaint with the department, or initiate a private action..*

*f. This section shall not apply to any deactivation that occurred prior to the effective date of the local law that added this section.*

*§ 20-1533 Prior deactivations. a. Within 1 year after the effective date of the local law that added this section, a contracted delivery worker who was subject to a prior deactivation by a delivery service may petition such delivery service for reinstatement or restoration of access to such delivery service's delivery platform. Within 30 days after receipt of such petition, such delivery service shall reinstate or restore such contracted delivery worker's access to such delivery platform, unless such prior deactivation occurred during the probation period or was for just cause, for a bona fide economic reason, as described in section 20-1534, or required by federal, state, or local law or rule.*

*b. In determining whether a prior deactivation of a contracted delivery worker by a delivery service was for just cause, a fact-finder shall consider, in addition to any other relevant factors, whether:*

*1. Such contracted delivery worker knew or should have known of such delivery service's policy, rule, or practice that formed a basis for such prior deactivation and knew or should have known of the potential consequences for violation of such policy, rule or practice;*

*2. Such delivery service's policy, rule, or practice that formed a basis for such prior deactivation was reasonably related to safe and efficient delivery service operations;*

*3. Such delivery service's policy, rule or practice that formed a basis for such prior deactivation was reasonable and applied consistently;*

*4. Such prior deactivation was a reasonable response to such contracted delivery worker's misconduct or failure to satisfactorily perform job duties and accounted for any mitigating circumstances, including, but not limited to, such contracted delivery worker's past work history;*

*5. Such contracted delivery worker violated the policy, rule, or practice or committed the misconduct or failure to satisfactorily perform job duties that formed a basis for such prior deactivation; and*

*6. Such delivery service considered any exculpatory evidence or other facts indicating that such contracted delivery worker did not violate such delivery service's policy, rule or practice.*

*c. If a delivery service does not reinstate or restore access of a contracted delivery worker who was subject to a prior deactivation to such delivery service's delivery platform within 30 days after receipt of a petition pursuant to subdivision a of this section, such delivery service shall provide a written explanation, in a form and manner designated by the department, to such contracted delivery worker of all the precise and detailed reasons for such prior deactivation. Such written explanation shall include information about: (i) such contracted delivery worker's right to challenge such prior deactivation as unlawful pursuant to this subchapter; (ii) how such contracted delivery worker may initiate an informal resolution process with the delivery service*

*pursuant to section 20-1537; (iii) the opportunity of such contracted delivery worker to submit evidence to substantiate a challenge to such prior deactivation; and (iv) such contracted delivery worker's right to file a complaint with the department, or initiate a private action.*

*d. Notwithstanding any other provision of this section, a delivery service may decline to immediately reinstate or restore access to such delivery service's delivery platform to a contracted delivery worker whose access is required to be reinstated or restored pursuant to subdivision a of this section if such contracted delivery worker does not meet a minimum requirement that applies to all current contracted delivery workers for such delivery service or if such delivery service is not providing access to such delivery platform to any new contracted delivery worker, and has not provided such access during the 3 months prior to the effective date of the local law that added this section. Where such delivery service declines to immediately reinstate or restore access to such delivery platform pursuant to this subdivision, such delivery service shall maintain a waitlist of contracted delivery worker whose access to such delivery platform is required to be reinstated or restored pursuant to subdivision a of this section and reinstate or restore such contracted delivery worker' access to such delivery platform, in the order in which such contracted delivery workers were placed on such waitlist, provided that any such contracted delivery worker meets the minimum requirements that apply to all current contracted delivery workers for such delivery service, prior to providing any other new contracted delivery worker access to such delivery platform.*

*§ 20-1534 Bona fide economic reasons. a. A deactivation, including a prior deactivation, shall not be considered based on a bona fide economic reason unless supported by a delivery service's business records demonstrating that such deactivation is in response to: (i) a proportionate reduction in volume of sales or profit within the fiscal quarter that ended prior to the issuance of*

*a notice of layoff required by subdivision d of section 20-1532; or (ii) a delivery service discontinuing its driving services in the city.*

*b. 1. Where a delivery service performs deactivations of contracted delivery workers based on a bona fide economic reason, such deactivations must be made in order of seniority of such contracted delivery workers, in accordance with rules of the department. For purposes of this section, seniority shall account for the date such contracted delivery worker commenced serving as a delivery worker for such service, and the amount of work performed by such contracted delivery worker in the timeframe.*

*2. A delivery service shall make reasonable efforts to offer reinstatement or restoration of access to such delivery service's delivery platform to any contracted delivery worker deactivated by such delivery service based on a bona fide economic reason within the previous 3 years, if any, before such delivery service may provide any other new contracted delivery worker access to such delivery platform.*

*3. This subdivision shall apply only to deactivations that occur on or after the effective date of the local law that added this section.*

*§ 20-1535 Burden of proof; evidence. a. In any proceeding alleging a violation by a delivery service of section 20-1532 or section 20-1533, such delivery service shall bear the burden of proving just cause pursuant to section 20-1532 or 20-1533 by a preponderance of the evidence, subject to the rules of evidence as set forth in the civil practice law and rules or, where applicable, the common law.*

*b. In determining whether a delivery service had just cause for a deactivation, a fact-finder may not consider any reasons proffered by the delivery service not included in the notice of deactivation provided to the contracted delivery worker pursuant to subdivision e of section 20-*

*1532 or the written explanation provided to the contracted delivery worker pursuant to subdivision c of section 20-1533.*

*c. A contracted delivery worker may submit evidence in any proceeding alleging a violation of this subchapter that was not provided to a delivery service pursuant to section 20-1533 or section 20-1537, and a fact-finder shall consider such evidence, notwithstanding any failure by such contracted delivery worker to submit such evidence to such delivery service prior to such proceeding.*

*§ 20-1536 Provision of data. a. Upon the issuance of a notice of deactivation required pursuant to subdivision e of section 20-1532, a delivery service shall provide a deactivated contracted delivery worker with information and data relevant to such contracted delivery worker's deactivation. Such information shall include, but need not be limited to:*

*1. Performance data specific to such contracted delivery worker;*

*2. All customer comments, ratings, and complaints received regarding the contracted delivery worker; and*

*3. Anonymized and aggregated reports, covering the 12 months prior to such contracted delivery worker's deactivation, regarding discipline, including deactivation, imposed by such delivery service on any other contracted delivery workers who engaged in the same or similar misconduct or failure to satisfactorily perform job duties forming a basis for the deactivation of the contracted delivery worker subject to such notice.*

*b. The information or data required by subdivision a of this section shall be redacted to remove the personally identifiable information of customers, provided that a factfinder may require disclosure of certain personally identifiable information if a contracted delivery worker could not otherwise meaningfully contest the basis for the deactivation.*

*c. Upon the issuance of the notice required pursuant to subdivision c of section 20-1533, a delivery service shall provide a deactivated contracted delivery worker with information and data relevant to such contracted delivery worker's deactivation, including all information required under subdivision a of this section, to the extent that such information is available to such delivery service.*

*d. For at least 6 years after deactivating a contracted delivery worker, a delivery service must continue to provide such contracted delivery worker with access to all information and data concerning such contracted delivery worker that such contracted delivery worker had access to prior to deactivation, including but not limited to such contracted delivery worker's tax and payment records.*

*§ 20-1537 Informal resolution process. a. A delivery service shall maintain an email address, website or other form of electronic communication through which a contracted delivery worker or their representative may challenge such contracted delivery worker's deactivation, prior deactivation, or impending deactivation for which such contracted delivery worker received a notice of layoff pursuant to subdivision d of section 20-1532 as unlawful pursuant to this subchapter. Such delivery service must provide such contracted delivery worker an opportunity to submit evidence to substantiate any such challenge and accept written communications pursuant to this section in the language in which they are written.*

*b. A contracted delivery worker may seek informal resolution of a deactivation of such contracted delivery worker, or an impending deactivation for which such contracted delivery worker receives a notice of layoff pursuant to subdivision d of section 20-1532, by a delivery service by initiating, within 1 year of such deactivation or receipt of such notice of layoff, an informal resolution process through the email address, website, or other form of electronic*

*communication maintained by such delivery service pursuant to subdivision a of this section, or through any other means that such contracted delivery worker and such delivery service agree to. The parties shall have 15 days after commencing such informal resolution process to reach a resolution, unless such contracted delivery worker and such delivery service mutually agree to a longer timeframe. If the parties resolve a challenge pursuant to this subdivision, they shall memorialize such resolution in a written agreement, on a form provided by the department.*

*c. A failure by a delivery service to engage in an informal resolution process as described in this section shall not be subject to a civil penalty under this chapter.*

*§ 20-1538 Reporting; records; information. a. Data collection and reporting. No less than annually, the department shall make available on the city's website a report on deactivations and alleged violations of sections 20-1532 and 20-1533 during the preceding calendar year. The department shall promulgate rules requiring that delivery services produce anonymized, aggregated data necessary to prepare such report. Such report shall include, with respect to the year preceding the release of such report: (i) the number of contracted delivery workers of each delivery service deactivated for just cause or bona fide economic reasons; (ii) the number of contracted delivery workers who filed complaints with the department alleging violations of sections 20-1532 and 20-1533 and the outcomes of such complaints; (iii) the number of contracted delivery workers who initiated an informal resolution process; (iv) the number of contracted delivery workers who reached an informal resolution with a delivery service; (v) the number of contracted delivery workers who commenced arbitrations or private actions that include claims alleging violations of sections 20-1532 or 20-1533 and the outcomes of such proceedings; and (vi) any other information the department deems relevant. Until all contracted delivery workers placed on a waitlist pursuant to section 20-1533 have had their delivery platform access restored, such*

*report shall also include the number of contracted delivery workers with prior deactivations who petitioned a delivery service for reinstatement or restoration of their access to such delivery service's delivery platform and the number of contracted delivery workers who were placed on a waitlist pursuant to section 20-1533.*

*b. Recordkeeping. 1. The department may promulgate rules concerning the maintenance, retention, and provision by a delivery service of data necessary to the implementation and enforcement of this subchapter, which may include a requirement that a delivery service adhere to a uniform system of records and submit such records and other reports as the department may determine, in accordance with applicable law and rules and with appropriate notice.*

*2. To implement or enforce the provisions of this subchapter, the department may issue an order or subpoena for the production of data, documents, testimony, or other information from a delivery service. Such data, documents, testimony, or other information may include, but are not limited to, information about the data that a delivery service monitors, collects, or stores about or from a contracted delivery worker or customer; information about discipline imposed on a contracted delivery worker; and any other information deemed relevant by the department. In accordance with applicable law and rules and upon reasonable notice of no less than 14 days, a person who receives a request or subpoena for data, documents, or other information pursuant to this section shall produce such data, documents or information to the department in its original format or a machine-readable electronic format as set forth in rules of the department.*

*c. Information and assistance program. The department shall establish a program that provides information and assistance to contracted delivery worker relating to the provisions of this subchapter. Such program shall include assistance by a natural person by phone and email and outreach and education to the public relating to the provisions of this subchapter. Such*

*program shall not provide legal advice but may provide general information and referrals to legal service providers.*

*§ 20-1539 Progressive discipline policy. a. A delivery service shall maintain a written progressive discipline policy in a single writing and adhere to such policy.*

*b. The written policy required pursuant to subdivision a of this section shall satisfy all requirements of this subchapter and, at a minimum, address the following:*

*1. Types of misconduct by a contracted delivery worker that may warrant discipline;*

*2. Any performance standards used to assess failure to satisfactorily perform job duties by a contracted delivery worker;*

*3. Disciplinary measures that may be applied to a contracted delivery worker, including but not limited to deactivation;*

*4. Procedures for notifying a contracted delivery worker of disciplinary measures that a delivery service intends to take against such contracted delivery worker and providing an opportunity to respond; and*

*5. Procedures for applying discipline against a contracted delivery worker.*

*c. The written policy required pursuant to subdivision a of this section must be clear and specific such that a reasonable person can understand the acts and omissions that may result in deactivation or other disciplinary measures.*

*d. A delivery service shall provide the written policy required pursuant to subdivision a of this section to each contracted delivery worker retained by such delivery service in English and in any other language as the department may determine by rule. A delivery service shall provide such policy to each contracted delivery worker no later than the effective date of this subdivision, or*

*prior to such contracted delivery worker's first trip, whichever is later, in a form and manner that the department may determine by rule.*

*e. A delivery service shall notify each contracted delivery worker of any change to the written policy required pursuant to subdivision a of this section at least 14 days before such change takes effect.*

*f. The department may promulgate rules establishing minimum requirements for the progressive discipline policy required pursuant to subdivision a of this section, including, but not limited to, requiring that a delivery service establish a system of graduated discipline based on the accrual of disciplinary points, strikes, or other similar consequences for misconduct or failure to satisfactorily perform job duties.*

*§ 20-1540 Exceptions. This subchapter shall not:*

*1. Apply to the deactivation of any contracted delivery worker by a delivery service during such contracted delivery worker's probation period with such service;*

*2. Limit or otherwise affect the applicability of any right or benefit conferred upon or afforded to a contracted delivery worker by the provisions of any other law, regulation, rule, requirement, policy, or standard, including but not limited to any federal, state, or local law providing for protections against retaliation or discrimination.*

*3. Apply to a delivery service that does not maintain a website, mobile application, or other internet service through which such delivery service offers or assigns a trip to a contracted delivery worker retained by such delivery service.*

§ 7. This local law takes effect 1 year after it becomes law, provided that: (i) the commissioner of consumer and worker protection shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, prior to such date; and (ii)

that any requirement on a delivery service, as defined in section 20-1501 of the administrative code of the city of New York, to provide data, documents, testimony, or other information to the department of consumer and worker protection, by rules adopted pursuant to subdivisions (a) and (b) of section 20-1538, as added by section six of this local law, may take effect prior to such date.

THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s.:

I hereby certify that the foregoing is a true copy of a local law of The City of New York, passed by the Council on December 18, 2025 and returned unsigned by the Mayor on January 20, 2026.

MICHAEL M. McSWEENEY, City Clerk, Clerk of the Council.

CERTIFICATION OF CORPORATION COUNSEL

I hereby certify that the form of the enclosed local law (Local Law No. 34 of 2026, Council Int. No. 1332-A of 2025) to be filed with the Secretary of State contains the correct text of the local law passed by the New York City Council, presented to the Mayor, and neither approved nor disapproved within thirty days thereafter.

SPENCER FISHER, Acting Corporation Counsel.