**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Uber Technologies, Inc.; Portier, LLC; Amazon Logistics, Inc.; Amazon.com, Inc.; Maplebear Inc. d/b/a Instacart,<br><br>Plaintiffs,<br><br>v.<br><br>City of New York,<br><br>Defendant. | Case No. 26-cv-9455 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

Eamon P. Joyce (N.Y. Bar No. 4104865)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
212.839.5300
ejoyce@sidley.com

Tobias S. Loss-Eaton (N.Y. Bar No. 4938403)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202.736.8000
tlosseaton@sidley.com

Eli Z. Freedberg (N.Y. Bar No. 4175816)
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
631.247.4713
efreedberg@littler.com

Alexander T. MacDonald (*PHV forthcoming*)
James A. Paretti, Jr. (*PHV forthcoming*)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., NW
Washington, DC 20006
202.842.3400
amacdonald@littler.com
jparetti@littler.com

*Attorneys for Maplebear Inc. d/b/a Instacart*

GIBSON, DUNN & CRUTCHER LLP
Mylan L. Denerstein
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-4000
mdenerstein@gibsondunn.com

Lucas C. Townsend (*PHV forthcoming*)
John W. Tienken (*PHV forthcoming*)
Riley K. Segars (*PHV forthcoming*)
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: (202) 955-8500
ltownsend@gibsondunn.com
jtienken@gibsondunn.com
rsegars@gibsondunn.com

Brian Richman
Jaime R. Barrios (*PHV forthcoming*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: (214) 698-3100
brichman@gibsondunn.com
jbarrios@gibsondunn.com

*Attorneys for Plaintiffs Amazon Logistics, Inc. and Amazon.com, Inc.*

Karen L. Dunn (N.Y. Bar No. 4498028)
Meryl C. Governski (*PHV forthcoming*)
Kyle N. Smith (N.Y. Bar No. 5075940)
Linda E. Halfacre (*PHV forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 240-2900
kdunn@dirllp.com
mgovernski@dirllp.com
ksmith@dirllp.com
ehalfacre@dirllp.com

*Attorneys for Plaintiffs Uber Technologies, Inc. and Portier, LLC*

# TABLE OF CONTENTS

**Page**


**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **3**

I. Plaintiffs Contract with Independent Couriers. .......... 3

II. The City Enacts The Delivery Deactivation Law. .......... 6

III. The Delivery Deactivation Law Mandates A New Deactivation Regime. .......... 10

**LEGAL STANDARD** .......... **12**

**ARGUMENT** .......... **12**

I. Plaintiffs Are Likely To Succeed On The Merits. .......... 12

A. The Delivery Deactivation Law Violates The Contracts Clause. .......... 12

1. The Law would substantially impair Plaintiffs' contracts. .......... 13

2. The Law has no "legitimate public purpose." .......... 18

3. The Law is not a "reasonable" or "appropriate" means of advancing any legitimate public purpose. .......... 21

B. The Law Violates The First Amendment. .......... 23

C. Plaintiffs Are Likely To Succeed On Their Due Process Claims. .......... 25

II. The Remaining Factors Weigh In Favor Of A Preliminary Injunction. .......... 25

A. Plaintiffs Will Be Irreparably Harmed Absent Immediate Relief. .......... 25

1. The Law causes irreparable constitutional harms. .......... 26

2. The Law causes irreparable business harms. .......... 26

B. The Public Interest and Balance of the Equities Favor Immediate Relief. .......... 28

**CONCLUSION** .......... **29**

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)....23

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)....29

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978)....12, 13, 14, 15, 18, 19, 20, 26

*Ass'n of Equip. Mfrs. v. Burgum*,
932 F.3d 727 (8th Cir. 2019)....19

*City of Cincinnati v. Discovery Network*,
507 U.S. 410 (1993)....25

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025)....23

*Donohue v. Mangano*,
886 F. Supp. 2d 126 (E.D.N.Y. 2012)....26

*DoorDash, Inc. v. City of New York*,
185 F.4th 1 (2d Cir. 2026)....23, 24, 25

*DoorDash, Inc. v. City of New York*,
692 F. Supp. 3d 268 (S.D.N.Y. 2023)....15, 18, 19

*Gov't Emps. Ins. Co. v. Patel*,
166 F.4th 280 (2d Cir. 2026)....28

*Hirschfeld v. Stone*,
193 F.R.D. 175 (S.D.N.Y. 2000)....26

*Home Bldg. & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934)....14, 23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)....23, 24

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004)....27

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994)....25

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....26

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021) ....................13, 18, 19, 21, 22

*Mitchell v. Cuomo*,
748 F.2d 804 (2d Cir. 1984)....................26

*Nat'l Fuel Gas Distrib. Corp. v. Christian*,
798 F. Supp. 3d 267 (N.D.N.Y. 2025)....................27

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)....................24

*Nat'l Inst. of Fam. & Life Advocs. v. James*,
160 F.4th 360 (2d Cir. 2025), and (2)....................23, 24

*New York v. DHS*,
969 F.3d 42 (2d Cir. 2020)....................28

*Nken v. Holder*,
556 U.S. 418 (2009)....................12, 25, 28

*Real Est. Bd. of N.Y., Inc. v. City of New York*,
182 F.4th 140 (2d Cir. 2026) ....................18

*Regina Metro. Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
154 N.E.3d 972 (N.Y. 2020)....................25

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
754 F. Supp. 2d 616 (S.D.N.Y. 2010)....................29

*Seventh Regiment Armory Conservancy, Inc. v. Knight*,
811 F. Supp. 3d 467 (S.D.N.Y. 2025)....................12

*Sveen v. Melin*,
584 U.S. 811 (2018)....................12, 18

*Ty, Inc. v. Jones Grp., Inc.*,
237 F.3d 891 (7th Cir. 2001) ....................27

*Uber Techs., Inc. v. City of New York*,
839 F. Supp. 3d 218 (S.D.N.Y. 2026)
....................10, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 26, 27, 28, 29

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................12

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
471 U.S. 626 (1985)....................25

**Regulations**

N.Y.C. Admin. Code § 20-1507 ....................12

N.Y.C. Admin. Code § 20-1508 ....................12, 17

N.Y.C. Admin. Code § 20-1511 ....................12, 17

N.Y.C. Admin. Code § 20-1531 ....................11, 15

N.Y.C. Admin. Code § 20-1532 ....................10, 11, 14, 16, 17

N.Y.C. Admin. Code § 20-1533 ....................11, 15, 17

N.Y.C. Admin. Code § 20-1535 ....................11, 17

N.Y.C. Admin. Code § 20-1536 ....................11

N.Y.C. Admin. Code § 20-1537 ....................12

N.Y.C. Admin. Code § 20-1538 ....................12

N.Y.C. Admin. Code § 20-1539 ....................12

**Constitutional Provisions**

N.Y. Const. art. I, § 6 ....................25

U.S. Const. amend. I ....................2, 12, 23, 26

U.S. Const. amend. XIV, § 1 ....................2, 12, 25

U.S. Const. art. I, § 10, cl. 1 ....................2, 12, 13, 23, 26

Plaintiffs Uber Technologies, Inc. and Portier, LLC (collectively, "Uber"), Amazon Logistics, Inc. (together with Plaintiff Amazon.com, Inc., "Amazon"), and Maplebear Inc. d/b/a Instacart ("Instacart") respectfully ask the Court to enjoin New York City Local Law 34 of 2026 ("Delivery Deactivation Law" or "Law").

## INTRODUCTION

New York City has enacted a law imposing an onerous new standard on businesses wishing to deactivate the accounts of app-based, independent couriers who breach contractual standards for safety, quality, and honest dealing. This Court should enjoin the City from enforcing the Law, just as a Court in this District did with the materially identical law governing deactivation of contracted for-hire-vehicle drivers. Like that law, the Delivery Deactivation Law strips Plaintiffs of their bargained-for discretion to remove couriers who violate contractual standards designed to protect the safety, privacy, and trust of everyone who relies on their apps.

The Law forbids Plaintiffs from ending their contractual relationship with couriers unless Plaintiffs can prove "just cause" based on a new, nonexclusive seven-factor test, a "bona fide economic reason," or compliance with another law. Except for a vaguely defined category of "egregious misconduct," Plaintiffs must employ "progressive discipline" before deactivation. The Law mandates onerous disclosures of confidential and sensitive records, including consumer information, to deactivated couriers. The Law even reaches back six years—allowing couriers to retroactively challenge years-old deactivations for failure to meet the City's new standard. And if "factfinders" determine Plaintiffs failed to meet that new standard—based on articulated or unarticulated factors or even a technical violation like a missed deadline—they "shall" order Plaintiffs to restore access to deactivated couriers. This Law, including its retroactive application

of a new standard, gambles with the safety and security of consumers, merchants, and the general public.

The Delivery Deactivation Law violates the Contracts Clause. It overrides private contractual terms defining when Plaintiffs can deactivate courier accounts and substitutes the City's judgment for the parties' bargain—both prospectively and retroactively. Yet the legislative record never established any widespread problem of "wrongful deactivations." The New York City Department of Consumer and Worker Protection ("DCWP") identified only 180 deactivation complaints over a "couple of years," without investigating whether *any* were "wrongful." Indeed, DCWP previously identified deactivation as a beneficial tool that businesses should use to combat fraud, which shows why Plaintiffs bargained for this right in the first place. The Contracts Clause forbids this impairment of essential terms in private contracts.

The Law also violates the First Amendment. It compels Plaintiffs to speak by requiring they provide "all the precise and detailed reasons" why each deactivation satisfies the City's standard and disclose supporting information—such as confidential reports by consumers, fraud detection methods, and information concerning other couriers. Those provisions force Plaintiffs to convey information and opinions they otherwise would not communicate, without regard for the risk doing so poses to consumers and merchants. And the Law applies its burdens retroactively to years-old deactivations, violating the Due Process Clause.

The Court should preliminarily enjoin the Law before January 17, 2027, because it will otherwise irreparably harm Plaintiffs, and the public interest squarely is *against* forcing businesses to contract with individuals whom they have determined breached agreed-upon standards, including related to fraud and safety.

## BACKGROUND

### I. Plaintiffs Contract with Independent Couriers.

### A. Uber Eats

Uber's technology platform connects couriers in New York City who want to earn money delivering meals, groceries, household goods, and alcohol with merchants in the City who want to sell those items through delivery channels and New Yorkers who want to obtain such deliveries safely and reliably. Since Uber launched its Uber Eats delivery platform in New York City, it has connected couriers with hundreds of thousands of earning opportunities every day. Declaration of Laura Hahn ("Hahn") ¶4. Deliveries bring couriers into merchant locations and oftentimes to a consumer's door—including to her home, often at night, and often with food. Declaration of Cory Freivogel ("Freivogel") ¶9.

Uber makes clear it "stand[s] for safety. Safety is not just a feature—it's a foundation." Freivogel ¶6. Uber relies on its contracts with couriers to safeguard the safety of couriers, consumers, merchants, and the public. Hahn ¶11; Freivogel ¶7. Uber agrees to grant couriers access to its platform only if they agree to the Platform Access Agreement with Uber's subsidiary Portier, LLC, which incorporates "applicable Uber standards and policies" including "the Community Guidelines," "safety standards" and "accessibility policies." Hahn ¶¶6-7 & Ex. U1 ("PAA"), at 1.[1] Uber's Community Guidelines emphasize the priority of making "every experience feel safe, respectful, and positive." Hahn, Ex. U4 ("Community Guidelines"), at 1; Freivogel ¶8.

The PAA provides Uber's right to deactivate couriers. PAA § 5.3. Hahn ¶¶9-10.

---

[1] The agreements that Uber and couriers entered into prior to January 1, 2022 provided for substantially the same rights as the PAA regarding deactivation and notice. Hahn ¶6 & Exs. U2-U3.

Deactivations are a last resort and rare. In 2025, Uber deactivated only a small percentage of courier accounts in New York; safety, fraud, and quality are prevalent reasons for courier deactivations in New York City. Hahn ¶12; Declaration of Phil De Coning ("De Coning") ¶17; Declaration of Mateusz Jarzabek ("Jarzabek") ¶8. Other important reasons for deactivation are safety related, such as threats, harassment, and unwanted contact after delivery. Hahn ¶12; Freivogel ¶¶19-21, 33.

Consumer or merchant reports are important for some types of deactivations. Freivogel ¶¶17-18. Uber notifies couriers when they have been the subject of a report that could lead to deactivation and informs them they may be deactivated if Uber receives additional reports. *Id.* ¶¶21, 23. Uber calibrates the specific details it discloses to balance transparency with merchant and consumer safety. *Id.* ¶¶24-26. There are certain times when, prioritizing safety, Uber exercises its discretion to immediately deactivate couriers identified in reports about serious situations, including where the actual facts may be ambiguous. *Id.* ¶¶19-20. Uber discloses the appeals process, if available, at the time it notifies a courier of deactivation. Hahn ¶14; Freivogel ¶23. Most deactivation decisions are eligible for review by a team of human reviewers. Hahn ¶¶14-15.

**B. Amazon Flex**

Amazon contracts with independent contractors (called "Delivery Partners") who use their own vehicles to make local deliveries through the Amazon Flex program. Decl. of Leslie Mosneron Dupin ("Dupin") ¶¶6-8. Delivery Partners choose available delivery blocks or instant deliveries through the Flex mobile app and, before providing services, must complete the Amazon Flex onboarding process, including a background check, and agree to the Amazon Flex

Independent Contractor Terms of Service ("TOS"). *Id.* ¶¶7, 9-12. The current TOS were released on January 6, 2025. *Id.* ¶13.

The TOS require Delivery Partners to meet standards for safety, reliability, delivery, customer service, and professional conduct. Dupin ¶16. Safety is Amazon's highest priority, and the TOS facilitate Amazon's steadfast commitment to safety. Among other things, Delivery Partners must comply with applicable safety laws, attempt to make deliveries within their scheduled delivery blocks, refrain from dangerous or threatening conduct, and comply with Amazon's Workplace Harassment Policy. *Id.*

Importantly, the TOS give Amazon the discretionary right to deactivate Delivery Partners who fail to meet those standards or otherwise breach the agreement, including by engaging in fraud, theft, harassment, unsafe behavior, or other misconduct. Dupin ¶¶17-18; *see also id.* ¶¶29-34 (providing examples). Currently, a deactivated Delivery Partner in New York City may appeal the decision within 30 days. *Id.* ¶35.

Deactivation is uncommon. Dupin ¶22. In 2025, 63,100 Delivery Partners operated with New York City as their service area, and Amazon deactivated only 3% of Delivery Partners who had active accounts for at least 30 days after their first delivery. *Id.* ¶23. As of October 2026, the deactivation rate is largely unchanged. *Id.* ¶24. Only 23% of deactivations are appealed and about 3% of all deactivated accounts are reactivated. *Id.* ¶39.

**C. Instacart**

Instacart runs a multi-sided digital marketplace that connects consumers, independent shoppers, and retailers for on-demand delivery. Decl. of Tyler Young ("Young") ¶4. Shoppers are independent contractors who sign up to provide delivery services through the Instacart Shopper App. When a shopper goes "online"—that is, indicates availability to provide shopping and

delivery services—the shopper can select work opportunities that contain one or more consumer orders, called "batches." *Id.* ¶10.

Before accessing the Shopper App, the shopper must meet certain requirements, including continuously maintaining a valid driver's license, passing a background check, and agreeing to Instacart's contractual terms. Decl. of Angela Jacobs ("Jacobs") ¶24. These terms are set out in three main documents: the Independent Contractor Agreement ("ICA"), the Full Service Shopper Account Access Guidelines, and the Community Guidelines. Young Exs. A, B, C. In these agreements, the shopper agrees, among other things, to perform all services safely and respectfully, abide by acceptable industry standards, and safeguard consumer privacy. Young ¶¶15-16 & Exs. A, B, C.

Instacart's standards are meaningful only when they are enforced. The ICA provides that Instacart may deactivate a shopper's access if, in Instacart's sole discretion, he or she materially violates Instacart's policies, including committing theft or illicitly sharing consumers' information. *Id.* ¶¶17-20. A deactivated shopper may appeal the decision. *Id.* ¶32.

Deactivation on the Instacart platform is rare. On average, only 5.7% of shopper accounts are permanently deactivated each year. The most common reasons for deactivation relate to fraud, quality, and safety. For example, from 2020 to 2025, more than half of deactivations in New York City related to fraud. Young ¶¶29-30.

## II. The City Enacts The Delivery Deactivation Law.

In July 2025, City Councilmembers introduced a bill to "amend the administrative code of the city of New York, in relation to the wrongful deactivation of app-based delivery workers," which the Council would eventually pass as the Delivery Deactivation Law. Decl. of Lucas C. Townsend ("Townsend"), Ex. A, Introduction and Reading of Bills, at 1; *id.*, Ex. B. By the

Council's own description, the Law's purpose is to prohibit "app-based delivery services from deactivating app-based delivery workers unless the deactivation is due to just cause or bona fide economic reasons." *Id.*, Ex. C, at 8.

The Law was introduced after a lobbying campaign by organized labor groups like the Workers Justice Project ("WJP") and Los Deliveristas Unidos ("LDU"), which have consistently advocated for laws "guaranteeing stronger worker protections against" purportedly "unfair deactivations" and holding "companies[ ] accountable" for "unfairly" deactivating the accounts of couriers. *Id.*, Ex. D, at 2, 8 & Ex. E, at 7. For example, in a publication dedicated to enhancing "street safety," WJP pushed for the passage of laws that would stop purportedly wrongful deactivations—such as "retaliatory deactivations"—and provide "due process" for deactivation decisions. *Id.*, Ex. D, at 8. At the September 2025 hearing on the Law before the Committee on Consumer and Worker Protection, representatives from WJP and LDU boasted the Law was designed to favor deactivated individuals. *Id.*, Ex. F, at 83.

At that same hearing, multiple Councilmembers parroted WJP's advocacy. Councilmember Shekar Krishnan claimed companies "are the prosecutor, judge, and jury" while the "burden" to "challenge a decision that was already made" falls on couriers. Townsend, Ex. C, at 64-66. And he further stated that companies were violating a "basic, fundamental principle"—due process—by "tak[ing] away … workers' rights and their livelihoods" without any "proper *process*" or "chance to make their case." *Id.* at 69-70. Similarly, other councilmembers repeated WJP's concerns about "street safety" and "hold[ing] the apps accountable." *Id.* at 30, 81; *see also id.* at 44 (Brooklyn Borough President arguing Law necessary to "hold the corporations accountable" for "unjust termination").

DCWP representatives testified in support of the Law, as well. Deputy Commissioner Carlos Ortiz argued that the Law would prevent "arbitrary and unfair deactivation[s]" that "are financially devastating for workers." Townsend, Ex. C, at 25. He further stated that "[t]he protections in this bill will also make the dangerous jobs of delivery workers safer and will improve street safety for all New Yorkers." *Id.* at 21.

The Council also received written testimony from 45 couriers submitted by WJP, 38 of whom testified they had been subject to deactivation. *See* Townsend, Ex. F, at 57-143. The majority admitted to receiving notice of the reason for deactivation. *E.g.*, *id.* at 121. While all denied any wrongdoing on their part, at least 15 testifiers admitted to engaging in the conduct that led to their deactivation, such as refusing long-distance trips, taking an inordinate amount of time to complete deliveries, and using multiple phones contrary to company policies. *E.g.*, *id.* Many of the deactivated couriers used similar language, such as "unfair," "devastating," and "without cause." *Id.* at 57-143.

Following the Committee's September hearing, the City Council amended the proposed legislation, *see* Townsend, Ex. G, and on December 18, 2025, the Committee issued a report discussing the Law, Townsend, Ex. H. The report relied on uncorroborated and unverified anecdotal evidence like that presented in the September hearing. Based on those unsubstantiated accounts, the report sweepingly concluded that "contracted delivery workers have felt exploited by" companies, "report[ed] that they lose access to the apps without being given a clear reason why," and "believed they were deactivated for delays that were not within their control." *Id.* at 20-23.

The report did not identify reliable data on wrongful deactivations. For the proposition that "many contracted delivery workers report that they lose the ability to secure work through the

apps—also known as 'deactivation'—without warning, explanation or recourse," the report cited only two news articles and one WJP-led survey. Townsend, Ex. H, at 22-23 & nn.95, 98-99. The news articles compiled additional uncorroborated anecdotes regarding deactivations and relied on a small survey from a different state conducted by various labor groups. Neither discusses any single instance of deactivation, much less wrongful deactivation, in New York City. *Id.*, Ex. I; *id.*, Ex. J.

The report's final source is a 2021 WJP survey of 500 couriers that found 68 percent of couriers had "reported facing discipline or punishment" by the companies with whom they provided services. Townsend, Ex. K, at 31. The survey did not state that such "issues" were limited to deactivation. *Id.* Where it mentions deactivations, it does not explain whether those deactivations were "wrongful." *Id.* Nor does it clarify whether the deactivations were "permanent" as that word is used in the Law. Additionally, the survey relied on a "non-random sample" of couriers "recruited" by WJP organizers. *Id.* at 13.

The report did not discuss any potential external impact the Law would have on businesses, other couriers, consumers, or the City. Townsend, Ex. H, at 20-23. It did not mention safety at all. It did not address concerns stemming from the Law's mandate to *reactivate* couriers merely because of a technicality (like a day-late notice). *Id.* Nor did the report consider whether making it harder for businesses to deactivate couriers could have perverse results, such as increased risk of fraud, theft, harassment, assault, decreased quality, increased prices, or financial impact on the City's budget. *Id.*

On the same day it issued its report, the Committee passed the Law as amended. The Committee did not discuss fraud, theft, misconduct, safety, the chilling of consumer or merchant reporting, or any other effect the Law would have on the public. *See generally* Townsend, Ex. L.

Chairperson Julie Menin explained that the Law was designed to benefit "contracted" couriers. *Id.* at 3. That day, following the Committee's vote, the full Council passed the Law with no substantive discussion. Townsend, Ex. M, at 121. The same day, the Council passed the materially identical Local Law 52, which imposed deactivation restrictions on ride-share businesses. N.Y.C. Local Law 52 of 2026; *Uber Techs., Inc. v. City of New York*, 839 F. Supp. 3d 218, 238-39 (S.D.N.Y. 2026).

The Council commended WJP's efforts as the Law's main driver. One councilmember expressly thanked "the Workers' Justice Project" by name when voting to pass the Law, noting it was a "leader" in "get[ting the] legislation across." Townsend, Ex. L, at 13. And Councilmember Brannan, the Law's sponsor, stated the Law was "a fitting capstone to . . . years of work together" with WJP and LDU and would ensure "[t]he human beings behind these billion-dollar apps [would] be treated with dignity and respect and nothing less." Townsend, Ex. N, at 10.

The Law was returned unsigned by the Mayor on January 20, 2026, and will take effect on January 17, 2027. Townsend, Ex. O, at 19.[2]

### III. The Delivery Deactivation Law Mandates A New Deactivation Regime.

The Law sharply restricts when a "delivery service" may deactivate an independent courier. Starting 30 days after the courier's first delivery, the business generally may deactivate only for "just cause," a sufficient downturn in business, or because another law requires it. § 20-1532(a). "Just cause" requires consideration of seven nonexclusive factors, including whether the service's rules were reasonable and consistently applied, whether it conducted a fair investigation, and whether deactivation was a reasonable response. § 20-1532(b). The Law gives no guidance on

[2] The Law has seven sections. The first six contain substantive components and would amend or add various provisions to chapter 15 of title 20 of the New York City Administrative Code. Unless otherwise specified, the citations herein refer to the section number of the Administrative Code as amended by the Law (*e.g.*, § 20-1532).

how to balance or weigh these factors, nor what other factors should or may be considered. Except for "egregious misconduct," the business must use "progressive discipline" before deactivation and may not rely on progressive discipline occurring more than a year prior. §§ 20-1531, 20-1532(c). The Law vaguely defines "egregious misconduct" as conduct "so outrageous, dangerous, or illegal" that it cannot reasonably be corrected through progressive discipline, and even the listed examples—including theft—qualify only "depending on the circumstances." § 20-1531.

The Law also reaches backward in time. Any courier deactivated since January 2021 may petition for restoration of access during the year after the Law takes effect. § 20-1533(a); *see also* § 20-1531 (defining "prior deactivation" as "a deactivation that occurred during the 6 years prior to the [Law's] effective date"). The business then has 30 days to restore access unless the earlier deactivation satisfies the Law's new standards. § 20-1533(a).

The Law also changes how deactivations must be documented and defended. A business must provide a notice to every single deactivated courier with "all the precise and detailed reasons" for a deactivation within 72 hours and disclose specified supporting information, including performance data, consumer comments, and information concerning other couriers who engaged in similar misconduct, whether or not the courier wants that information. §§ 20-1532(e), 20-1536(a). The business must continue to provide a deactivated courier "with access to all information and data concerning such [courier] that such [courier] had access to prior to deactivation" for six years after deactivation. § 20-1536(d). If the decision is challenged, the business bears the burden of proving compliance and may not rely on reasons omitted from its notice to the deactivated courier, even if additional reasons were discovered later. § 20-1535(b). The courier, by contrast, may submit additional evidence, which the factfinder must consider. § 20-1535(c).

Finally, the Law requires businesses to maintain written progressive-discipline policies, authorizes DCWP to prescribe minimum requirements for those policies, and imposes reporting and recordkeeping obligations. §§ 20-1538, 20-1539. Couriers may challenge deactivations through an internal "informal resolution" process that Plaintiffs must provide, administrative proceedings, or private lawsuits. §§ 20-1507, 20-1511, 20-1537. Available remedies include reactivation, lost earnings, compensatory damages, attorney's fees, civil penalties, and, for some violations, punitive damages. §§ 20-1508 to 20-1511.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The latter two factors merge when the party opposing the injunction is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To warrant a preliminary injunction, a party "need only show that it is likely to succeed on one of" its claims. *Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 480 (S.D.N.Y. 2025).

## ARGUMENT

### I. Plaintiffs Are Likely To Succeed On The Merits.

The Delivery Deactivation Law violates the Contracts Clause, First Amendment, and the Due Process Clause.

#### A. The Delivery Deactivation Law Violates The Contracts Clause.

The Contracts Clause prohibits States and local governments from passing any law "impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. It "applies to any kind of contract," *Sveen v. Melin*, 584 U.S. 811, 818 (2018), and reflects "the high value" that the Framers "placed on the protection of private contracts," *Allied Structural Steel Co. v. Spannaus*, 438 U.S.

234, 245 (1978). Having agreed to certain "rights and obligations," "parties are entitled to rely on" those contractual promises. *Id.* The Contracts Clause ensures that States and local governments respect those agreements even when exercising "otherwise legitimate police power." *Id.* at 242.

A State or local law "crosses the constitutional line" when it (1) would substantially impair a party's contractual rights, and either (2) lacks a "significant and legitimate public purpose," or (3) is not an "appropriate" or "reasonable" way to advance any such purpose. *Melendez v. City of New York*, 16 F.4th 992, 1031 (2d Cir. 2021). Here, the Delivery Deactivation Law permanently alters—and thus substantially impairs—Plaintiffs' contractual relationships with New York City couriers. There is no significant or legitimate public purpose behind the Law, nor would it be a reasonable and appropriate means of advancing any such purpose. Instead, the City seeks to grant a one-sided benefit to a favored few with no discernible benefit (and considerable detriment) to the public at large.

**1. The Law would substantially impair Plaintiffs' contracts.**

Substantial impairment exists if the challenged law "undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [its] rights." *Uber*, 839 F. Supp. 3d at 242 (quoting *Melendez*, 16 F.4th at 1033). That is the case here.

Plaintiffs' agreements establish the conditions under which couriers may access their apps and reserve contractual authority to determine when that access should end. Dupin ¶¶13, 15-18, 21; Hahn ¶¶6-7; Young ¶¶15-28. Each of Plaintiffs' agreements with couriers expressly reserves authority over both termination of the agreement and continued platform access. Dupin ¶¶17-18, 21; Hahn ¶¶8-10; Young ¶¶15-28. These deactivation provisions "define a central aspect of the parties' relationship: whether, when, and under what circumstances" an individual may access

Plaintiffs' programs. *Uber*, 839 F. Supp. 3d at 243. This is an "essential element[ ]" of Plaintiffs' existing contractual terms. *Id.* at 242; Dupin ¶21; Young ¶28; Hahn ¶11. It is the "means" by which they "enforce" contractual obligations, ensuring that couriers who contract with Plaintiffs provide delivery services consistent with Plaintiffs' standards. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 439 (1934); Dupin ¶21; Young ¶¶28, 42; Hahn ¶¶10-11. DCWP itself has recognized that deactivation is an important "tool[ ] to deter misconduct." Townsend, Ex. P, at 14. Simply put, Plaintiffs contract for the right *not* to continue a business relationship with those they have determined to have engaged in fraud or misconduct, threatened the property or safety of others, or otherwise violated Plaintiffs' standards. Hahn ¶¶9-11.

The Law displaces those contractual terms. Starting 30 days from a courier's first delivery, Plaintiffs may deactivate a covered courier only for statutory just cause, a qualifying economic reason, or a legal requirement. § 20-1532(a). Except for egregious misconduct, establishing just cause requires prior progressive discipline under a written policy provided to the courier, and discipline issued more than one year earlier cannot satisfy that requirement. § 20-1532(c). The Law thus "nullifies express terms" in Plaintiffs' contracts and "superimpos[es]" obligations "conspicuously beyond" those that Plaintiffs "had voluntarily agreed to undertake." *Allied Structural*, 438 U.S. at 246-47; Hahn ¶¶9-11.

The Law further undermines Plaintiffs' contractual bargain by subjecting their deactivation decisions to review by an outside factfinder. Thus, "whether a violation warrants deactivation is no longer committed to [Plaintiffs'] discretion under the standards incorporated into [their] agreement[s] but is governed instead by the City's criteria and ultimately decided by an outside factfinder if challenged." *Uber*, 839 F. Supp. 3d at 243. Misconduct or poor performance is just one "just cause" factor among many, since the Law permits factfinders to consider any factor they

choose—which carries no particular weight. As a result, a factfinder may decide deactivation is improper even if a courier clearly violated an unambiguous standard with spelled-out consequences.

The Law "rewrites" Plaintiffs' deactivation rights and obligations retroactively. *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 290 (S.D.N.Y. 2023). The Law retroactively applies its new "just cause" standard to deactivations up to *six years old*. §§ 20-1531, 20-1533; Dupin ¶56; Young ¶53; Hahn ¶20. Plaintiffs must defend those decisions under an unforeseeable standard using evidence that may be stale, inadequate under the Law's new standards, or missing. Dupin ¶¶56-57; Young ¶55; Hahn ¶21. Couriers properly deactivated under their contracts years ago may therefore regain access now simply because old records fail the new standard—or notice was one day late. § 20-1533(a); Hahn ¶¶23, 26. Such "retroactive changes" are textbook substantial impairment. *Allied Structural*, 438 U.S. at 247.

Examples of actual deactivations highlight the particular concerns with retroactivity. For example, Amazon has deactivated Delivery Partners for engaging in physical altercations in or near Amazon facilities. Dupin ¶34. In one circumstance, multiple Delivery Partners began fighting at an Amazon facility. *Id.* They then left the facility, where another Delivery Partner joined the fight. *Id.* Because Amazon does not tolerate physical violence, and because such misconduct places Amazon associates, other Delivery Partners, and consumers in harm's way, Amazon deactivated all those Delivery Partners' accounts. *Id.* Instacart has also deactivated shoppers who engaged in violence while providing services. In one high-profile example, a shopper was accused of shooting the dog of a well-known actress while delivering groceries to the actress's house. Instacart does not tolerate either the use of weapons or violence of any kind. It

therefore immediately deactivated the shopper's account—though not before the incident sparked media coverage and reputational harm. Young ¶82.

The Law would permit these couriers to secure reactivation simply because a factfinder determines the contemporaneous evidence does not satisfy the City's new "just cause" standard. Perhaps the reasons conveyed in the moment were not detailed enough, the evidence went stale, or the penalty strikes the factfinder as too harsh under the circumstances. Hahn ¶¶23, 28; Freivogel ¶35. And there is no guarantee the factfinder hearing these challenges would even agree on how to apply that vague "just cause" standard, resulting in potentially contradictory rulings about the same or similar incidents. Requiring Plaintiffs to reactivate those accounts in *any* circumstances provides an unjust windfall to those couriers at the expense of consumers, other couriers, and the public. Hahn ¶25; Freivogel ¶34.

Several other provisions of the Law substantially impair Plaintiffs' rights and expectations under their agreements with contracted couriers. The Law, for example, mandates that, before any future deactivation, Plaintiffs must engage in "progressive discipline" unless the courier's behavior was sufficiently "egregious." § 20-1532(c). So even if Plaintiffs would otherwise deactivate the courier and terminate their business relationship, the City purports to mandate that Plaintiffs continue working with them by adopting another means of policing the couriers' conduct. *See Uber*, 839 F. Supp. 3d at 243. For example, fraud, account sharing, and identity-related issues appear nowhere on the Law's list of egregious misconduct. The Law allows a factfinder to decide these forms of fraud are not egregious and instead require "progressive discipline" over Plaintiffs' contractual rights. De Coning ¶19; Jarzabek ¶¶4, 8.

The Law additionally creates a particular process for notifying individuals of deactivation decisions. It requires businesses to provide a notice containing "all" the "precise" and "detailed"

reasons for deactivation within 72 hours of deactivation. §§ 20-1508(a)(3)(g), 20-1511(b), 20-1532(e). While Plaintiffs may already provide notice under their contracts, the "Law converts a voluntary practice into a mandatory obligation." *Uber*, 839 F. Supp. 3d at 244; Hahn ¶18; Freivogel ¶¶23-25. If Plaintiffs fail to satisfy this procedure in any way—including by providing the notice late or without sufficiently "precise and detailed" reasons—then Plaintiffs *must* restore access to that deactivated courier at the courier's request, regardless of the reasons for deactivation. §§ 20-1508(a)(3)(g), 20-1511(b), 20-1532(e). The City is thus mandating that Plaintiffs maintain contractual relationships even when couriers undisputedly breached contractual promises.

The Law matches its burdensome obligations with a harsh enforcement scheme. Deactivated couriers or the City may pursue administrative or civil actions against Plaintiffs for purportedly wrongful deactivations. They may seek, among other things, compensatory damages, punitive damages, and reactivation—consequences far beyond ordinary contractual remedies. Unlike a typical breach-of-contract action where the party seeking relief (here, couriers) bears the burden of proof, the Law requires *Plaintiffs* to prove that a challenged deactivation was appropriate under a new, nebulous "just cause" standard based on the reasons they conveyed at the time of deactivation. For newly deactivated couriers, Plaintiffs may defend deactivation decisions with only the reasons they disclosed in a notice provided within 72 hours of deactivation. § 20-1535(b). For those previously deactivated, Plaintiffs are limited to what reasons they provided in their notice denying reactivation. § 20-1533. That limitation is particularly problematic given that information supporting years-old deactivations may be stale, inaccessible, or insufficient under the Law's new standard. Dupin ¶57; Young ¶¶54-55; Hahn ¶21. But while Plaintiffs are forbidden from relying on new reasons, the Law imposes no similar limitations on deactivated individuals.

These "substantial" impairments were not "foreseeable." *Uber*, 839 F. Supp. 3d at 244-46. The question is not simply whether Plaintiffs operated in a regulated environment, but whether existing regulation "'pertained to'" the contractual deactivation authority the Law now displaces. *Id.* at 244 (quoting *Melendez*, 16 F.4th at 1034-35). No regulation in effect when Plaintiffs entered into their respective contracts prescribed the substantive grounds or procedures for suspending or deactivating a courier's access. And even knowledge that the City might someday enact restrictions of this kind does not make the impairment foreseeable in the constitutional sense. *Id.* at 245 (quoting *Real Est. Bd. of N.Y., Inc. v. City of New York*, 182 F.4th 140, 164 (2d Cir. 2026)).

The Law's impairments, too, are permanent. In *Uber*, the Court distinguished statutes that permit contracting parties to preserve their original rights (through a filing, election, designation, payment, etc.) from those unconstitutional statutes that leave the affected party permanently unable to restore the right for which it contracted. 839 F. Supp. 3d at 245-46; *see also Sveen*, 584 U.S. at 819-22. The Delivery Deactivation Law falls in the latter category because Plaintiffs may not safeguard or reinstate "the rights for which they contracted." *Uber*, 839 F. Supp. 3d at 246. Instead, their "broad authority" has been "eliminate[d]." *Id.*

**2. The Law has no "legitimate public purpose."**

Because the Law substantially impairs Plaintiffs' contracts with couriers, the City bears the burden to show a "significant and legitimate public purpose" behind the Law. *Melendez*, 16 F.4th at 1031. That burden is increased where, as here, the substantial impairment is "severe." *Id.* at 1035 (brackets omitted); *see also Allied Structural*, 438 U.S. at 245; *DoorDash*, 692 F. Supp. 3d at 291. Given this severity, the Court must undertake a "careful examination of the nature and purpose of the … legislation." *Allied Structural*, 438 U.S. at 245; *accord Uber*, 839 F. Supp. 3d at 246-47. The City cannot meet its burden.

On its face, the Law does not "deal with a broad, generalized economic or social problem"; instead, it aims to benefit "a narrow class" of the broader public. *Allied Structural*, 438 U.S. at 248-50; *see also DoorDash*, 692 F. Supp. 3d at 289. The Law is aimed at only wrongfully deactivated "app-based contracted delivery workers." It therefore only benefits a narrow, "favored" group—a small percentage of couriers who can no longer access their accounts because of allegedly wrongful deactivation. *Allied Structural*, 438 U.S. at 248-50; *Melendez*, 16 F.4th at 1037 (vacating denial of preliminary injunction where the law did "not protect a basic societal interest" and benefited "only a favored group"); *see also Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 731-33 (8th Cir. 2019).

The City cannot argue otherwise. "The record considered by the City Council in support of the law did not establish the percentage of deactivations that were wrongful or arbitrary." *Uber*, 839 F. Supp. 3d at 249. Councilmembers accepted without scrutiny anecdotal accounts from deactivated couriers repeating terms like "wrongful," "unfair," and "devastating": the same language used by WJP. The Council relied on the same type of anecdotal data in the 2021 WJP survey, that is *years before* the Law's passage and based on answers to questions not directly probative of the question of "wrongful deactivations." There is no scintilla of evidence in the record about what constitutes a "wrongful deactivation." Nor is there evidence, including objective data, that there ever was or currently is a problem of "wrongful deactivations" and, if there is, that they affect anyone other than a fraction of an already small percentage of couriers who faced deactivation. Hahn ¶12. Without any data or non-anecdotal evidence, the Council's sole support for imposing unconstitutional restrictions on multiple businesses are generalizations offered by a lobbying organization whose interests focus on a single, "narrow" constituency (the couriers) at the expense of the vast majority of New Yorkers. *Id.* at 249 n.5. And the City can

point to no record evidence of any other "downstream effect[ ]" of deactivations on the City that the Law was designed to address. *Id.* at 249. At most, "the legislative record documents" reflect individuals complaining about their "private interests," *id.*, not a "broad, generalized economic or social problem," *Allied Structural*, 438 U.S. at 250. Such an "extremely narrow focus" is not a legitimate basis for the City to rewrite Plaintiffs' contracts. *Id.* at 248.

At minimum, the City cannot identify *any* legitimate public purpose in retroactively regulating years-old deactivations. This retroactive application targets an even "narrow[er] class" of individuals. *Allied Structural*, 438 U.S. at 248. It does not deter future deactivations because it applies only to those deactivated before the Law's enactment. And the City has no legitimate public purpose in awarding a "new legal assessment of the completed deactivation under standards and burden of proof that did not govern when the decision was made." *Uber*, 839 F. Supp. 3d at 241 n.4. In fact, the Law's retroactive provisions undermine the public interest because they would force Plaintiffs to restore access to deactivated couriers who may have engaged in fraud, theft, or unsafe conduct merely because evidence no longer exists to justify the deactivations under a new standard. Hahn ¶¶21, 26, 28; De Coning ¶18.

The Law requires the public to pay a heavy price for the alleged benefit of supposedly "wrongfully" deactivated couriers. With respect to those deactivated for theft or fraud, reactivation poses a risk to consumers' property and imperils Plaintiffs' relationships with consumers and merchants. Even for those who remain deactivated, the required disclosures about who reported misconduct raise the risk of retaliation, placing consumers and merchants in jeopardy. The Law is disserves public safety to benefit a small minority.

### 3. The Law is not a "reasonable" or "appropriate" means of advancing any legitimate public purpose.

Even if there were a legitimate public purpose, the Law is not a reasonable or appropriate means of advancing it. Under the Second Circuit's five-factor balancing test, the "totality" of the factors demonstrates that the Law does not appropriately advance any legitimate public purpose. *Melendez*, 16 F.4th at 1038-45.

*First*, the Law does not impose a "temporary" impairment—it "permanently and entirely extinguishes" Plaintiffs' contractual rights. *Melendez*, 16 F.4th at 1039. The Law has no expiration date. Plaintiffs' "rights do not resume after a fixed period." *Uber*, 839 F. Supp. 3d at 252. And Plaintiffs cannot restore their deactivation rights in the future. A "permanent and complete impairment … weigh[s] heavily against a finding of reasonableness." *Melendez*, 16 F.4th at 1039-40.

*Second*, the legislative record provides no "record basis to link purpose and means." *Melendez*, 16 F.4th at 1040. The City Council had no reliable estimate of how many deactivations are wrongful, in the past or going forward. Nor does the legislative record explain how the Law's retroactive requirements going back six years have anything to do with preventing wrongful deactivations going forward. Retroactively applying a new just-cause standard does not curb wrongful deactivations because those deactivations have already happened and were based on the standard Plaintiffs and couriers mutually agreed to. *See* Dupin ¶¶18-20, 56; Young ¶¶15-28, 53-55; Hahn ¶¶6, 9. And because a retroactive application requires Plaintiffs to defend their deactivation decisions using potentially stale and missing evidence and relying on a newly imposed standard, it is almost guaranteed that some accounts of individuals who pose fraud or safety risks are nevertheless reactivated. Dupin ¶¶57-58; Young ¶¶69-76; Freivogel ¶34; De Coning ¶18; Hahn ¶¶21, 26. The Law's retroactive provision thus does nothing to prevent wrongful

deactivations while increasing the probability of wrongful reactivations. Likewise, the onerous notice burdens are not tailored because they apply regardless of the nature of the deactivation and even where the deactivated courier does not even want the information. Hahn ¶19; Freivogel ¶28.

*Third*, the Law's "allocation of its economic burden" is placed on "the few shoulders" of businesses like Plaintiffs by "upsetting lawfully contracted-for expectations" between Plaintiffs and couriers. *Melendez*, 16 F.4th at 1042. The Law places an unreasonable burden on businesses like Plaintiffs that already take measures to root out contractors who engage in fraud or other misconduct. Dupin ¶¶43-52; Young ¶¶69-76; De Coning ¶¶9, 16-17; Jarzabek ¶8; Freivogel ¶¶10-12. The Law upends those measures by replacing them with a new set of obligations and requires Plaintiffs to implement different policies to advance their objectives of protecting consumer safety and preventing misconduct. *See* Dupin ¶¶79-88; Young ¶76; Hahn ¶¶17-22.

*Fourth*, despite the Law's purported objective of stopping "wrongful deactivations," its remedies—such as requiring reactivation if Plaintiffs fail to provide the 72-hour statutory notice timely or with sufficiently precise detail—are "not condition[ed]" on whether a deactivation was "wrongful." *Melendez*, 16 F.4th at 1041. Reactivation may be required in some instances regardless of whether the courier was deactivated for "just cause" simply because the notice was defective or years-old evidence is no longer accessible. Dupin ¶55; Young ¶¶54-55, 78; Hahn ¶¶21, 23, 26. Moreover, the Law's purported purpose of addressing the "economic vulnerability" of couriers is untethered from the Law's substantive requirements—relief is not "condition[ed]" on financial need. *Uber*, 839 F. Supp. 3d at 254.

*Fifth*, the Law provides no means by which Plaintiffs can "be compensated for damages or losses sustained as a result of" the contractual impairment. *Melendez*, 16 F.4th at 1045. That is particularly troubling here where "the Law's restrictions on deactivation may create additional

safety and fraud risks." *Uber*, 839 F. Supp. 3d at 254; Dupin ¶¶43, 52, 54, 66; Young ¶78; Freivogel ¶¶30, 34; De Coning ¶¶22-25; Jarzabek ¶¶13-14.

***

The Law rewrites Plaintiffs' bargain with couriers, impairing their "means" to "enforce" agreed standards against fraud and safety threats. *Blaisdell*, 290 U.S. at 439. It serves no legitimate public purpose and is neither a reasonable nor appropriate means. *Uber*, 839 F. Supp. 3d at 240. Plaintiffs are therefore likely to succeed in demonstrating the Law violates the Contracts Clause.

### B. The Law Violates The First Amendment.

The Law violates the First Amendment's prohibition on compelled speech.

The City may not "compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). When a law requires someone "to convey particular content that they would not otherwise disclose," that law is "content-based, regardless of the character of the speech it compels." *DoorDash, Inc. v. City of New York*, 185 F.4th 1, 8 (2d Cir. 2026). And when the compelled speech is noncommercial, as here, strict scrutiny applies and the law is presumptively unconstitutional. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573-79 (1995). The burden then shifts, and the defendant must justify its speech-restrictive law by showing that (1) there is an "actual problem" that amounts to a "compelling state interest," *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 378 (2d Cir. 2025), and (2) the challenged provisions are the "least restrictive means" to advance that state interest, *CompassCare v. Hochul*, 125 F.4th 49, 63 (2d Cir. 2025).

By compelling Plaintiffs to share "all the precise and detailed reasons" for deactivations, disclose all relevant evidence, disclose data and information related to "other couriers," and make these records available to deactivated couriers for six years, the Law compels speech. The Law forces Plaintiffs to disclose sensitive and confidential information to those who pose a risk to the

safety and property of others and integrity of Plaintiffs' programs. *Hurley*, 515 U.S. at 573; Dupin ¶¶51-60, 73; Freivogel ¶¶25-31; De Coning ¶¶21-24; Jarzabek ¶¶11-13; Hahn ¶19.

The City cannot satisfy strict scrutiny. The legislative record shows no compelling interest requiring these disclosures; in fact, exposing consumers and merchants to retaliation and exposing Plaintiffs to fraud undermines the public interest. Freivogel ¶¶25-27, 30; De Coning ¶¶22-23; Jarzabek ¶¶11, 13. The City instead has determined that it should impose burdens on Plaintiffs solely to benefit a favored class of couriers. That narrow benefit is not a compelling interest. *See DoorDash*, 185 F.4th at 6. If anything, these disclosures are likely to increase fraudsters' ability to deceive Plaintiffs and consumers going forward. De Coning ¶¶15, 22-23; Jarzabek ¶¶13-14.

The City also will have no evidence that "less burdensome" alternatives would be inadequate. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 779 (2018). Requiring disclosure of every detailed reason, consumer comment, rating, complaint, supporting record, and aggregation of comparable deactivations—even without an indication that couriers want it—cannot be the least restrictive means of preventing wrongful deactivations. Hahn ¶19; Freivogel ¶28.

The compelled speech is noncommercial. Deactivation notices have nothing to do with "an advertisement," do not "make[ ] reference to a specific product," and lack a meaningful connection to an economic motive given the far stronger fraud and safety concerns the speech poses. *Nat'l Inst. of Fam. & Life Advocs.*, 160 F.4th at 374. The "nature of the speech taken as a whole" is thus noncommercial. *Id.* Even if the speech were commercial, the Law fails intermediate scrutiny. Hypothetical harms to a narrow group establish no "substantial" interest, and the disclosures do not "directly advance" one. *DoorDash*, 185 F.4th at 8-9. Even accepting the City's stated objective, the legislative record confirms it neither "'carefully calculated'" the

speech burdens' costs and benefits nor evaluated "numerous and obvious less-burdensome alternatives." *Id.* at 9 (quoting *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 & n.13 (1993)). These disclosures are also not "reasonably related to" preventing consumer deception. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985).

### C. Plaintiffs Are Likely To Succeed On Their Due Process Claims.

The Delivery Deactivation Law violates the Due Process Clause of the Fourteenth Amendment and Article I, Section 6 of the New York Constitution by applying retroactively without any rational legislative purpose, and its retroactive reach must itself be justified. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 264-66 (1994); *Regina Metro. Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 154 N.E.3d 972, 995 (N.Y. 2020). Neither the text nor the legislative history of the Law provides the Council's reasoning for why various provisions of the Law should apply retroactively at all, or specifically for six years. Attempting to hold Plaintiffs to a "just cause" standard and factors that did not exist during the past six years does not serve the City's stated purpose of *preventing* wrongful deactivations. Because it lacks that nexus, the Law is arbitrary and, therefore, illegitimate. *See Regina*, 154 N.E.3d at 1001-02. It does not even serve a rational basis. "Retroactivity concerns are further heightened" where, as here, a law would affect "contractual or property rights, matters in which predictability and stability are of prime importance." *Id.* at 1000 (citing *Landgraf*, 511 U.S. at 271).

## II. The Remaining Factors Weigh In Favor Of A Preliminary Injunction.

The remaining preliminary injunction factors—irreparable harm, balance of the equities, and public interest—all favor immediate relief. *Nken*, 556 U.S. at 426.

### A. Plaintiffs Will Be Irreparably Harmed Absent Immediate Relief.

Absent a preliminary injunction, the Law will irreparably harm Plaintiffs by violating their constitutional rights and impairing their businesses.

### 1. The Law causes irreparable constitutional harms.

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984); *accord Uber*, 839 F. Supp. 3d at 255. That applies to the Contracts Clause, which was "perhaps the strongest single constitutional check on state legislation during our early years as a Nation" and retains its vitality still. *Allied Structural*, 438 U.S. at 241; *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012). And "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (cleaned up). Plaintiffs all face an imminent threat of constitutional injury by being forced to engage in contractual relationships they did not agree to and engage in speech they would otherwise not. Freivogel ¶¶31, 37; De Coning ¶¶22-24; Jarzabek ¶¶13-14. These injuries alone warrant a preliminary injunction. *Mahmoud*, 606 U.S. at 569; *Uber*, 839 F. Supp. 3d at 255.

### 2. The Law causes irreparable business harms.

The Law will also cause irreparable harm to Plaintiffs' businesses and consumer goodwill. The Law threatens to force Plaintiffs to reveal their internal fraud detection and prevention methods and provide would-be wrongdoers with a roadmap for avoiding future detection, all of which would result in monetary losses Plaintiffs cannot recoup from the City. *See* De Coning ¶¶15, 20-23; Jarzabek ¶¶10-14; *see also Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) ("disclosure of confidential information" is "quintessential" irreparable harm). If the Law goes into effect, Plaintiffs would face an untenable choice between irreparable harms: (1) deactivate the courier's account and turn over information revealing their proprietary and confidential techniques for detecting fraud, thereby providing a roadmap for future fraudsters to evade detection; (2) deactivate the courier's account without making those disclosures and consequently

be barred from presenting any of that evidence in a subsequent proceeding before an outside factfinder; or (3) maintain the courier's access to the platform despite the fraud, and risk additional fraud and unrecoverable losses. *See* De Coning ¶25; Freivogel ¶36. Those are irreparable harms. *See, e.g.*, *Nat'l Fuel Gas Distrib. Corp. v. Christian*, 798 F. Supp. 3d 267, 287 (N.D.N.Y. 2025).

The Law will also harm Plaintiffs' merchant and consumer goodwill. *Uber*, 839 F. Supp. 3d at 256. For example, third-party sellers in Amazon's online marketplace contract with Amazon to arrange for reliable transportation of their products to consumers in the City. Dupin ¶¶4-6. Consumers expect the same when they make purchases from Amazon. Dupin ¶¶7-78 (Amazon communications regarding delivery reliability). But the Law creates a "concrete risk" that Plaintiffs "will be compelled to restore access to drivers whom their safety or integrity standards would exclude." *Uber*, 839 F. Supp. 3d at 256. A courier who engages in fraud but continues to have access to Plaintiffs' apps would jeopardize the reliability that Plaintiffs' retail partners and consumers have come to know and expect. This harms the goodwill that Plaintiffs have built. Dupin ¶83; Young ¶¶69-76; Freivogel ¶¶5, 34; Hahn ¶¶24-25. This "loss of client relationships and consumer good will built up over the years constitutes irreparable harm." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). "These type[s] of injuries are presumed to be irreparable . . . ." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001). And an incident involving a courier, whom Plaintiffs have sought to deactivate but cannot now because of the Law, would further damage the "trust, reputation, goodwill, and business opportunities in ways that are difficult to establish and measure." *Uber*, 839 F. Supp. 3d at 256; Dupin ¶83; Young ¶72; Hahn ¶¶25, 27; Freivogel ¶34. It may shake consumers' "confidence in the safety and integrity of [Plaintiffs'] services." *Uber*, 839 F. Supp. 3d at 257. Forcing Plaintiffs to disclose to couriers information that merchants or consumers provided with

an expectation it would remain private also risks consumer goodwill. Plus, if merchants or consumers understand Plaintiffs may be required to share every comment, rating, or complaint, and all data and information relevant to a deactivation, they are less likely to submit reports about negative experiences with couriers, including of serious conduct that even the Law would recognize as just cause for deactivations. *See* Freivogel ¶¶27, 30; *cf. New York v. DHS*, 969 F.3d 42, 86 (2d Cir. 2020).

The Law's compliance costs are irreparable, going well beyond what is ordinary or compensable. The Law would inundate Plaintiffs with petitions from couriers deactivated as far back as January 17, 2021, and provide the companies with only 30 days to research and respond, which stands to impose a fundamental restructuring of operations, creation of new infrastructure for investigating and responding to complaints, and compelled departure from core business practices. Hahn ¶¶20-22. The burden of proof imposed on Plaintiffs by the Law also forces Plaintiffs to engage in extensive record keeping and comprehensive disclosure in their initial notice of deactivation. Hahn ¶¶18-19. As this Court previously explained, the need to reconstruct years of historical decisions and create new review systems "reinforces the breadth and immediacy" of the harms. *Uber*, 839 F. Supp. 3d at 256.

Finally, the multi-factor "factfinding" process established by the Law is likely to expose Plaintiffs, and their couriers, to inconsistent judgments depending upon who the "factfinder" may be, how those factfinders each interpret the mandatory factors, and whatever additional factors they consider (or do not consider), from which Plaintiffs could not recover. *Cf. Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 291-92 (2d Cir. 2026); *see* Freivogel ¶35; Hahn ¶28.

**B. The Public Interest and Balance of the Equities Favor Immediate Relief.**

When the government is the opposing party, the governmental-harm and public-interest factors merge. *Nken*, 556 U.S. at 435. Neither the City nor the public has an interest in enforcing

an unconstitutional law. *See, e.g.*, *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). Plaintiffs' likelihood of success therefore establishes that these factors favor an injunction. The Law also undermines the public's interests in "safety" and enforcing contracts. *Uber*, 839 F. Supp. 3d, at 258. Parties should not be "allowed to skirt" contractual "obligations at another's expense." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010). Couriers receive flexibility and independence in exchange for accepting contractual standards enforceable through deactivation in agreed circumstances. Hahn ¶¶5, 9-11. As the City itself acknowledged, deactivation is an essential "too[l] to deter misconduct," Townsend, Ex. P, at 14, protecting Plaintiffs' businesses and the public's access to safe, reliable deliveries. This bargain benefits everyone.

Yet the Law impairs those contractual rights—even reopening deactivations up to six years old—to benefit individuals who breached those standards. Restoring their access "introduce[s] additional risks to public safety." *Uber*, 839 F. Supp. 3d at 258. No one should be forced to contract with individuals they have determined pose fraud, theft, or safety risks. Freivogel ¶34; De Coning ¶19; Jarzabek ¶14. When enacting the Law, the City never considered "whether its changes to protect some drivers will harm the millions of other" stakeholders who rely on Plaintiffs. *Uber*, 839 F. Supp. 3d at 258. The City will be able to identify no legitimate, substantial public interest justifying the Law now.

## CONCLUSION

Plaintiffs respectfully request that this Court issue a preliminary injunction barring the enforcement of the Law as applied to Plaintiffs while this litigation proceeds. Plaintiffs respectfully request that the Court issue a preliminary injunction before January 17, 2027, to permit Plaintiffs to seek appellate relief, if necessary, before the Law takes effect.

Dated: October 28, 2026
New York, New York

By: */s/ Eli Z. Freedberg* (with permission)
Eamon P. Joyce (N.Y. Bar No. 4104865)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
212.839.5300
ejoyce@sidley.com

Tobias S. Loss-Eaton (N.Y. Bar No. 4938403)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202.736.8000
tlosseaton@sidley.com

Eli Z. Freedberg (N.Y. Bar No. 4175816)
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
631.247.4713
efreedberg@littler.com

Alexander T. MacDonald (*PHV forthcoming*)
James A. Paretti, Jr. (*PHV forthcoming*)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., NW
Washington, DC 20006
202.842.3400
amacdonald@littler.com
jparetti@littler.com

*Attorneys for Maplebear Inc. d/b/a Instacart*

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Mylan L. Denerstein*
Mylan L. Denerstein
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-4000
mdenerstein@gibsondunn.com

Lucas C. Townsend (*PHV forthcoming*)
John W. Tienken (*PHV forthcoming*)
Riley K. Segars (*PHV forthcoming*)
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: (202) 955-8500
ltownsend@gibsondunn.com
jtienken@gibsondunn.com
rsegars@gibsondunn.com

Brian Richman
Jaime R. Barrios (*PHV forthcoming*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: (214) 698-3100
brichman@gibsondunn.com
jbarrios@gibsondunn.com

*Attorneys for Plaintiffs Amazon Logistics, Inc. and Amazon.com, Inc.*

By: */s/ Karen L. Dunn* (with permission)
Karen L. Dunn (N.Y. Bar No. 4498028)
Meryl C. Governski (*PHV forthcoming*)
Kyle N. Smith (N.Y. Bar No. 5075940)
Linda E. Halfacre (*PHV forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 240-2900
kdunn@dirllp.com
mgovernski@dirllp.com
ksmith@dirllp.com
ehalfacre@dirllp.com

*Attorneys for Plaintiffs Uber Technologies, Inc., and Portier, LLC*

## WORD COUNT CERTIFICATION

I, Mylan L. Denerstein, an attorney duly admitted to practice law before this Court, hereby certify pursuant to this Court's Local Civil Rule 7.1 that this memorandum of law complies with the word limit set forth in this Court's Local Civil Rule 7.1(c) because it contains 8,737 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
October 28, 2026

*/s/ Mylan L. Denerstein*
Mylan L. Denerstein