Index No. 26 CV 09455

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UBER TECHNOLOGIES, INC.; PORTIER, LLC; AMAZON LOGISTICS, INC.; AMAZON.COM, INC.; MAPLEBEAR INC. D/B/A/ INSTACART, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION

***STEVEN BANKS***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Karen Selvin*
*Scali Riggs*
*Connor Lie-Spahn*
*Tel: (212) 356-2208*
*Matter No. 2026-064926*

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ III

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 2

A. Wrongful Deactivation of Couriers and Enactment of LL34 ........ 3

B. LL34 ........ 7

C. The Instant Action ........ 9

STANDARD OF REVIEW ........ 10

ARGUMENT

POINT I

PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. ........ 11

A. LL34 Does Not Violate the Contract Clause. ........ 11

i. LL34 Does Not Substantially Impair Plaintiffs' Contracts. ........ 11

ii. LL34 Serves a Significant and Legitimate Public Purpose. ........ 15

iii. LL34 is an Appropriate and Reasonable Means of Achieving its Purpose. ........ 18

B. LL34 Does Not Violate the First Amendment. ........ 22

C. LL34 Does Not Violate Due Process. ........ 30

i. LL34 Provides for Prospective Reinstatement, Not Retroactive Penalties or Liability ........ 30

ii. Even if Construed as Retroactive, LL34 Satisfies Due Process ........ 31

**Page**

POINT II

PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM........ 33

POINT III

BALANCE OF THE EQUITIES TIPS IN THE CITY'S FAVOR........ 36

CONCLUSION........ 37

WORD COUNT CERTIFICATION........ 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Structural Steel v. Spannaus*,
438 U.S. 2334 (1978)....................15, 18

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986)....................24

*Barrett v. State of Indiana*,
229 U.S. 26 (1913)....................17

*Bd. of Trs. v. Fox*,
492 U.S. 469 (1989)....................24

*Buffalo Teachers Fed'n v. Tobe*,
464 F.3d 362 (2d Cir. 2006)....................18, 21

*Carten v. Kent State Univ.*,
282 F.3d 391 (6th Cir. 2002) ....................30

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
447 U.S. 557 (1980)....................24, 25, 26, 28, 29

*CFCU Comm'ty Credit Un. v. Hayward*,
552 F.3d 253 (2d Cir. 2008)....................17

*Cmty. Hous. Improvmt. Program. v. City of N.Y.*,
59 F.4th 540 (2d Cir. 2023) ....................10

*Compasscare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) ....................24, 25, 26, 28

*Concerned Home Care Providers, Inc. v. Cuomo*,
783 F.3d 77 (2d Cir. 2015)....................17, 35

*Cornelio v. Rosado*,
24-cv-01335, 2025 WL 2771677
(N.D.N.Y. Sept. 29, 2025) ....................24

*De Veau v. Braisted*,
363 U.S. 144 (1960)....................32

*Donohue v. Cuomo*,
980 F.3d 53 (2d Cir. 2020)....................14, 15

**Cases** **Pages**

*DoorDash, Inc. v. City of N.Y.*,
185 F.4th 1 (2d Cir. 2026) ....................27

*Doyle v. Suffolk County*,
786 F.2d 523 (2d Cir. 1986).................... 35, 36

*E. Enters v. Apfel.*,
524 U.S. 498 (1998)....................31

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
459 U.S. 400 (1983)....................11, 15, 18

*Exxon Corp. v. Eagerton*,
462 U.S. 176 (1983)....................18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)....................33

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005)....................35

*Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*,
93 F.3d 68 (2d Cir. 1996)....................35

*Gen. Motors Corp. v. Romein*,
503 U.S. 181 (1992)....................33

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949)....................23

*Home Bldg. & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934)....................11, 18

*HomeAway.com v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2018) ....................24

*Hudson Shore Assocs. Ltd. P'ship v. N.Y.*,
139 F.4th 99 (2d Cir. 2025) ....................10

*Jin v. Shanghai Originals, Inc.*,
990 F.3d 251 (2d Cir. 2021)....................16

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987)....................18

**Cases** **Pages**

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994).....30, 32

*Lewis v. Thompson*,
252 F.3d 567 (2d Cir. 2001).....28

*Maryland v. King*,
567 U.S. 1301 (2012).....36

*Mazurek v. Armstrong*,
520 U.S. 968 (1997).....10

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021).....2, 12, 17, 19, 21, 22

*N.Y. State Rest. Ass'n v. New York City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009).....25

*Nat'l Ass'n for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025),
*cert. granted sub nom.*,
*Grant v. Higgins*,
146 S. Ct. 2811 (2026).....34

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001).....28

*Nat'l Retail Fed. v. James*,
806 F. Supp. 3d 427 (S.D.N.Y. 2025).....27

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020).....33

*Ogden v. Wax Works, Inc.*,
29 F. Supp. 2d 1003 (N.D. Iowa 1998).....30

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 455 (1978).....25

*Olson v. State of California*,
104 F.4th 66 (9th Cir. 2024).....15, 16, 29

*Real Est. Bd. of NY, Inc. v. City of N.Y.*,
182 F.4th 140 (2d Cir. 2026).....11, 13, 17, 18, 21

**Cases** **Pages**

*Regina Metro. Co. v. New York State Div. of Hous. & Cmty. Renewal*,
35 N.Y.3d 332 (2020) ....................31

*Restaurant Law Center v. City of New York*,
90 F.4th 101 (2d Cir. 2024) ....................16, 17, 29

*Roman Catholic Diocese v. Cuomo*,
592 U.S. 14 (2020) ....................10

*RUI One Corp. v. City of Berkeley*,
371 F.3d 1137 (9th Cir. 2004) ....................29

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) ....................23, 24

*Sanitation & Recycling Indus. v. City of New York*,
107 F.3d 993 (2d Cir. 1997) ....................18

*Singas Famous Pizza Brands Corp. v. New York Advert. LLC*,
10-Civ-8976, 2011 WL 497978
(S.D.N.Y. Feb. 10, 2011),
*aff'd*, 468 F. App'x 43 (2d Cir. 2012) ....................34

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ....................23

*Sullivan v. Nassau County Interim Fin. Auth.*,
959 F.3d 54 (2d Cir. 2020) ....................15

*Sveen v. Melin*,
584 U.S. 811 (2018) ....................12, 14

*Texaco Inc. v. Short*,
454 U.S. 516 (1982) ....................11, 13

*Thornhill v. State of Alabama*,
310 U.S. 88 (1940) ....................16

*Tucker Anthony Realty Corp. v. Schlesinger*,
888 F.2d 969 (2d Cir. 1989) ....................35

*U.S. Trust Co. v. New Jersey*,
431 U.S. 1 (1977) ....................11

**Cases** **Pages**

*Uber Technologies, Inc. v. City of New York*,
No. 1:26-cv-4893
(S.D.N.Y. July 21, 2026) ....................9, 17

*Uber Techs., Inc. v. City of Seattle*,
No. 25-228, 2026 WL 3255510
(9th Cir. Oct. 29, 2026)....................25, 26

*United States v. O'Brien*,
391 U.S. 367 (1968)....................24

*United States v. Salerno*,
481 U.S. 739 (1987)....................10

*Usery v. Turner Elkhorn Mining Co.*,
428 U.S. 1 (1976)....................33

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)....................25, 28

*Veix v. Sixth Ward Bldg. & Loan Assn.*,
310 U.S. 32 (1940)....................18

*Vugo, Inc. v. City of New York*,
931 F.3d 42 (2d Cir. 2019)....................30

*West Coast Hotel v. Parish*,
300 U.S. 379 (1937)....................16, 29

*Wheely USA, Inc. v. City of New York*,
830 F. Supp. 3d 378 (S.D.N.Y. 2026)....................23, 26, 27

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)....................35, 36

*Yang v. Kosinski*,
960 F.3d 119 (2d Cir. 2020)....................36

*Zauderer v. Off. of Disciplinary Couns.*,
471 U.S. 626 (1985).................... 26, 27, 28, 29

**Statutes**

C.P.L.R. § 213(2)....................32

Col. Rev. Statutes § 8-4-127 ....................15

<u>**Statutes**</u> <u>**Pages**</u>

Minn. Statute § 181C.04 ....................15

N.Y.C. Admin. Code § 19-549 ....................15

N.Y.C. Admin. Code § 20-1201 ....................15

N.Y.C. Admin. Code § 20-1231 ....................15

N.Y.C. Admin. Code § 20-1241 ....................15

N.Y.C. Admin. Code § 20-1271 ....................3, 15

N.Y.C. Admin. Code § 20-1509 ....................9, 31

N.Y.C. Admin. Code § 20-1521 ....................15

N.Y.C. Admin. Code § 20-1526 ....................34

N.Y.C. Admin. Code § 20-1531. ....................3, 7, 8, 12, 32

N.Y.C. Admin. Code § 20-1532 .................... *passim*

N.Y.C. Admin. Code § 20-1533 .................... *passim*

N.Y.C. Admin. Code § 20-1535 ....................8

N.Y.C. Admin. Code § 20-1536 ....................8, 12, 22, 29

N.Y.C. Admin. Code § 20-1537 ....................8

N.Y.C. Charter § 37(b) ....................7

R.C.W. § 49.46.300 ....................15

Seattle Mun. Code § 143.2.50....................15

## PRELIMINARY STATEMENT

For years, the New York City Council ("Council") has enacted worker protections to safeguard the City's most vulnerable workers as a vital means of promoting the broader health and safety of all New Yorkers. Building on prior reforms for app-based delivery workers ("Couriers"), Council introduced legislation in July 2025 that would become Local Law 34 of 2026 ("LL34"). LL34 establishes basic protections for the thousands of Couriers who complete roughly 2.77 million weekly deliveries across the five boroughs through delivery platforms ("Services"). LL34 curbs arbitrary deactivations—the indefinite or permanent termination of a Courier's platform access—and remedies deficient post-deactivation procedures. Abrupt, opaque deactivations, often triggered by algorithms, have caused severe financial insecurity for thousands of Couriers and fueled dangerous conditions as workers rush through congested streets to avoid losing their livelihoods.

To ameliorate these harms, LL34 amends Chapter 15 of Title 20 of the New York City Administrative Code ("AC") to prohibit Services from deactivating Couriers arbitrarily, requiring just cause (under a Service-created progressive discipline policy), a bona fide economic reason, or a legal mandate. LL34 explicitly preserves Services' legitimate business interests by permitting immediate deactivations for egregious misconduct.

Plaintiffs, Uber Technologies, Inc., Portier, LLC (collectively "Uber"), Amazon Logistics, Inc., Amazon.com, Inc. (collectively "Amazon"), and Maplebear Inc. d/b/a/ Instacart ("Instacart") commenced this action and moved for a preliminary injunction to enjoin enforcement and implementation of LL34. Plaintiffs claim that LL34 violates their constitutional rights under the Contract Clause, the First Amendment, and the Due Process Clause.[1]

---

[1]The Complaint also raises a First Amendment compelled association claim, free speech claim under the New York State Constitution, and a vagueness challenge, but Plaintiffs have opted to not move on those claims.

Plaintiffs' allegations have no sound basis in law or fact. LL34 does not violate the Contract Clause because it does not substantially impair Plaintiffs' existing contracts, and, in any event, is a reasonable and appropriate means to protect thousands of Couriers from the sudden and devastating loss of income stemming from wrongful deactivation, while increasing safety on City streets. Council chose reasonable means to achieve this legitimate public purpose, satisfying the five-factor analysis set forth in *Melendez v. City of New York,* 16 F.4th 992 (2d Cir. 2021). Plaintiffs' First Amendment claim is equally unavailing. LL34 regulates conduct, not speech, and therefore does not implicate the First Amendment. And, even if it is found to implicate the First Amendment, at most, LL34 is commercial speech and easily satisfies rational basis review. Plaintiffs' Due Process claim is similarly baseless. Affording previously deactivated Couriers a one-year window to seek prospective reinstatement imposes no retroactive liability or penalties but merely gives the law comprehensive effect and furthers a legitimate public purpose. Finally, Plaintiffs can show no irreparable harm from a statute developed *with* their own input, and the balance of the equities and the public interest strongly favor basic workplace fairness and safer streets. Plaintiffs' motion must be denied.

## STATEMENT OF FACTS

New York City's delivery market is dominated by multi-billion-dollar tech giants, like Plaintiffs, whose business models rely on access to a fleet of roughly 61,000-80,000 Couriers without basic employment safeguards. Ex. F at 41, 53; Ex. D at 9.[2] Couriers depend on delivery work for their primary income, yet labor under coercive conditions where Services algorithmically pace dispatches and continuously surveil delivery speed, acceptance rates, and route efficiency. Ex. F at 18, 41, 54. Following the City's 2021 Courier protections (LL113–117) and a pandemic-

[2] All exhibits referenced herein are annexed to the November 19, 2026 Declaration of Scali Riggs.

driven delivery surge, Services intensified algorithmic pacing and retaliatory deactivations to offset minimum-pay costs.[3] Ex. E at 46, 52; Ex. F at 54. Modeled on the City's fast-food wrongful-discharge law, AC § 20-1271, *et seq.,* and refined through testimony and redline markups from Services, Council enacted Int. 1332-A as LL34 of 2026 (AC § 20-1531, *et seq.*) to prohibit arbitrary deactivations and relieve the resulting street-safety crisis. AC § 20-1532(c)–(d).

### A. Wrongful Deactivation of Couriers and Enactment of LL34

The legislative record for LL34 was developed through public hearings, agency investigations, academic research, public safety analyses, and sworn testimony before Council's Committee on Consumer and Worker Protection ("Committee"). At a September 12, 2025 hearing, the Department of Consumer and Worker Protection ("DCWP") testified in support of Int. 1332. Ex. E at 21; Ex. F at 1-3. DCWP officials testified that Couriers routinely face abrupt, arbitrary deactivations that are harmful to them and their families. *Id.* Worse, the deactivations could be for issues completely beyond the Couriers' control, such as traffic conditions, restaurant delays, e-bikes breaking down, and one Courier who reported "he was deactivated when he was hit by a car and hospitalized." Ex. E at 21. DCWP emphasized, "The protections in this bill will also make the dangerous jobs of delivery workers safer and will improve street safety for all New Yorkers." *Id.*

Testimony from individual Couriers put a human face to the crisis, demonstrating that automated systems routinely impose summary terminations for events entirely beyond human control. Alejandro Grajales testified he was deactivated by DoorDash, without notice or opportunity to appeal, for taking too long to make a delivery due to bridge closures. *Id.* at 58. Grubhub deactivated Hossain Shuvo without warning for allegedly "fraudulently increas[ing] [his] engaged pay during a delivery" when his e-bike battery failed mid-delivery, ignoring

[3] Contrary to Plaintiffs' suggestion, the City *never* recommended that Services deactivate Couriers in response to the minimum pay rule.

contemporaneous photos and repair receipts. Ex. F at 84. Milon Chowdhury, a father of three, was immediately deactivated by Grubhub after being struck by a car during a rainy delivery and hospitalized for two days, leaving his family destitute and with no recourse. *Id.* at 105; Ex. N

Workers have continued to report problems with deactivation after the Committee hearing. After four months with Instacart, Mohamadou Dioulde Jallow was deactivated over a single customer complaint about a mixed-up order; his appeal was denied the same day despite no follow up. Ex. N at 54. He began working for DoorDash thereafter and was deactivated after approximately eight months due to late deliveries caused by merchants not preparing food orders on time. *Id*. These deactivations caused him to default on college loan payments and drop out of school. *Id*. Ali Aitlaheen was suddenly deactivated after seven years with Uber Eats with an automated message accusing him of GPS manipulation, with no investigation or meaningful appeal. *Id*. at 2. Brian Octavio Medina Tapia was deactivated after eight years when Uber Eats wrongly accused him of submitting a false identity document and then denied his appeal the next day without explanation. *Id*. at 26. Chernor Musa Bah worked for Uber Eats for a year until he was deactivated for cancelling an order for a restaurant that was closed – Uber then denied his appeal because he had cancelled other dangerous trips Uber had assigned him that required him to travel by bicycle on highways. *Id*. at 29. Mamadou Balde was deactivated after over a year when Uber Eats' AI facial recognition algorithm falsely accused him of sharing his account with someone else, leaving him homeless. *Id.* at 42. The record is replete with dozens of similar accounts. Ex. F. Of note, when pressed by Committee Chair Menin regarding how Uber's internal systems distinguish traffic delays from intentional trip prolongation, Uber's representative acknowledged that traffic delays filter into a broad category of "fraud" and admitted she possessed no data on how many Couriers were deactivated under that designation. Ex. E at 78.

Citywide data confirmed the scale of deactivations: DCWP found that 16% of active Couriers had experienced deactivations. Ex. F at 41. Cornell University research established that more than 20% of surveyed Couriers had suffered deactivation, predominantly triggered by automated delay and speed metrics. *Id*. Furthermore, survey evidence cited in Council's Committee Report documented that 68% of food Couriers had experienced arbitrary platform discipline or deactivation without explanation or opportunity to appeal. Ex. I at 22. Yet, as Council recognized, the true impact of wrongful deactivation extends far beyond those who have already experienced it: the constant, pervasive threat of summary deactivation is a reality under which every Courier labors, creating a coercive environment.

A central purpose of LL34 is to improve street safety and protect pedestrians, cyclists, and motorists from hazardous traffic conditions caused by the platforms' efficiency-maximizing dispatch models which pressure Couriers to prioritize delivery volume and speed metrics above all else. Council engaged in extensive questioning regarding platform practices that penalize Couriers for trip delays, establishing that speed pressure forces Couriers to ride recklessly, cut corners, and create a more dangerous environment on the street for all New Yorkers. *See* Ex. E at 62-64.

Transportation safety organizations and worker advocates submitted testimony confirming that just cause and due process protections for Couriers directly advance public street-safety across the City. *See*, *e.g.*, Ex. F at 46 (testimony from Eric McClure, Executive Director, StreetsPAC); 47 (testimony of Jackie Rivera, The Ghost Biker Fellowship).

Empirical academic research linked this street-level crisis to the economic precarity of Couriers. CUNY School of Public Health and Queens College found from one study, *A Price Too High: Injury and Assault Among Delivery Gig Workers in New York City*, that over 67% of

Couriers depend on app delivery as their primary income. Ex. F at 18. The study documented job-related Courier injury rates of 21.9% and assault rates of 20.8%, concluding that deactivation protections serve both as fair working standards and vital public health interventions reducing street risks. *Id*. Cornell also found that 49% of surveyed Couriers had been involved in a delivery traffic accident, while roughly 20% had been summarily deactivated for delayed trips or unchallengeable reviews. *Id.* at 41-42. Accidents and injuries do not solely affect Couriers, as often there is an unsuspecting member of the public, a pedestrian, or a motorist at the other end of a collision. Given their workforce size and rates of accidents, Council reasonably understood that Couriers facing deactivation pressures to rush and take greater risks were driving a public safety crisis. *Id.*; *see also* Ex. N.

The legislative process leading to LL34 was collaborative and responsive to industry feedback. Following the September 2025 hearing, Council engaged in extensive dialogue with industry stakeholders. In October 2025, Plaintiff Amazon submitted redlines to the Council detailing specific statutory changes they sought. *See* Ex. M. Rather than advancing the initial draft of Int. 1332, Council integrated numerous industry revisions into a Proposed Int. 1332-A to narrow the bills' reach and accommodate Services' stated operational requirements, safety protocols, and business needs. For example, in response to requests from Amazon that the definition of "deactivation" expressly exclude "temporary" account pauses, Council amended the proposed language to exclude non-permanent, non-indefinite "revocation or restriction of an app-based delivery worker's access to the delivery platform or authorization to accept deliveries on the delivery platform." *Compare* Ex. B, Int. 1332 *with* Ex. G, Int. 1332-A; *see also* Ex. M. Council also revised the definitions of "just cause" and "misconduct" in response to Amazon's feedback, amending "just cause" so that it broadly covers a Courier's "failure to satisfactorily perform job

duties," while confining the requirement of demonstrably and materially harmful conduct to the separate definition of "misconduct." *Id*. Furthermore, Council addressed objections regarding advance notice by eliminating the requirement entirely and replacing it with a requirement to provide written notice within 72 hours after deactivation has occurred. *Id*.

Council similarly accommodated the Services' focus on maintaining immediate authority to remove dangerous actors by enacting an explicit definition of "egregious misconduct," defined as "misconduct that is so outrageous, dangerous, or illegal that a delivery service cannot reasonably expect to correct it through progressive discipline." AC § 20-1531. While Council declined to grant platforms unfettered discretion to designate any policy violation as "egregious," it established clear statutory safe harbors allowing immediate deactivation without prior warnings under AC §§ 20-1531 and 20-1532(c). Following these collaborative revisions, industry participants recognized the final bill as workable, with representatives from market leaders such as DoorDash confirming that the revised text was acceptable. Ex. M. In a letter to Council opposing a different piece of deactivation legislation applicable to for-hire drivers, Uber praised Int. 1332-A's definition of "egregious misconduct" and the lack of a 14-day waiting period, and confirmed that Uber did not oppose Int. 1332-A. Ex. L.

On December 18, 2025, the Committee voted to approve the bill. Ex. J at 14. Later that day, the full Council passed Int. 1332-A. Ex. K at 121. Pursuant to New York City Charter § 37(b), former Mayor Eric Adams took no action within 30 days of passage, and the bill was automatically enacted into law as LL34 of 2026 (eff. 1/17/2027). Ex. A at 19.

**B. LL34**

LL34 establishes comprehensive protections against wrongful deactivation. It prohibits Services from permanently deactivating a Courier (after a 30-day probation period) except for just cause, a bona fide economic reason, or as required by federal, state, or local law.

AC § 20-1532(a). Under LL34, a platform must maintain a written progressive discipline policy, provide Couriers with 120 days advance notice for economic-based deactivations, deliver a detailed written explanation within 72 hours of any deactivation, supply Courier performance data, anonymized customer complaints, and other data, and afford an informal resolution appeal process. AC §§ 20-1532, 20-1536, 20-1537.

Significantly, LL34 incorporates robust public safety carveouts. The statute permits delivery platforms to *immediately* deactivate a Courier without advance notice or progressive discipline in cases of "egregious misconduct," including, but not limited to: "(i) violence or threats of violence; (ii) theft; (iii) sexual harassment; (iv) discrimination in violation of federal, state, or local law; or (v) willful destruction of property." AC § 20-1531. The law places the burden of proof on the Service to justify any deactivation by a preponderance of the evidence before a court, independent arbitrator, or administrative tribunal. AC § 20-1535.

Finally, regarding Couriers deactivated prior to the law's effective date, LL34 establishes a mechanism for reinstatement. Under AC § 20-1533, Couriers deactivated during the six years preceding the law's effective date may, within one year of the effective date, submit a petition requesting prospective reinstatement. AC § 20-1533(a). Within 30 days of receiving a petition, the Service must restore the Courier's platform access, unless it determines that the prior deactivation occurred during an initial 30-day probationary period, was supported by just cause or a bona fide economic reason or was otherwise required by law. *Id*. Crucially, this mechanism operates solely as a means to secure prospective platform access: LL34 expressly exempts delivery platforms from civil penalties for any deactivations occurring before the statute's effective date, awards no retroactive backpay, and permits placement of eligible Couriers on a waitlist if the

platform has paused all new onboarding or the worker fails to meet current qualifications. AC §§ 20-1509(a), 20-1533(d).

**C. The Instant Action**

Plaintiffs commenced this action seeking to preliminarily enjoin LL34, alleging violations of the Contract Clause, First Amendment, and Due Process Clause. Plaintiffs argue that LL34 serves no legitimate public purpose, harms public safety, and provides only "a one-sided benefit to a favored few." Pls.' Mem. at 13.

Plaintiffs advance arguments that stand in sharp contrast to the testimony Services delivered before the Council and during the collaborative process refining the bill. While representatives for Plaintiffs and other Services acknowledged during the legislative process that platform access restrictions and scheduling lockouts are frequently used as a means to manage labor supply and minimum pay costs, *see* Ex. E at 74, 75, and Ex. F at 33, Plaintiffs now characterize deactivations in court almost exclusively as alleged anti-fraud and safety measures.

In seeking an injunction, Plaintiffs rely heavily on *Uber Technologies, Inc. v. City of New York*, No. 1:26-cv-4893 (S.D.N.Y. July 21, 2026) (Woods, J.), which preliminarily enjoined LL52 of 2026, a distinct statute regulating the deactivations of high-volume for-hire vehicle ("FHV") drivers for Uber and Lyft. In that case, the district court concluded that the record before it failed to demonstrate that wrongful deactivation is a true societal problem and expressed concern that the law's 14-day advance notice provision could keep drivers who harm people on the road. The City disputes the district court's conclusions in that action, and it is currently on appeal before the Second Circuit. In any event, LL34 governs a distinct commercial sector, has differing terms, and reflects an independent legislative process tailored to the app-based delivery

market.[4] Each enactment must be evaluated on its own merits, based on its specific statutory terms and the evidentiary record before Council.

## **STANDARD OF REVIEW**

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation modified). Plaintiffs must demonstrate that they are likely to succeed on the merits of their claims, are likely to suffer irreparable harm, that the balance of equities tips in their favor, and that an injunction is in the public interest. *See Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 16 (2020). And, facial challenges are the "most difficult" for a plaintiff to win. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Hudson Shore Assocs. Ltd. P'ship v. N.Y.*, 139 F.4th 99, 107 (2d Cir. 2025). Because Plaintiffs raise a facial challenge, they have to show that they are likely to prove the law's unconstitutionality in every possible application. *Cmty. Hous. Improvmt. Program. v. City of N.Y.*, 59 F.4th 540, 548-49 (2d Cir. 2023).[5] Plaintiffs have failed to make the requisite showing here.

[4] Plaintiffs' claim that LL52 and LL34 are "materially identical" is false. Pls.' Mem. at 1.

[5] The Complaint raises both facial and as-applied challenges.

## ARGUMENT

### POINT I

### PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A. LL34 Does Not Violate the Contract Clause.

The Contract Clause provides that "[n]o State shall pass any . . . Law . . . impairing the Obligation of Contracts." U.S. Const. Art. I, § 10 cl. 1. The prohibition on contractual impairment is "not an absolute one and is not to be read with literal exactness like a mathematical formula." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977) (citation modified). Legislatures retain "broad power" to adopt generally applicable laws "without being concerned that private contracts will be impaired, or even destroyed, as a result." *Id.* at 22. This is especially true where the government is acting to "safeguard the vital interests of its people." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934).

Analysis of a Contract Clause claim proceeds in three parts. First, the law must substantially impair an existing contract.[6] *See Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983). Second, if there is a substantial impairment, courts consider whether the law serves a legitimate public purpose. *Id.* Third, if the law serves a legitimate public purpose, courts then consider whether the law is appropriate and reasonable to achieve that purpose. *Id.* at 412.

##### *i. LL34 Does Not Substantially Impair Plaintiffs' Contracts.*

The threshold inquiry in a Contract Clause analysis is whether the law "has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 411. The substantial

[6] The Contract Clause does not apply to future contracts not yet entered into. *Texaco Inc. v. Short*, 454 U.S. 516, 531 (1982) ("The statute cannot be said to impair a contract that did not exist at the time of its enactment."); *see also Real Est. Bd. of NY, Inc. v. City of N.Y.*, 182 F.4th 140, 162 (2d Cir. 2026) (Contract Clause claim applied only to agreements predating the challenged law's enactment that remained in effect on its effective date) ("REBNY").

impairment inquiry asks "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Melendez,* 16 F.4th at 1033 (*quoting Sveen v. Melin*, 584 U.S. 811, 819 (2018)). Substantial impairment is a matter of degree, and a law's practical impact informs that inquiry. *Id.* at 1025 (collecting cases).

Plaintiffs argue that LL34 displaces their authority over who may or may not use their platforms, and, further, that their authority is undermined by "subjecting their deactivation decisions to review by an outside factfinder." Pls.' Mem. at 13-14. Yet, LL34 does not affect Plaintiffs' authority over deactivations, it merely adjusts the process by which Plaintiffs may exercise that authority. LL34 requires Plaintiffs to (1) maintain a written progressive discipline policy and follow that policy prior to deactivating a Courier unless deactivating for egregious conduct, (2) provide Couriers with a detailed written explanation of the reason for a deactivation within 72 hours of any deactivation, and (3) disclose performance data, and anonymized reports regarding discipline imposed on other Couriers for the same misconduct. *See* AC §§ 20-1532, 20-1536. LL34 does not dictate what Plaintiffs' progressive discipline policies should be, what grounds Plaintiffs should use as a basis for deactivation, or whether Plaintiffs may or may not deactivate a Courier. The decision to deactivate, and for what reason, remains within Plaintiffs' discretion.

Significantly, LL34 permits Services to *immediately* deactivate a Courier in cases of "egregious misconduct," which, at Plaintiffs' request (Ex. M) was defined broadly to include any conduct so outrageous that Plaintiffs cannot reasonably expect to correct it through progressive discipline. AC § 20-1531. Moreover, Plaintiffs' contracts are already subject to review by outside factfinders. Couriers may bring lawsuits against Plaintiffs for breach of contract, and such dispute

would be subject to review through arbitration or otherwise. Because the Services' existing contracts are subject to review by outside factfinders, LL34 cannot be said to substantially impair Plaintiffs' contracts in this way.

Next, Plaintiffs incorrectly argue that LL34 "rewrites" Plaintiffs' deactivation rights retroactively resulting in properly-deactivated Couriers regaining access to Plaintiffs' platforms. Pls.' Mem. at 15-16. LL34 merely provides the *possibility* of prospective relief to Couriers by allowing them to seek reinstatement. LL34 does not automatically declare any prior deactivations unlawful or mandate reinstatement.[7]

Plaintiffs further contend that their prior deactivation rights *might* be impaired because an otherwise appropriate deactivation cannot survive a challenge due to Plaintiffs' failure to maintain records to support the deactivation. Pls.' Mem. at 15-16; *see also* Hahn Decl. ¶ 20; Young Decl. ¶ 53; Dupin Decl. ¶ 56. This argument, though, is based on pure speculation and does not establish a concrete impairment. In any event, since prior deactivations remain subject to legal challenges unrelated to LL34, it stands to reason that Plaintiffs preserved at least some evidence as a standard business practice. Indeed, Uber's current data retention policy indicates that it retains data, including communications, "for purposes of our tax, insurance, legal or regulatory requirements," for the life of the account plus seven years.[8]

Tellingly, Plaintiffs maintained at least enough evidence to proffer two detailed examples of prior deactivations in their sworn declarations. *See* Dupin Decl. ¶ 34; Young Decl. ¶ 82. Plaintiffs provide no explanation as to why similar evidence would be unavailable in other

---

[7] Plaintiffs fail to explain how terminated contracts, that are not still executory, implicate the Contract Clause. *Texaco Inc,* 454 U.S. at 531; *REBNY*, 182 F.4th at 162.

[8] Available at: https://www.uber.com/global/en/privacy-notice-drivers-delivery-people/?uclick_id=b22e9f92-9a7e-44de-acc0-2061fc591d4d#data-retention-deletion (last visited, November 10, 2026).

cases, and nothing in LL34 suggests that a similar declaration would be deemed insufficient by a factfinder in a deactivation challenge. *See Sveen*, 584 U.S. at 823-24 (no Contract Clause violation where party could safeguard rights "by taking an action"). LL34 requires the factfinder to consider commonsense factors like whether the Service deactivated in response to a violation of a policy or for other misconduct or failure to perform job duties. AC § 20-1533(b) (4). Nowhere does LL34 dictate what types of evidence or documentation are sufficient to establish these factors.

Plaintiffs' contracts and practices further undermine their argument that LL34 creates a substantial impairment. For example, Uber alleges that deactivations are rare and two thirds of deactivations are due to fraud or safety concerns. Compl. ¶ 103. Uber states that it provides notice within 24 hours for most other deactivations. *Id.* ¶ 104-109. Similarly, Amazon's contracts permit deactivation for cause *with* notice. *Id.* ¶ 130. Amazon alleges a low deactivation rate of about 3%, and that it immediately deactivates for conduct deemed "egregious" but provides alerts and warnings prior to deactivating for conduct that does not rise to the level of egregious, offering learning materials to assist Couriers. *Id.* ¶¶ 133-136. Instacart's contracts provide for termination upon written notice, or without notice when necessary to ensure safe and reliable operations. *Id.* ¶ 165. Instacart alleges that it often sends warnings in advance of deactivation but would not do so for serious violations. *Id.* ¶ 174. Instacart alleges a 5% deactivation rate. *Id.* ¶ 184. Given Plaintiffs' statements that they rarely deactivate Couriers and that when they do, they provide notice and otherwise fair process, LL34 would rarely, if ever, impair Plaintiffs' contracts. *See Donohue v. Cuomo*, 980 F.3d 53, 82 (2d Cir. 2020) (minimal impairments to contracts are permissible); *Sveen*, 584 U.S. at 823-24 ("[T]he Court has long upheld against Contract Clause attack laws mandating other kinds of notifications or filings.").

Finally, the extent to which a party's reasonable expectations under a contract have been disrupted depends, in part, on whether the legislative action was foreseeable. *See Donohue*, 980 F.3d at 82; *see also Olson v. State of California*, 104 F.4th 66, 76 n.4 (9th Cir. 2024) (rejecting Contract Clause claim because Uber and others could not have reasonably expected their treatment of drivers to remain unregulated). LL34 was foreseeable. For years, the City has implemented worker protections across industries, including for Couriers. *See*, *e.g.*, AC §§ 19-549; 20-1522 (minimum pay standards); 20-1221, 20-1231, 20-1241, (fair scheduling); 20-1521 (delivery trip disclosures); 20-1271 (just cause protection for fast food workers). It was foreseeable that the City would extend existing just cause protections to Couriers, particularly given that Plaintiffs operate in a heavily regulated industry and LL34 is not the first of its kind in the City. *See, e.g.*, AC § 20-1271, *et seq.*; *Sullivan v. Nassau County Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020) (foreseeability is "affected by whether the relevant party operates in a heavily regulated industry."). In 2021, Seattle enacted a "Driver's Deactivation Rights" ordinance. Seattle Mun. Code 143.2.50. Other jurisdictions followed suit. *See* R.C.W. 49.46.300 (Washington State); Minn. Statute § 181C.04; Col. Rev. Statutes § 8-4-127. LL34 did not come out of nowhere, and Plaintiffs cannot plausibly claim to have been unable to reasonably expect it. Companies operating in industries subject to "extensive and intrusive" regulation, such as Plaintiffs, should expect more regulation—even if prior laws did not "specifically" address the issues set out in the contract. *Energy Reserves*, 459 U.S. at 413.

***ii. LL34 Serves a Significant and Legitimate Public Purpose.***

Since Plaintiffs cannot show a substantial impairment, this Court's inquiry can end here. *See Allied Structural Steel*, 438 U.S. 2334, 245 (1978). However, even if this Court finds a

substantial impairment, LL34 survives because it serves a legitimate public purpose and is a reasonable means of achieving that purpose.

The City has a legitimate interest in ensuring fair working conditions and preventing unfair deactivations. *See, e.g., Thornhill v. State of Alabama*, 310 U.S. 88, 103 (1940) ("[L]abor relations are not matters of mere local or private concern."); *West Coast Hotel v. Parish*, 300 U.S. 379, 393 (1937) (legislature has wide discretion to pass laws "to insure wholesome conditions of work and freedom from oppression"); *Restaurant Law Center v. City of New York*, 90 F.4th 101, 106 (2d Cir. 2024) (wrongful discharge law for fast-food workers was valid exercise of police power); *Olson,* 104 F.4th at 78 (protecting workers and reducing income inequality are legitimate state interests). Laws governing wages and hours, discrimination, workplace safety, collective bargaining, and workers' compensation have all been justified by the government's legitimate interest in this area.

LL34 is an important part of a broader scheme of worker-protection measures. Council heard extensive evidence that Couriers are deactivated without justification and under terrible circumstances. *See*, *e.g.*, Ex. F at 105 (testimony from Courier deactivated after being struck by a car while delivering in heavy rain); *Id.* at 84 (testimony from Courier deactivated after his e-bike battery failed mid-delivery despite providing contemporaneous photos and repair receipts from a bicycle mechanic). And the consequences of deactivation can be catastrophic for Couriers. One Courier testified that his work as a Courier was his only source of income and that he is facing eviction since being deactivated. Ex. E, 90-92; *see also id.*, 99-100 (sudden deactivation cut Courier off from sole source of income). The Second Circuit has recognized that laws "protect[ing] workers from abusive employment practices" serve "important public policies." *Jin v. Shanghai Originals, Inc.*, 990 F.3d 251, 259 (2d Cir. 2021).

Plaintiffs' claim that LL34 only benefits a narrow class is without merit. The record reflects that there are between 61,000 and 80,000 Couriers who complete roughly 2.77 million deliveries across the City each week. Ex. F at 53; Ex. D at 9. LL34 protects all of them. And there is nothing inappropriate about a legislature taking steps to protect a vulnerable segment of its local workforce, regardless of its size. *See, e.g., Barrett v. State of Indiana*, 229 U.S. 26, 29 (1913) (law protecting coal miners); *Restaurant Law Center*, 90 F.4th at 106 (wrongful discharge law for fast-food workers); *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015) (wage parity law for home-care aides). Council is entitled to focus its efforts on groups that need help, and the law need not directly benefit anyone other than Couriers to pass constitutional muster. *See REBNY*, 182 F.4th at 164 ("improving housing mobility amongst renters" is a legitimate purpose); *CFCU Comm'ty Credit Un. v. Hayward*, 552 F.3d 253, 268 (2d Cir. 2008) (helping debtors who declare bankruptcy to keep their homes was "significant and legitimate public purpose").

More fundamentally, LL34 is not solely a worker-protection measure; it is a public safety law, enacted to protect a basic societal interest and not just a "favored group." *See Melendez* 16 F.4th at 1037. In enacting LL34, Council was addressing a street safety crisis affecting the City. Ex. F at 46. The threat of instant, arbitrary deactivation creates immense "speed pressure" that forces Couriers to engage in risky riding behaviors. *See, e.g., id*. This direct link between arbitrary deactivations and public danger was central to Council's intervention. Ex. E at 62-64. By guaranteeing additional process and removing the fear of arbitrary termination over unforeseen delays, LL34 mitigates these hazards. The law empowers Couriers to prioritize safe choices on the road, which in turn reduces traffic collisions and protects the public.

Plaintiffs argue, as some have in other lawsuits (*See Uber Techs.,* No. 1:26-cv-4893), that there is "no evidence" that there ever was or currently is a problem with wrongful

deactivations. Pls.' Mem. at 19. Plaintiffs ignore the extensive testimony Couriers provided to Council, both in person and in written comments. This testimony showed that Couriers are often deactivated wrongfully, without warning, and without meaningful recourse.

The Contract Clause does not interfere with "the inherent police power of the State to safeguard the vital interests of its people." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983); *see also, e.g., Energy Reserves Group*, 459 U.S. at 410; *Allied Structural Steel*, 438 U.S. at 241; *Veix v. Sixth Ward Bldg. & Loan Assn.*, 310 U.S. 32, 38 (1940). That police power permits the government to protect the "health, morals, comfort, and general welfare of the people," and it is "paramount to any rights under contracts between individuals." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 437 (1934). "A legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'" *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (*quoting Sanitation,* 107 F.3d at 993). LL34 serves a legitimate public purpose.

***iii. LL34 is an Appropriate and Reasonable Means of Achieving its Purpose.***

Where "a law impairs a private contract, substantial deference is accorded to the legislature's judgment as to the necessity and reasonableness of a particular measure." *Buffalo Teachers*, 464 F.3d at 369; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (the Supreme Court has "repeatedly held that unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure") (citation modified). The Second Circuit recently reiterated that it "defer[s] to the city's judgment about the appropriate means to further its legitimate governmental interest." *REBNY*, 182 F.4th at 159 (cleaned up). Moreover, the Second Circuit confirmed that the

Contract Clause "does not permit [a court] to second-guess the City's actions based on potential second-order effects." *Id.* at 165.

In determining whether a law is appropriate and reasonable, courts in this Circuit consider five factors set forth in *Melendez*: (1) whether the law impairs contracts on a temporary basis or permanently; (2) whether there is some record basis to link the legislature's purpose and its chosen means; (3) whether the burden of the law falls on the party causing that harm; (4) whether the relief provided is conditioned on need; and (5) whether the law provides compensation to the party whose contractual rights are impaired. Considering these factors, it is clear that LL34 is a reasonable means to achieve the City's legitimate goal.

First, LL34 does not permanently and entirely extinguish Plaintiffs' contractual rights. Plaintiffs argue that LL34 "has no expiration date," and Plaintiffs cannot "restore their deactivation rights." Pls.' Mem. at 21. As set forth above, LL34 does not prevent Plaintiffs from deactivating Couriers. It provides a process for deactivation and gives Couriers meaningful challenge rights. Plaintiffs retain the right to deactivate Couriers who engage in misconduct or provide poor service—they just have to be prepared to prove it later if challenged and sometimes use progressive discipline first. AC § 20-1532. Further, an expiration date does not belong in a law that applies not only to existing Couriers, but also to Couriers who may work for Plaintiffs in the future.

Next, there is a clear record basis to link LL34's purpose and its chosen means. The purpose of LL34 was to establish basic due process for a uniquely precarious workforce, thereby alleviating the pressures that directly imperil street safety and threaten public health across the City. Ex. E at 62-64. To accomplish this, LL34 requires minimal effort from Plaintiffs. Under the law, Plaintiffs must have a written progressive discipline policy, utilize progressive discipline in

advance of some deactivations, and provide notice to all Couriers of the reasons for deactivation after the fact. AC §§ 20-1532 (a)-(f). LL34 gives Couriers a meaningful opportunity to respond to any claims lodged against them, and to develop a better understanding of what the Services require of them to avoid future deactivations. The process that LL34 puts in place helps alleviate the fear of immediate loss of income, and thus empowers Couriers to prioritize their safety, and the safety of others.

Plaintiffs allege that there is no record basis to link preventing wrongful deactivations going forward and LL34's prior deactivation requirements. Pls.' Mem. at 21. While LL34's primary aim is to prevent wrongful deactivations going forward, it is also important to provide Couriers who are currently deactivated with the opportunity to seek a remedy. LL34 affords these Couriers a short one-year window to petition a Service for reinstatement. LL34 does not mandate reinstatement, it merely provides Couriers with a process to seek redress, giving LL34 full and meaningful effect.

LL34 aligns with Plaintiffs' professed goals because it is in Plaintiffs' interest to learn if an otherwise reliable and highly-rated Courier was wrongfully deactivated. *See, e.g.*, Compl. ¶ 65 (acknowledging that it is in at least one Plaintiff's economic interest to have more Couriers). Plaintiffs benefit financially from having reliable Couriers using their platforms and should be just as interested in correcting any past errors. The reinstatement provisions directly respond to record evidence that wrongful deactivations have been a longstanding problem, dating back to at least 2023 when DCWP began minimum pay enforcement. *See*, Ex. E at 46, 52-53 (noting that platforms used deactivation to disincentivize wage claims). It was well within Council's considerable discretion to determine that Couriers who were deactivated before the law's effective date should not be shut out of the law's protections.

Importantly, Council received extensive input from Plaintiffs and crafted the bill in a manner that was appropriately tailored. *See Buffalo Teachers*, 464 F.3d at 371 (taking into account whether the government considered other alternatives or took more drastic measures); Ex. M. The legislature is afforded significant deference as to the appropriate means to achieve its goals and the Second Circuit has cautioned against "reexamin[ing] all of the factors underlying the legislation," with the benefit of hindsight, and "ma[king] a de novo determination whether another alternative would have constituted a better statutory solution." *Id.* at 370. The fit between the law and the problem it aims to alleviate merely has to be reasonable; the legislature is not obliged to rule out every possible alternative. *Id.*

As to the third factor, the burden of contractual impairment is tailored to the party causing the public harm. *Melendez*, 16 F.4th at 1042. LL34 correctly places its minimal burdens on the "persons ... responsible for the circumstances warranting relief": the Services. *REBNY*, 182 F.4th at 167 (cleaned up). The Services are better positioned to bear any costs imposed by LL34's protections. In contrast, Couriers execute standardized, non-negotiable independent-contractor agreements that afford Services enormous discretion to decide when Couriers should be deactivated. The record shows that Couriers face devastating financial consequences from deactivation and often lack means to challenge a deactivation. Couriers' unequal financial position and lack of bargaining power demonstrates that it was reasonable and appropriate for Council to place the law's burdens on the Services.

The fourth factor in *Melendez* looks to whether the relief provided by the law is conditioned on need. Plaintiffs argue that LL34's remedies are not conditioned on need because requiring reactivation for Plaintiffs' failure to provide required notices under the law has no bearing on whether a deactivation was wrongful. Pls.' Mem. at 22. This Court should reject such

a strained reading of LL34. The record makes clear that notice is a meaningful part of the process that Couriers are lacking. Because the required notice states the reason for deactivation, no Courier can meaningfully challenge a deactivation as wrongful without it. And, without the potential for reactivation as a "consequence" of a failure to provide notice, there is no incentive for a Service to comply with the notice requirement. There is nothing in the law that prevents Plaintiffs from amending a defective notice or, if a Courier is reinstated based on an untimely or defective notice, immediately deactivating that Courier and sending a proper notice. Plaintiffs' secondary argument, that the relief provided to the Couriers is not conditioned on financial need (Pls.' Mem. at 22), is blatantly contradicted by the record.

Finally, courts consider whether the law provides compensation for damages or losses sustained because of the impairment. *Melendez* at 1038–46. While Defendant does not concede that Plaintiffs will suffer any monetary losses as a result of LL34, Defendant does not contest that LL34 provides for no compensation.

The *Melendez* factors show that LL34 is a reasonable means of addressing the problem of wrongful deactivations and ensuring street safety. The legislature made reasonable decisions about the means chosen, and those decisions are entitled to deference. *DeBenedictis*, 480 U.S. at 505.

**B. LL34 Does Not Violate the First Amendment.**

Plaintiffs argue that LL34's provisions requiring Plaintiffs to provide notice to Couriers of the reason for deactivation, along with supporting information, such as performance data, consumer comments, and instances of similar misconduct from other Couriers (AC §§ 20-1532(e), 20-1536(a) and (d)) (collectively the "Notice Provisions"), are content-based provisions that compel noncommercial speech in violation of the First Amendment. *See* Pls.' Mem. at 23.

Therefore, Plaintiffs conclude, LL34 should be reviewed under strict scrutiny. Plaintiffs are incorrect.

LL34 does not implicate speech at all. While requiring Services to provide notice and other relevant information requires the Services to put words on a page, the aforementioned provisions do not abridge freedom of speech "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). The Notice Provisions, at most, impose "incidental burdens on speech" to further the goals of the legislation. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

The Notice Provisions do not dictate the specific words that must be used, nor do they compel Plaintiffs to convey any viewpoint or value-laden message. They merely regulate the *process* Plaintiffs must undertake when they wish to deactivate a Courier, which incidentally requires Plaintiffs to convey factual information to the Courier so that the Courier can understand the reasons for deactivation and the right to contest it. Thus, the provisions "affect what [Plaintiffs] must *do*"—provide Couriers with process related to potential deactivations—"not what they may or may not *say*." *Rumsfeld v. FAIR.*, 547 U.S. 47, 60 (2006) (emphases in original). As such, they fall outside the First Amendment's reach.

In *Wheely USA, Inc. v. City of New York*, 830 F. Supp. 3d 378 (S.D.N.Y. 2026), the Court found that requiring FHV bases to collect and transmit certain trip records on a monthly basis to the Taxi and Limousine Commission did not implicate the First Amendment. Important to the Court's analysis was that the required reporting did not "reflect a compelled endorsement of any governmental message, and Plaintiffs remain free to express their disagreement with the Rules." *Id.* at 418. Ultimately, the Court found that required communication was "'plainly

incidental' to the regulation of conduct." *Id.* at 417 (*quoting Rumsfeld*, 547 U.S. at 62). Likewise, here, the Notice Provisions' requirements are incidental to the broader scheme of regulating the deactivation process, do not reflect an endorsement of any government message, and do not prevent Plaintiffs from expressing their disagreement with the statute. *See Cornelio v. Rosado*, 24-cv-01335, 2025 WL 2771677, at *5 (N.D.N.Y. Sept. 29, 2025).

The *conduct* regulated by the Notice Provisions also does not fall within the First Amendment's protection as it is not "inherently expressive." *Rumsfeld*, 547 U.S. at 65–66 (*quoting United States v. O'Brien*, 391 U.S. 367, 376 (1968)). *See also HomeAway.com v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2018). Here, the provisions codify a process for deactivations of Couriers. Incidental to that process, the Notice Provisions correct information asymmetries by giving Couriers the reasons for deactivation and data and information related to deactivations generally so that Couriers can meaningfully challenge a wrongful deactivation. Because there is no "significant expressive element," the First Amendment is not implicated. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986).

Even if the Notice Provisions are found to have more than an incidental effect on speech, and therefore implicate the First Amendment, they concern only commercial speech. Commercial speech "enjoys a limited measure of protection." *Bd. of Trs. v. Fox*, 492 U.S. 469, 477 (1989) (cleaned up). The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience," or, alternatively, as speech "proposing a commercial transaction." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 560–61 (1980). Here, the speech required by the Notice Provisions is intrinsically related to the commercial relationship between Plaintiffs and their Couriers. *See Compasscare v.*

*Hochul*, 125 F.4th 49, 65 (2d Cir. 2025) (requirement that employers issue handbooks with information regarding employees' rights implicated commercial speech).

Plaintiffs argue that the Notice Provisions implicate non-commercial speech because the speech "has nothing to do with an advertisement" and "lack[s] a meaningful connection to an economic motive." Pls.' Mem. at 24. However, platform access and a meaningful opportunity to challenge a wrongful deactivation are absolutely connected to a Courier's economic motive. Many Couriers rely on their delivery work as their sole source of income. *See* Ex. N. Moreover, "[t]he Supreme Court has never defined the precise bounds of the category of expression that may be termed commercial speech," *Compasscare*, 125 F.4th at 64, but has instead found that the commercial speech doctrine rests on the "'commonsense' distinction" between commercial speech and other varieties of speech, *Cent. Hudson*, 447 U.S. at 562 (*quoting Ohralik,* 436 U.S. at 455–56). For example, in *N.Y. State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009), the Second Circuit found that a law that required disclosure of calorie information regulated commercial speech because calorie count was intertwined with the sale of a restaurant meal. Similarly, information required to be disclosed under the Notice Provisions is intrinsically linked to the terms of work for Couriers, i.e., Plaintiffs' deactivation policies.

Recently, the Ninth Circuit held that a similar Seattle ordinance, which requires Services to inform Couriers in writing of a Service's deactivation policy, regulated commercial speech. The Court assumed, without deciding, that speech was implicated by that Ordinance, and found that the speech was commercial in nature, because it "'simply propose[s] a commercial transaction.'" *See Uber Techs., Inc. v. City of Seattle*, No. 25-228, 2026 WL 3255510, at *4 (9th Cir. Oct. 29, 2026) (*quoting Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976)).

Similarly, the *Wheely* Court found that even if the challenged regulations in that case implicated speech, they regulated commercial speech, because "[t]he communications at issue—statements to workers about the terms and conditions of their engagement—were directly related to employment and thus commercial in nature." 830 F. Supp. 3d at 419 (cleaned up). Hence, it is a matter of "commonsense" that the Notice Provisions implicate, at most, commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commn.*, 447 U.S. 557, 562 (1980).

Generally, restrictions on commercial speech are subject to intermediate scrutiny and analyzed under the four-part test set forth in *Central Hudson*. However, laws that require, rather than restrict, commercial speech, as is the case here, are typically subject to more deferential rational basis review. *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985). A regulation compelling commercial speech does not violate the First Amendment if it is "reasonably related to the State's interest" and is neither "unjustified or unduly burdensome." *Compasscare*, 125 F.4th at 64, 67.

To the extent that the First Amendment is implicated, rational basis review applies because the Notice Provisions require Services to provide "purely factual and uncontroversial information"—information that informs a Courier of the basis of their job loss and how to challenge it—and do not restrict any speech. *See Zauderer*, 471 U.S. at 651; *Compasscare*, 125 F.4th at 64–65. Plaintiffs argue that LL34 compels them to communicate information to Couriers that they otherwise would not communicate, and therefore strict scrutiny applies. Pls.' Mem. at 23. However, *Zauderer* specifically contemplates mandated disclosures by the government. That the provisions require Plaintiffs to say something they do not wish to say, does not warrant higher scrutiny. "The Second Circuit has been clear that a commercial disclosure is not rendered 'controversial' merely because the regulated entity does not wish to make that disclosure or

because they would prefer to make a different statement on that same topic." *Nat'l Retail Fed. v. James*, 806 F. Supp. 3d 427, 437-438 (S.D.N.Y. 2025). There is nothing "controversial" about informing Couriers of decisions, policies, and data that directly impact them. *See Uber Techs,* 2026 WL 3255510, at *6 (even if disclosures implicated speech, *Zauderer* applies because communication of policies that workers are subject to is factual and not controversial); *Wheely*, 830 F. Supp. 3d 419 (if speech was implicated, *Zauderer* applies because disclosures did not require plaintiffs to take sides in a political controversy or express any opinions).

Plaintiffs rely on *DoorDash, Inc. v. City of N.Y.*, 185 F.4th 1 (2d Cir. 2026) to contest the application of rational basis review. There, the Second Circuit found that *Zauderer* did not apply to a law that required food delivery apps to provide customer data, including name, address, email, phone number, and order contents, to restaurants upon request because the disclosures did not relate to the food delivery apps' products or services. Thus, according to the Court, the law did not "serve the purpose animating *Zauderer*'s deferential review" of protecting the free flow of accurate information to help the recipient make informed economic decisions about the service or transaction. *Id.* at 7-8 (citations omitted). Plaintiffs' reliance on *DoorDash* is misplaced.

Couriers, along with serving as Plaintiffs' workforces, are consumers of Plaintiffs' products and services, as they contract with Plaintiffs to use Plaintiffs' technology in an arrangement that is financially beneficial to both the Couriers and to Plaintiffs. The disclosures mandated by the Notice Provisions inform Couriers why they can no longer use Plaintiffs' products and services and help Couriers make informed economic decisions, like whether to expend resources challenging a deactivation or seek work elsewhere. As such, the disclosures further the public informational interest central to *Zauderer* and are entirely consistent with the Second

Circuit's reasoning in *DoorDash*. Indeed, the Second Circuit noted in *DoorDash* that its prior applications of *Zauderer* "involved a disclosure 'about a company's own products or services,'" and that information about a platform's services could include the "grounds on which they may *deactivate* a restaurant's account." *Id.* (emphasis added).

The Second Circuit has applied *Zauderer*'s less demanding scrutiny to commercial disclosure requirements, like those at issue here, "because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberties." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). Here, the Notice Provisions "further[], rather than hinder[], the First Amendment goal of the discovery of truth" and "the robust and free flow of accurate information." *Id.* Thus, to the extent that they implicate speech, the Notice Provisions are subject to rational basis review. *See Va. State Bd. of Pharm.*, 425 U.S. at 770.

The Notice Provisions easily satisfy this standard. To pass muster under rational basis review, the government does not have to produce evidence or empirical data to sustain rationality; instead, it can rely upon "rational speculation." *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001). Nor does the government have to establish that the statute eliminates all the evils it was designed to ameliorate. *See Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115–16. Here, there is a reasonable relationship between the intended purpose of the provisions and the means employed to achieve that purpose. The provisions are neither "unjustified [n]or unduly burdensome," *Compasscare*, 125 F.4th at 64, 67. The record provides ample support for upholding the Notice Provisions. Council considered testimony from Couriers who reported deactivation without warning, and without reason. *See generally*, Exs. E, F. Testimony also reflected considerable deficiencies in existing appeals processes. *Id.* Thus, the need for legislation that limits abrupt

Courier deactivations and allows Couriers to challenge deactivations in a meaningful way is evident, and the Notice Provisions are a rational means to accomplish these goals.

If *Zauderer* did not apply, the Notice Provisions would be subject to, at most, intermediate scrutiny under *Central Hudson*. To survive intermediate scrutiny, the commercial speech must concern lawful activity and not be misleading, the asserted governmental interest must be substantial, and the regulation must directly advance that interest and not be more extensive than necessary to serve that interest. *Cent. Hudson*, 447 U.S. at 566. The Notice Provisions involve the disclosure of factual, uncontroversial information and thereby satisfy the first prong. *See id.* Moreover, they directly advance the important government interests of limiting wrongful deactivations, without notice, and ensuring street safety. *See, e.g., West Coast Hotel*, 300 U.S. at 393; *Restaurant Law Center*, 90 F.4th at 106; *Olson*, 104 F.4th at 78; *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004) (municipality had broad authority to "protect workers").

The Notice Provisions are no more burdensome than necessary. Plaintiffs' argument that Council did not consider "numerous less burdensome alternatives," (Pls.' Mem. at 24-25) is both incorrect and disingenuous.[9] Council not only considered alternatives proffered by Plaintiffs, but Council adopted many of Plaintiffs' suggestions, including by redefining several key terms, eliminating the initial requirement that platforms provide 14-days' advance notice prior to deactivation, replacing it with a requirement under AC § 20-1532(e) to provide written notice within 72 hours after deactivation has occurred, and significantly narrowing AC § 20-1536 to accommodate Plaintiffs. *See* Ex. M. Plaintiffs concede that they already provide Couriers with

---

[9] Notably, Plaintiffs have not identified *any* purportedly less burdensome alternatives that would address the City's underlying concerns. *See generally*, Compl.; Pls.' Mem.

some notice and information, so any added burden from the provisions is minimal. In the end, Council is afforded "considerable leeway in determining the appropriate means to further a legitimate government interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 58 (2d Cir. 2019) (the Second Circuit is "loath to second-guess the government's judgment" (citation modified)). Council carefully considered both empirical and anecdotal evidence and crafted the Notice Provisions to directly advance the substantial government interest. Even if intermediate scrutiny applies, the Notice Provisions survive. [10]

## C. LL34 Does Not Violate Due Process.

Plaintiffs contend that AC § 20-1533 ("Reinstatement Provision")—which gives Couriers deactivated within six years before LL34's effective date one year to petition for prospective reinstatement—violates due process "by applying retroactively without any rational legislative purpose" and altering "the legal consequences of completed transactions and previously accrued rights." Pls.' Mem. at 25; Compl. ¶¶ 23, 329–331. However, Plaintiffs misconstrue the nature and operation of the statute.

### *i. LL34 Provides for Prospective Reinstatement, Not Retroactive Penalties or Liability*

A statute "is not made retroactive merely because it draws upon antecedent facts for its operation." *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994). Here, a Courier's status as someone who was previously deactivated functions as an antecedent qualifying condition that triggers a forward-looking measure: potentially ending a Courier's platform exclusion. *Cf. Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002) (order directing employer to reinstate worker is exercise of prospective power, not retroactive punishment); *Ogden v. Wax Works, Inc.*, 29 F.

[10] Should the Court find strict scrutiny applies, the Notice Provisions meet this threshold because the governmental interest is compelling, they achieve the goals Council sought to address, and they are narrowly tailored.

Supp. 2d 1003, 1010 (N.D. Iowa 1998) (classifying job reinstatement as a "prospective equitable remedy," distinct from retroactive relief).

Critically, LL34 includes the hallmarks of a prospective statute, as the Council deliberately shielded Services from retroactive liability in at least three ways: First, AC § 20-1532(f) mandates that deactivations that occurred prior to the effective date of the law are not subject to the provisions of that section. Second, AC § 20-1509(a)—the section which prescribes the civil penalties for violations under Chapter 15—explicitly exempts AC § 20-1533 from such civil penalties. Third, AC § 20-1533 authorizes no awards of backpay, retroactive lost earnings, or monetary damages for prior deactivations.

***ii. Even if Construed as Retroactive, LL34 Satisfies Due Process***

Even if deemed retroactive, the Reinstatement Provision satisfies due process because rational basis review of retroactive economic legislation remains "extremely deferential," *Regina Metro. Co. v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 386 (2020), and legislation might be unconstitutional only if it "imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *E. Enters v. Apfel.*, 524 U.S. 498, 528-29 (1998). Here, AC § 20-1533 imposes no retroactive liability, applies across an entire industry rather than a singled-out party, and combines a narrow one-year petition window with compelling public interests.

Plaintiffs argue that applying a just cause standard to deactivations from the past six years "does not serve the City's stated purpose of preventing wrongful deactivations." Pls.' Mem. at 25. Yet Council's purpose was far broader: addressing a street-safety crisis, counteracting

coercive algorithmic pressures, and providing opportunities for a precarious workforce. A one-year reinstatement petition window directly advances these objectives.

First, AC § 20-1533 ameliorates the specter of arbitrary, irreversible deactivation that compels risky riding and exerts immense psychological pressure on Couriers to perform even in hazardous conditions. By providing an orderly process for prospective reinstatement, LL34 demonstrates to the active fleet of Couriers that minor delays are no longer unreviewable career death sentences, mitigating the pressure that endangers all street users and restoring good faith.

Second, it remedies ongoing labor market distortions. A statute that did nothing about prior deactivations would grandfather in years of unchecked deactivations, permanently leaving thousands of willing, experienced Couriers shut out of the labor market. Provisions that reach back to past events can serve "entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law." *Landgraf*, 511 U.S. at 267–68; *see also De Veau v. Braisted*, 363 U.S. 144, 160 (1960).

Third, the six-year lookback is tailored and rational. Aligning the lookback with January 2021 directly tracks the City's enactment of its landmark Courier labor standards (LL113–117 of 2021), which triggered a surge of purported "trip fraud" deactivations. *See, e.g.,* Ex. I at 23; Ex. E at 46, 59, 63. Furthermore, a six-year window mirrors New York's breach of contract statute of limitations period under CPLR § 213(2), during which Plaintiffs already faced potential civil challenges to their deactivations and had reason to preserve relevant evidence.[11]

[11]Plaintiffs argue that if they have not maintained records dating back to 2021, they will be forced to reactivate even if there was serious misconduct or other just cause for the previous deactivation. There is no support for such contention. To the extent that Plaintiffs lack documentation to explain a previous deactivation, it will be up to the fact-finder to determine the proper course based on the evidence and testimony at hand. The possibility that a situation like this may arise does not give rise to a pre-enforcement, facial challenge to the entirety of the Reinstatement Provision.

Finally, Plaintiffs' speculation that AC § 20-1533 will disrupt network operations or force them to onboard unsafe workers ignores the statutory text. Reinstatement is not automatic. Services may refuse restoration if a prior deactivation occurred during the 30-day probationary period, or rested on just cause, bona fide economic reasons, or legal mandate. AC § 20-1533(b). Immediate deactivations for egregious misconduct—including violent offenses, sexual harassment, property damage, and anything else not reasonably correctable through progressive discipline—remain fully preserved. AC § 20-1531. Furthermore, if Services have paused onboarding, they may waitlist eligible Couriers, and reinstated Couriers must satisfy all current qualifications. AC § 20-1533(c)-(d).

Precedent makes "clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976). Because AC § 20-1533 is supported by "a legitimate legislative purpose furthered by rational means," *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992), Plaintiffs' due process challenge fails.

## POINT II

## PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM.

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.*, 969 F. 3d 42, 86 (2d Cir. 2020) (citation modified). Here, Plaintiffs cannot show that they will suffer irreparable harm without injunctive relief. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("irreparable harm is the single most important prerequisite . . ."). To start, as discussed *supra*, Plaintiffs cannot establish a likelihood of success on any of their claims. Second, even if they could, while the Second Circuit has held that

irreparable harm for certain alleged deprivations of constitutional rights, such as violations pertaining to the First, Fourth, and Eighth Amendment, may be presumed, it has rejected the argument that *any* alleged constitutional injury satisfies the standard. *See id.* Presuming irreparable harm for violations of the Contract Clause or Due Process Clause risks a "major departure from the long tradition of equity practice." *Id.* at 247 (cleaned up). This Court should continue to heed the Supreme Court's "emphasis on the limits of" the Court's "equitable powers," which "caution against extending the presumption" of irreparable harm "to new contexts." *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025).

Plaintiffs' other allegations of harm fail. Plaintiffs contend that: (1) they will suffer irreparable harm from being "forced" to reveal internal fraud detection and prevention measures; (2) they will suffer irreparable damage to reputation and goodwill; (3) they will suffer nonrecoverable compliance costs; and (4) they will be harmed by "inconsistent judgments" from factfinders. None of these claims have merit.

LL34 does not mandate the specific substance of its required disclosures and there is absolutely no reading of LL34 that leads to the conclusion that it mandates that Plaintiffs turn over sensitive information related to their fraud detection and prevention measures.

Plaintiffs' claim of reputational damage misconstrues LL34 and is too speculative to establish irreparable harm. *See Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 10-Civ.-8976, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), aff'd, 468 F. App'x 43 (2d Cir. 2012). Plaintiffs allege that they will be compelled to restore access to Couriers who commit fraud (Pls.' Mem. at 27) and that the Notice Provisions will have a chilling effect on a customer's willingness to provide a rating or review (Pls.' Mem. at 28) to the detriment of Plaintiffs' reputations. These claims hinge on a chain of speculative inferences, based first on predictions

about LL34's effects on the Plaintiffs' deactivation practices; then about a neutral fact-finder's decision making; and finally, about potential downstream effects on corporate goodwill and reputation. Plaintiffs do not provide any explanation as to how or why LL34 "compels" Plaintiffs to provide platform access to fraudsters – it plainly does not. *See, e.g.,* AC § 20-1532(c). Further, Plaintiffs provide no evidence to substantiate their claim regarding a chilling of customers' speech and ignore that LL34 provides for the anonymization of customer complaints. AC § 20-1526(b). Harm must be "likely," rather than remote or speculative. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

As for the costs of compliance, "[a] monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation," which Plaintiffs have failed to do. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Moreover, "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).

Lastly, Plaintiffs seek to enjoin, not just enforcement of LL34, but implementation of all its provisions – even the ones not challenged here, and even as to companies that are not parties to this action. To the extent that this Court finds that a preliminary injunction is warranted, the Court should enjoin only the affected provisions as to Plaintiffs and allow the remainder of the law to go into effect. Whether an invalid portion of a local ordinance can be severed from the valid portions is a question of state law. *See Concerned Home Care Providers, Inc.*, 783 F.3d 88 (2d Cir. 2015). "Under New York law, a court should refrain from invalidating an entire statute when only portions of it are objectionable." *Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996). There is a presumption that lawmakers would prefer the sections of a law surviving after a portion is invalidated remain effective. *See Doyle v. Suffolk County*, 786 F.2d

523, 528 (2d Cir. 1986). And the Council's intent for invalid portions of its laws to be severed, with all remaining parts to stay in effect, is explicitly codified in local law. AC § 1-105.

## POINT III

## BALANCE OF THE EQUITIES TIPS IN THE CITY'S FAVOR.

Plaintiffs cannot show that the balance of equities weighs in their favor, and that a preliminary injunction is in the public interest. *See Winter,* 555 U.S. at 20. A court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[.]" *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020). This Court may deny the injunction if it fails on the balance of the equities, regardless of the merits or potential harm. *See Winter* 555 U.S. at 23.

The record demonstrates that unwarranted Courier deactivations negatively impact Couriers and the public at large. Couriers are harmed directly through the immediate loss of income, and the public is harmed through decreased street safety. The currently available remedies for Couriers are deficient and only available *after* deactivation, when the harm has already taken place. Enjoining LL34 will allow the inequities faced by Couriers to persist. In addition, the City suffers an irreparable injury when it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). LL34 addresses a real concern in the lives of vulnerable members of our community. And Plaintiffs acknowledge that they benefit from having Couriers on their platforms and consider deactivation to be a last resort. *See*, *e.g.*, Compl. ¶ 65. Yet, when commonsense measures are developed *with* input from Services to address these issues, Plaintiffs balk, alleging potential harms based on tenuous hypotheticals and a strained reading of LL34. The City's interest

in protecting Couriers and the public far outweighs the Plaintiffs' speculation about hypothetical harms.

## CONCLUSION

The City respectfully requests that this Court deny Plaintiffs' motion in its entirety, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
November 19, 2026

Steven Banks
Corporation Counsel of the City of New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007
(212) 356-2208

By: /s/
Karen Selvin
Scali Riggs
Connor Lie-Spahn

## WORD COUNT CERTIFICATION

According to Microsoft Word, the portions of this memorandum of law that must be included in a word count, pursuant to Local Civil Rule 7.1 and the Part's Individual Practices in Civil Cases, contain **11,095 words** (including footnotes), exclusive of cover page, table of contents, table of authorities, signature block, and this certification.

Dated: New York, New York
November 19, 2026

**STEVEN BANKS**
Corporation Counsel of the
City of New York
*Attorney for Defendant City of New York*
100 Church Street
New York, New York 10007
(212) 356-2208

By: ___/s/_____________________
Karen Selvin
Scali Riggs
Connor Lie-Spahn